# EXHIBIT 3



Deposition of:

## Judson Beedy

*December 17, 2020*

In the Matter of:

## Chisesi, Donna Vs. Hunady, Matthew, et al.

Veritext Legal Solutions

877.373.3660 | calendar-al@veritext.com | 800.808.4958

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF ALABAMA

3                   SOUTHERN DIVISION

4    _____

5    DONNA CHISESI, AS INDEPENDENT

6    ADMINISTRATRIX OF THE ESTATE OF

7    JONATHAN VICTOR, DECEASED,

8            Plaintiff,

9       v.                          Case No.

10   MATTHEW HUNADY, IN HIS INDIVIDUAL    1:19-CV-00221-C

11   CAPACITY, AS A BALDWIN COUNTY,

12   ALABAMA, SHERIFF'S DEPUTY, AND

13   HUEY HOSS MACK, IN HIS INDIVIDUAL

14   CAPACITY, AS THE SHERIFF OF

15   BALDWIN COUNTY, ALABAMA,

16            Defendants.

17   _____

18

19

20

21

22

23

24

25

1     VIDEOCONFERENCE DEPOSITION OF JUDSON BEEDY

2   DATE:          Thursday, December 17, 2010

3   TIME:          11:29 a.m.

4   LOCATION:      Remote Proceeding

5                  1502 West Highway 98

6                  Daphne, Alabama 36526

7   REPORTED BY:   Anya Javadi, Notary Public

8   JOB No.:       4380211

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    A P P E A R A N C E S
 2    ON BEHALF OF PLAINTIFF DONNA CHISESI, AS INDEPENDENT
 3    ADMINISTRATRIX OF THE ESTATE OF JONATHAN VICTOR,
 4    DECEASED:
 5         J. SAMUEL TENENBAUM, ESQUIRE (by videoconference)
 6         Bluhm Legal Clinic, Northwestern University
 7         Pritzker School of Law
 8         750 North Lake Shore Drive, Eighth Floor
 9         Chicago, IL 60611-3069
10         s-tenenbaum@law.northwestern.edu
11
12    ON BEHALF OF DEFENDANTS MATTHEW HUNADY, IN HIS
13    INDIVIDUAL CAPACITY, AS A BALDWIN COUNTY, ALABAMA,
14    SHERIFF'S DEPUTY, AND HUEY HOSS MACK, IN HIS
15    INDIVIDUAL CAPACITY, AS THE SHERIFF OF BALDWIN COUNTY,
16    ALABAMA:
17         J. RANDALL MCNEILL, ESQUIRE (by videoconference)
18         Webb & Eley
19         7475 Halcyon Pointe Drive
20         Montgomery, AL 36117-8053
21         wschaller@webbeley.com
22
23
24
25
```

1    ALSO PRESENT:

2         Donna Chisesi, Plaintiff (by videoconference)

3         Eric Hogrefe, Student (by videoconference)

4         Ellie Cohen, Student (by videoconference)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

EXAMINATION:                                    PAGE

    By Mr. Tenenbaum                            9

    By Mr. McNeill                              55

    By Mr. Tenenbaum                            70


                    E X H I B I T S

NO.                DESCRIPTION                  PAGE

Exhibit 1     Summary of statement of          57

              Donald Wayne Alumbaugh


                (*Exhibit attached.)

1                   P R O C E E D I N G S

2                   REPORTER:  Good afternoon.  My name is

3       Anya Javadi; I am the officer assigned by Veritext to

4       take the Zoom record of this proceeding.  I am a

5       Notary authorized to take acknowledgements and

6       administer oaths, and we are now on the record.

7                   This is the deposition of Jud Beedy

8       taken in the matter of Donna Chisesi, as independent

9       administrator of the Estate of Jonathan Victor,

10      deceased, vs. Matthew Hunady, in his individual

11      capacity as a Baldwin County, Alabama, Sheriff's

12      Deputy, and Huey Hoss Mack, in his individual

13      capacity, as the Sheriff of Baldwin County, Alabama.

14      The -- No. is 1:19-CV-00221-C.  Time -- I'm sorry, are

15      we expecting an Elli Cohen to join us?

16                  MR. MCNEILL:  Yes.  She's one of my

17      students also.

18                  REPORTER:  Okay.  Letting her in,

19      basically.  Okay.

20                  And the time is 11:29 a.m. on

21      December 17, 2020, at 1502 West Highway 98, Daphne,

22      Alabama 36526.

23                  Due to the pandemic and out of concern

24      for public and participant safety, parties agree that

25      I will swear in the witness remotely outside of his

1    presence.  Additionally, absent an objection on the

2    record before the witness is sworn, all parties and

3    the witness understand and agree that any certified

4    transcript produced from the recording virtually of

5    this proceeding:

6                         - is intended for all uses permitted

7                         under applicable procedural and

8                         evidentiary rules and laws in the same

9                         manner as a deposition recorded by

10                        stenographic means; and

11                        - shall constitute written stipulation

12                        of such.

13                   At this time will everyone appearing

14    remotely please identify yourself for the record.

15                   Mr. Tenenbaum, we'll start with you.

16                   MR. TENENBAUM:  Sam Tenenbaum, counsel

17    for the Plaintiff.

18                   MR. McNEILL:  Randy McNeill, counsel

19    for the Defendants.

20                   MR. BEEDY:  It's actually Judson,

21    J-U-D-S-O-N, Beedy, B-E-E-D-Y.

22                   REPORTER:  Okay.

23                   MR. BEEDY:  I'm the witness.

24                   REPORTER:  I apologize.  I will make

25    sure --

1                     MR. BEEDY:  That's okay.

2                     REPORTER:  -- I correct that.

3                     That was everyone who will be speaking

4    today, correct?

5                     MR. TENENBAUM:  Correct.

6                     REPORTER:  Everyone else is appearing.

7    Okay.  Thank you.

8                     Hearing no objection, I will now swear

9    in the witness.

10                    Please raise your right hand and state

11   your name for the record.

12                    MR. BEEDY:  Judson Beedy.

13   WHEREUPON,

14                         JUDSON BEEDY,

15   called as a witness, and having been first duly sworn

16   to tell the truth, the whole truth and nothing but the

17   truth, was examined and testified as follows:

18                    REPORTER:  Thank you.

19                    Counsel, you may proceed.

20                    MR. TENENBAUM:  Randy, usual

21   stipulations?

22                    MR. McNEILL:  Yes.

23                    MR. TENENBAUM:  Okay.

24   //

25   //

1                    EXAMINATION

2    BY MR. TENENBAUM:

3        Q    All right.  Is it still Captain Beedy?

4        A    It is.

5        Q    All right.  Good.  Could you tell us by whom

6    you're employed?

7        A    I'm employed by the City of Daphne at the

8    police department.

9        Q    All right.  And you're a captain in the

10   police department?

11       A    I am.

12       Q    All right.  And, generally, what are your

13   duties as a captain in the police department?

14       A    I supervise the patrol and detective

15   division within the department.

16       Q    Okay.  Can you tell us a little about your

17   background, educational and professional?

18       A    I graduated from University of South Alabama

19   with a criminal justice degree.  I went to work for a

20   naval station, Mobile, as a civilian police officer

21   for about nine months, and then I was hired with the

22   City of Daphne in 1994.  I've been here for 26 years.

23            I rose up through the ranks and now hold the

24   rank of captain.  I have been in the patrol division

25   and the detective division, and I rose through the

1    ranks.  I have attended numerous trainings to include

2    I'm a graduate of the FBI National Academy.  I

3    graduated from Force Science Institute on officer-

4    involved shooting.  I'm also a licensed -- in the

5    state of Alabama.

6                    MR. McNEILL:  And we just lost your

7    video.

8                    THE WITNESS:  I don't know if it's my

9    internet or what.  I will kind of watch that to make

10   sure if it goes off, I'll click it back on.

11                   MR. McNEILL:  Okay.  You came back on.

12   BY MR. TENENBAUM:

13        Q    All right.  Could you describe what the

14   training in officer-involved shootings was.

15        A    Well, Force Science -- are you familiar

16   with the Force Science Institute?

17        Q    No.

18        A    It's in Chicago.  It is an organization that

19   does scientific research into, basically, actions,

20   reactions, decision making during high-stress

21   situations, which is perfect for shootings or law

22   enforcement shootings.  It's a week -- it's a two-

23   week-long course with an exam at the end of it.

24                   I've also been involved -- I've also

25   attended other officer-involved shooting and internal

1    investigation classes over my career, especially when

2    I was a lieutenant over the detective division.  At

3    that point in time, I was also the supervisor over

4    internal affairs.

5         Q    Okay.  You also have a role with the Baldwin

6    County -- I think it's called Major Crimes Unit?

7         A    I used to.  I actually resigned from that

8    position about a year and a half ago, but at the time

9    of this incident I was an assistant commander with the

10   Baldwin County Major Crimes Unit.

11        Q    Okay.  And what is that unit?

12        A    It is a collection of experienced

13   investigators within Baldwin County.  Due to several

14   circumstances, which I'll be glad to give you my

15   opinion on those, the sheriff and the chiefs within

16   the county decided that we would -- excuse me -- no

17   longer going to contact the state of Alabama to

18   investigate officer-involved shootings and we were

19   kind of going to kind of do it on a local basis.

20             So we got some investigators from all or a

21   majority of the cities within Baldwin County.  Any

22   time there was a officer -- custody death --

23        Q    You broke up there for a minute.  Sorry.

24   You're going -- go ahead.

25        A    Hear me now?

1      Q     Now we can.

2      A     Whenever there was officer-involved

3  shooting, in-custody death or capital murder, you

4  know, Major Crimes Unit could be activated to

5  investigate it, which they get a lot of investigators

6  to one incident very quickly.

7      Q     And how does it become activated?

8      A     The chief of police or the sheriff or one of

9  their designees would contact the commander of the

10 unit.  The commander would decide whether or not it

11 was a viable case for the Major Crimes Unit, and that

12 would be approved by the board.  If the board approved

13 it, we would be activated.

14     Q     Okay.  And in 2017, who was the commander of

15 the unit?

16     A     Captain Steve Arthur with the Baldwin County

17 Sheriff's Department.

18     Q     And who made up the board in 2017?

19     A     There were, I believe, at the time six

20 chiefs and the sheriff.  Now, I'm not sure off the top

21 of my head because chiefs roll around a lot.

22     Q     Okay.

23     A     So new chiefs all around, so I don't want to

24 give names because I'm not sure I'd get them all

25 right.

1       Q     Not a concern.  Just wanted to have a

2    general idea of how that worked.

3            How did you become involved in the Victor

4    matter?

5       A     I was contacted by Captain Arthur with the

6    sheriff department.  I believe I was contacted by

7    Captain Arthur.  I was contacted by somebody that

8    there was an investigation.  And at the time, due to

9    conflict of interest, whatever agency was involved in

10   the incident, they would be excluded from

11   participating in the investigation.

12      Q     All right.  So none of their personnel would

13   be involved in the investigation?

14      A     Not once it got to a point.  This particular

15   case, I know some of the deputies that were on scene

16   began taking witness statements before the Major

17   Crimes Unit got activated and arrived on the scene.

18   But, yes, that was general practice unless we were

19   short of manpower.

20      Q     Okay.  Other than the on-the-scene

21   statements that some of the deputies took, did anybody

22   from the sheriff's department have any other role in

23   the investigation once you were activated?

24      A     Do you mind if I refer -- I have the case

25   notes here, the case file.

1      Q    Go ahead.

2      A    Do you mind if I refer to that?

3      A    No.  By the way, you know what?  And that

4  file has been produced in this case, correct?

5      A    I don't know.

6              MR. McNEILL:  It is correct.  I

7  produced it, because I got it from you guys, from the

8  Major Crimes Unit, made it to the SO and I did provide

9  it.

10             MR. TENENBAUM:  Right.

11  BY MR. TENENBAUM:

12      Q    Other than the case file, were there any

13  other documents related to the case that are not in

14  the case file?  Let's put it that way.

15      A    Not that I know of.

16      Q    Okay.  Was there ever a summary report put

17  together of the investigation?

18      A    There, there, there is a summary report of

19  the investigation, yes.

20      Q    And that's in the case file?

21      A    Yes, sir.

22      Q    Okay.  All right.  Do you remember when you

23  got activated?

24      A    You mean the time of the day or the date?

25      Q    Was it the day of the shooting?  Let's put

1   it that way.

2        A    It was.  It was.

3        Q    And were you put in charge of the

4   investigation?

5        A    I was.  I was the supervisor on scene.  The

6   way it worked was there was a commander, two assistant

7   commanders.  If the commander was not able to be part

8   of the investigation, one of the assistant commanders

9   would take over.

10       Q    All right.

11       A    The assistant commander would assign a case

12  agent, which would be another detective assigned to

13  the scene.  Where the commander would oversee the

14  whole investigation, the case agent would be the one

15  that would be responsible for collecting all the

16  paperwork, evidence-related paperwork, to put a case

17  file together.

18            So I was supervising -- I was the commander

19  on scene.

20       Q    All right.  And the reason you were the

21  commander is because the sheriff's department was

22  involved in the shooting?

23       A    Correct.

24       Q    Okay.  And were you able to recover all the

25  body cams?

1     A    As far as I know, yes.

2     Q    And would that have been in the case file as

3  well?

4     A    I'm not sure.  I mean, I would assume.  I

5  don't know what you have.  I mean, I have body cam

6  video -- no, actually, I don't even know if I have

7  copies of the videos here.  I think I just have copies

8  of pictures.  I don't think I have the videos here, so

9  I don't know what's been provided to you.

10    Q    Okay.  All right.  Would you describe the

11  steps you took in connection with the investigation?

12    A    Well, it's probably about a 30-minute drive

13  from our residence, which is where I left from.  So on

14  the way out there -- which, actually, it had shut

15  down, I-10, so it took me a little bit longer to get

16  out there.  I knew I was going to meet a couple crime

17  scene investigators, and I knew I was going to meet at

18  least three or four or five investigators.

19       So on the way out there I was attempting to

20  contact investigators to get them headed to the scene.

21    Q    Okay.  And how many people did you contact?

22    A    I think we ended up with eight.

23    Q    All right.  Do you have their names?

24    A    Five, six, seven, eight -- nine.  Well, nine

25  including me.

1        I do.  Do you want them?

2    Q    Sure.

3    A    Chad Lambert with Gulf Shores Police

4 Department.

5    Q    Go ahead.

6    A    Is anybody writing -- you just want me to

7 say them?

8    Q    Yeah, you can say them.  The court reporter

9 is getting it all down.

10    A    I got you.

11        Jason Woodruff with Gulf Shores Police

12 Department, Bill Collins with Gulf Shores Police

13 Department, Glenn Hartenstein with Foley Police

14 Department, Rex Bishop with Robertsdale Police

15 Department, Jim Rivers with Daphne Police Department.

16        Just to let you know, Jim Rivers was our

17 evidence -- over the evidence, the crime scene.

18        Rob Palmer with Orange Beach Police

19 Department, and Lisa Johnson with Orange Beach Police

20 Department.

21    Q    Okay.  About what time did you arrive on the

22 scene?

23    A    I must have got there about 6:00 or 6:30 in

24 the evening, I think.  Maybe a little bit later than

25 that.  That might have been when it was -- it was

1    probably about -- it might have been a little bit

2    later.  Maybe around 7:00.

3        Q    All right.

4        A    We got contacted about 6:00 and it took me a

5    while to get out there.

6        Q    All right.  Was Mr. Victor's body still

7    there?  Had he been taken to the hospital when you

8    arrived?

9        A    He was not there when I arrived.

10       Q    Okay.  What did you do when you arrived?

11       A    I got a briefing on what had happened from

12   Steve Arthur with the sheriff's department.

13       Q    All right.

14       A    And then I began to make a list of tasks

15   that needed to get accomplished.

16       Q    All right.  What did Mr. Arthur tell you?

17       A    He said that the -- and I'm not sure if it's

18   -- there was a volunteer fire department that had

19   responded to a single-vehicle accident where somebody

20   was stuck in the ditch.  There was an ambulance -- at

21   least one ambulance on scene.  They attempted to get

22   the subject out of the car.

23            I'm sorry.  Let me stop my phone.  I didn't

24   know it was still on.  There you go.

25            They attempted to get him and help him get

1   out of the car.  They were not able to.  They noticed

2   that he had some blood on him and was fidgeting with

3   something in the front seat of the car, is when they

4   called the Baldwin County Sheriff's Department to come

5   out and assist them.

6           Q    Okay.  Did you speak to --

7           A    I apologize.  My audio and video keep going

8   out, but I will keep trying to turn it back on.

9           Q    It's okay.  It's part of dealing with the

10  technology.  We get it --

11          A    Yes.

12          Q    -- believe me.

13               Did you speak with Corporal Hunady at that

14  time?

15          A    No, sir.

16          Q    Do you know if anybody took a statement from

17  him at that time?

18          A    I think somebody took a statement from him.

19  We did not take one there at the scene.

20          Q    Okay.  And is his statement in the file?

21          A    I believe there's an investigator narrative

22  of it in the file.  I don't know -- I don't remember

23  if he did a -- and I can take a few minutes and look

24  if you would like, if he actually did a witness

25  statement or not.

1          I don't see it lumped in with the rest of

2     the deputies' statements.

3          Q    All right.  Do you know if at any time

4     Corporal Hunady asserted his rights under the Fifth

5     Amendment?

6          A    Now that you say that, I'm wondering in this

7     case if he did.

8               MR. McNEILL:  Object to form.

9               THE WITNESS:  Sorry?

10    BY MR. TENENBAUM:

11         Q    That's all right.  Randy made an objection.

12              MR. TENENBAUM:  He can answer over it,

13    right, Randy?

14              MR. McNEILL:  Yes, he can answer over

15    the --

16              THE WITNESS:  I'm not seeing the

17    statement by Officer Hunady, so --

18    BY MR. TENENBAUM:

19         Q    Okay.

20         A    -- I was not expecting that question.  He

21    very well might have invoked his right to --

22         Q    The Baldwin County's Sheriff's Department

23    itself conducted an internal affairs investigation.

24    Did you have any communications with them about that?

25         A    No.

1    Q    Did they ever provide you with their file?

2    A    No, sir.  And I think you know that Baldwin

3    County Major Crimes Unit was just there to investigate

4    whether a crime was committed, not if any internal

5    violations were done.

6    Q    Right.  Okay.  Who were they trying to

7    determine had committed a crime?

8    A    Whether anybody did.

9    Q    Was there a determination made as to whether

10   Mr. Victor had committed a crime?

11   A    The case was presented to the Baldwin County

12   grand jury, and they did not return a true bill.

13   Q    And how did --

14   A    I can answer that question --

15   Q    All right.

16   A    -- but there, there was, there was no true

17   bill.

18   Q    Was there a recommendation made by -- you

19   make recommendations?

20   A    I didn't present it to the grand jury, so I

21   don't know if a recommendation was made or not.

22   Q    In your summary report, did you --

23   A    There's no -- there's no recommendation in

24   the summary report.  It's just --

25   Q    So your role is really to put together all

1  the facts and then you then, what, turn it over to the

2  district attorney's office?

3      A    Correct.

4      Q    How long did your investigation last for?

5      A    Oh, well, totally, once you get all the

6  evidence and forensics and autopsies back, I mean,

7  it's three or four months.

8      Q    Okay.  And you supervised the entire

9  process, correct?

10     A    Yes, sir.

11     Q    Did you do any investigation of Mr. Victor's

12  background?

13     A    I didn't personally, but some was done.

14     Q    Did anyone investigate his medical history?

15     A    I think we tried to get some of his medical

16  history.  We got some information, but I don't know

17  that the out-of-state subpoenas were ever complied

18  with.

19     Q    Now, there's no question that Corporal

20  Hunady -- he was a corporal at the time -- shot

21  Mr. Victor, is there?

22     A    No, sir.

23     Q    Mr. Victor died of the gunshot wounds?

24     A    Yes, sir.

25     Q    Mr. Victor did not have a weapon in his

1  possession, did he?

2      A    He did not have a firearm, yes, sir.

3      Q    Have any other kind of weapon?

4      A    Not that you would consider a typical

5  weapon.

6      Q    How about an atypical weapon?

7      A    Well, I mean, scissors and hammers and all

8  that kind of stuff.  So there was a lot of stuff

9  recovered from his vehicle, but he did not have what

10  you would typically consider a weapon.

11      Q    Did you recover a hammer?

12      A    No, we did not.

13      Q    Okay.  There was a scissors, right?

14      A    Correct.

15      Q    Was it a pretty small scissors?

16      A    Yes.

17      Q    All right.  It wasn't a big set of shears or

18  anything like that?

19      A    Correct.

20      Q    Did you find any drugs in the vehicle or on

21  Mr. Victor's person?

22      A    No, sir.  I question whether on his person

23  because he went to the hospital and we really didn't

24  have time to search his person.  So I will say no

25  because there was no reported that any were found --

```
 1        Q    Okay.

 2        A    -- but I don't want to say there wasn't.

 3        Q    Was any alcohol found?

 4        A    No, sir.

 5        Q    The car Mr. Victor was driving was not a

 6   stolen vehicle, was it?

 7        A    No, sir.

 8        Q    At no time did Mr. Victor in fact use a

 9   weapon?

10        A    No, sir.

11        Q    At the time did Mr. Victor have any warrants

12   out for his arrest?

13        A    No, sir.

14        Q    At the time or immediately prior thereto had

15   Mr. Victor committed a crime?

16        A    Not that I'm aware of.

17        Q    Was Mr. Victor fleeing the scene of a crime?

18        A    Not that I'm aware of.

19        Q    Are you aware of him being wanted for any

20   crime?

21        A    No, sir.

22        Q    Did you personally review the videotapes?

23        A    I did.

24        Q    Okay.

25        A    Not all of them but most of them, because a
```

1    lot of them were with -- the deputies were laying on

2    the ground and their body camera is right here.  A lot

3    of it was blackness.

4        Q    Right.  But you could hear what was said,

5    right?

6        A    Yes, sir.

7        Q    To some extent.  I mean, there may have

8    been --

9        A    To some extent.  Sometimes those microphones

10   get muffled, also.

11       Q    All right.  Especially if they're on the

12   ground?

13       A    Yes, sir.

14       Q    All right.  Did you ever hear any of the

15   officers present, including Corporal Hunady, tell

16   Mr. Victor to drop his weapon?

17       A    Yes, sir.

18       Q    Who said that?

19       A    Corporal Hunady said it.

20       Q    He used the term "weapon"?

21       A    I don't know if he used "weapon" or if he

22   said "Drop" -- just "Drop it."

23       Q    All right.

24       A    I'm not sure off the top of my head the

25   exact verbiage.  But he did try and instruct him to,

1    yeah, put it down.

2         Q    All right.  Can you describe what he wanted

3    Mr. Victor to drop, as opposed to just saying, "Drop

4    it"?

5         A    He did not.  He just said, "Drop it" --

6         Q    Okay.

7         A    -- is what I remember.

8         Q    All right.  Prior to Corporal Hunady firing

9    his weapon, did he tell Mr. Victor, If you don't drop

10   it, I'm going to shoot?

11        A    I don't remember that statement.  I don't

12   want to say it didn't happen.

13        Q    Do you know the type of weapon that

14   Corporal Hunady used?

15        A    It was an AR style rifle.

16        Q    All right.

17        A    I don't remember the exact weapon.

18        Q    All right.  Did you yourself take a look at

19   the weapon?

20        A    I did not, actually.  That was our evidence

21   person who was responsible for collecting all the

22   weapons from the deputies at the scene to be given to

23   forensics for examination.

24        Q    Okay.  Do you know if the weapon was what's

25   known as a smart -- are you familiar with the term

1  "smart weapon"?

2       A    No, sir.

3       Q    It has some kind of computer control in it.

4       A    I'm familiar -- I have seen some of that

5  stuff where it's kind of a safety where a fingerprint

6  or something has to be established in order for the

7  weapon to function.  So I'm familiar somewhat with --

8  if that's what you're talking about, smart weapons?

9       Q    Right.

10      A    What was requested?  I'm sorry.

11      Q    Do you know if Mr. Hunady's weapon was a

12 smart weapon?

13      A    I'm pretty sure it was not.

14      Q    Okay.  Do you know if Corporal Hunady, when

15 he fired -- if the gun was an automatic or if he had

16 to pull the trigger the number of times that he fired?

17      A    I do not believe it was on automatic.

18      Q    Were you able to determine how far

19 Corporal Hunady was from Mr. Victor when he fired his

20 weapon?

21      A    He determined it was between 8 and 10 feet.

22      Q    All right.  Now, did you look into

23 Corporal Hunady's background?

24      A    What --

25      Q    In terms of his ability with a weapon.

1      A    No, sir.  That's more of an internal thing

2  than a criminal act.

3      Q    Did you know that he was on their SWAT team

4  and was --

5      A    I did know he was on their SWAT team.

6      Q    And he was experienced with firearms; in

7  fact, had been a Top Gun at some point?

8      Q    I didn't know that, but just because Baldwin

9  County, the law enforcement, works so closely together

10  we all kind of know each other, so I, I guess I did

11  know those -- I didn't know that he was a marksman or

12  -- I did know he was on the SWAT team.  And typically

13  SWAT operators get a lot more time and practice with

14  weapons.

15      Q    All right.  Now, in terms of training, are

16  officers trained to shoot at a center mass?

17      A    I'm not sure what the Baldwin County

18  Sheriff's Department trains on.  That is typical of

19  most law enforcement that I've ever come in contact

20  with.

21      Q    All right.

22      A    It's more of an internal thing than a

23  criminal matter.

24      Q    All right.  Did you ever determine why, from

25  8 to 10 feet, Corporal Hunady was -- didn't hit

1    Mr. Victor's center mass but, rather, hit his lower
2    extremities?
3         A    No.  Again, that's not really something we
4    were responsible for looking into.
5         Q    What was the condition of the ground when
6    you got there?  Was it wet, soggy?
7         A    It was -- of course, we were on the
8    interstate --
9         Q    Right.
10        A    -- so by the time I had gotten there, the
11   interstate had dried, the actual asphalt had dried.
12   But, yes, the grass just adjacent to the interstate
13   and the ditch and where the car was, it, it, it -- a
14   large southern afternoon rainstorm had just come
15   through there.
16        Q    All right.  And does that mean that the
17   ground was wet?
18        A    Yes.
19        Q    The ground was --
20        A    It was wet.
21        Q    -- wet?
22        A    Yes.
23        Q    The ground was soggy?
24        A    Yes.  There was water -- standing water in
25   the ditch.

1     Q    Okay.  Was it difficult to walk around in

2     it?

3     A    Once you got to the standing water in the

4     ditch, it was; but, no, prior to that it wasn't.

5     Q    Okay.  Did you yourself interview any of the

6     witnesses?

7     A    No, sir.

8     Q    Who was the first witness to say that

9     Mr. Victor might have a weapon?

10    A    The first one that said it or the first one

11    that -- I guess I don't understand the question.

12    Because we interviewed witnesses as we came across

13    them.

14    Q    Right.

15    A    So the last one that said it might not be

16    the first one that seen it.  So I just want to make

17    sure I answer your question.

18    Q    Let's go back to first one who claimed they

19    had seen a weapon -- something that might be a weapon.

20    A    No, I think it was pretty much all about the

21    same time as the deputies were trying to get him --

22    well, once he exited the vehicle.

23    Q    Okay.  But --

24    A    I think they were suspicious of it already

25    because they had information that there was blood in

1    the car --

2         Q    Right.

3         A    -- and he was fumbling with something in the

4    front seat.

5         Q    Okay.  Prior to him exiting the car, are you

6    aware of anyone who had said that he had a gun?

7         A    No, sir.

8         Q    Did anyone after he exited the vehicle say

9    that they saw a gun?

10        A    No, sir.

11        Q    Did you review the 9-1-1 tapes?

12        A    I did not personally.

13        Q    All right.  There was a report in those

14   tapes that someone had claimed that there was a weapon

15   prior to him exiting the vehicle.  Were you able to

16   determine who said that, that was the basis of that

17   report?

18        A    No, sir.  I mean, we could have.  I don't

19   remember off the top of my head.  But that closely

20   aligns with, possibly, the fire department or the

21   ambulance that was out there when they saw him

22   fumbling with something.  They could have reported

23   that as a caution to the deputies arriving.

24        Q    Did you hear the portion of the tape where

25   Corporal Hunady stated that Mr. Victor supposedly had

1  a weapon?

2      A    I vaguely remember that part of the tape.  I

3  think it was more a reference to when he exited the

4  car he assumed he had a weapon.  So possibly had one,

5  assumed one; I'm not sure of the exact verbiage off

6  the top of my head.

7      Q    Prior to firing his weapon, did you

8  determine whether Corporal Hunady actually saw a

9  weapon?

10     A    He did not.

11     Q    There were other deputies there who had

12 their guns drawn, correct?

13     A    Correct.

14     Q    Do you remember how many there were,

15 approximately?

16     A    I can tell you.  I think there was six.

17 One, two, three, four, five, six, seven -- eight.

18     Q    Eight sheriff's department deputies?

19     A    I believe so, yes.

20     Q    All right.  Can you list their names for me,

21 please?

22     A    Ben Burke -- see who's on the list -- Daniel

23 Middleton, Nathan Lusk, Zachary Dinkins, Andrew

24 Harvell, Erik Vonbergen, John Gardner, and Stephanie

25 Clinkerton [ph].

1    Q    Okay.  Did any of them fire their weapon?

2    A    No, sir.

3    Q    Are you aware of any commands they had given

4    Mr. Victor?

5    A    I think Corporal Hunady was the one giving

6    the commands since he was in the position closest to

7    the vehicle.

8    Q    Did you examine the vehicle when you were

9    there?

10   A    I didn't examine it.  I did look into it and

11   briefly looked through it.  I didn't want to mess up

12   the crime scene for my crime scene investigators.

13   Q    Were you able to look into the vehicle?

14   A    I was.

15   Q    Okay.  And you could see what was on the

16   seat?

17   A    Yeah.  Yes.

18   Q    Or the back seat?

19   A    I mean, you could see some of it, and some

20   stuff was covered up.  I didn't go through it, by any

21   means.  So I could see through the windows and see

22   what was -- you know, general condition of the

23   vehicle.

24   Q    Okay.  I just want to go back; I want to

25   clear up one thing.  Who called you and told you you

1    were going to be in charge of the investigation?

2         A     I'm, I'm 99 percent sure it was

3    Captain Arthur with the Baldwin County Sheriff's

4    Department.

5         Q     Okay.  In Mr. Victor's background, did you

6    determine whether -- were made aware of any mental

7    problems that he had had prior to the incident?

8         A     I was -- I was made aware that there could

9    have been mental problems in his background and he was

10   possibly not taking his medicine correctly.  But,

11   again, I don't know that we ever got any concrete

12   information to that effect.

13        Q     Who told you that?

14        A     I believe --  we called the sheriff's

15   department where he lived to try and get someone to

16   notify the family and get in touch with them.  And I

17   believe we heard it from the deputy that was going

18   over there.

19        Q     Okay.  Do you know what kind of medication

20   he was supposedly on?

21        A     No, sir.

22        Q     About how many officer-involved shootings

23   have you been involved in?

24        A     Well, none that I've been involved in --

25        Q     I don't mean where you shot someone.

1    A    Okay.

2    Q    I mean that you investigated.

3    A    I've investigated probably 17 or 18.

4    Q    Okay.  Were you the first one from the Major

5    Crimes Unit to arrive on the scene?

6    A    If I wasn't the first one, I was the second

7    one.

8    Q    Okay.

9    A    Rex Bishop works for a department that is

10   about 10 minutes from where it happened, and he was

11   one of the investigators on scene.  And he very well

12   could have arrived before -- prior to me.

13   Q    Okay.  Did you have a photographer on the

14   scene?

15   A    Our crime scene person responsible for

16   overseeing the crime scene is our photographer also.

17   Q    Right.  They took a number of photographs

18   and I think we've seen those.

19   A    Yes, sir.

20   Q    Did they also do videotapes?

21   A    I don't think they videotaped it.

22   Q    Okay.  What other kind of physical evidence

23   did they accumulate?

24   A    Well, we collected all the weapons that were

25   at the scene.  I know that --

1     Q    Well, but when you say "all the weapons,"
2  you mean from all the deputies?
3     A    Yes, sir.
4     Q    Okay.
5     A    We wanted to make sure that -- what weapons
6  were fired and what weapons weren't fired.
7     Q    All right.  And the only one that was fired
8  was Corporal Hunady's?
9     A    Correct.
10    Q    All right.
11    A    Of course, we collected a lot of evidence
12  from the vehicle.
13    Q    Okay.
14    A    We collected a lot of casings from the spent
15  rounds.  You know, we collected body cam video.  So --
16    Q    You got the body cam videos right on the
17  spot?
18    A    Oh, no, sir.  Those have to be taken back to
19  the sheriff's department where they are downloaded
20  into a computer system, and then we have to retrieve
21  them from that.
22    Q    Okay.
23    A    I thought you meant in general.
24    Q    Oh, no.  No.  Go ahead.  Keep going, though,
25  in general.

1     A    Yeah.  We collected numerous amounts of

2  evidence.

3     Q    All right.  Do you know who Donald Alumbaugh

4  is?

5     A    Not off the top of my head.

6     Q    He was one of the civilians on the scene.

7     A    Okay.

8     Q    Were you made aware that Mr. Alumbaugh had

9  spoken to Mr. Victor, told him to wrap his bloody

10  hands in his jacket?

11     A    I don't remember that one.  I'm not saying

12  that it didn't happen, but I don't remember that.  I

13  know we collected some video from some civilians that

14  were there, and I know we interviewed, I think, about

15  six or eight cars back from where it happened -- when

16  it happened.

17     Q    Were you able to determine who

18  Corporal Hunady had spoken to when he arrived on the

19  scene?

20     A    No, sir.  Not to say that we couldn't, but,

21  no, I don't remember finding that out.

22     Q    All right.  How about what Corporal Hunady

23  was told when he arrived on the scene?

24     A    I think that came through dispatch, which we

25  have the dispatch calls.  I think they were instructed

1  to assist the fire department and the ambulance out

2  there with a single-car vehicle and a person that was

3  in the vehicle that they couldn't get to respond.

4      Q    All right.  Aside from dispatch, do you know

5  what preliminary inquiries Corporal Hunady made when

6  he arrived on the scene?

7      A    I don't know that there was necessarily an

8  inquiry that anybody made.  I think they were pretty

9  well informed of what they were getting called to.

10  And when they got there, of course, I think they took

11  up positions to assess what was going on.  And I think

12  all of them did that as they were arriving.

13         I don't think there was, necessarily, a

14  briefing like I would have gotten when I got there.

15      Q    Okay.  Did anyone report that Mr. Victor had

16  discharged a weapon at them?

17      A    No, sir.

18      Q    Did anyone report that Mr. Victor had

19  pointed a weapon at them and threatened them?

20      A    No, not that I'm aware of.

21      Q    Did you hear someone from 911 tell the

22  paramedics to back off and not to call the sheriff's

23  department because they didn't want to escalate the

24  event?

25      A    I'm not aware of that.

1      Q    Now, were you made aware that Mr. Victor had

2  exited on the passenger side?  Right?

3      A    Yes, sir.

4      Q    About how deep was the standing water at

5  that point, if you recall?

6      A    Once he exited his vehicle, once he stepped

7  out, it probably got dry pretty quickly because the

8  ditches are -- as you can see, the ditches are fairly

9  small, I will say, and his vehicle was in the ditch.

10  So by the time he stepped out of the vehicle he was on

11  the drier ground.

12      Q    It was still wet?

13      A    Oh, yes.

14      Q    And was the ground muddy?

15      A    I wouldn't say muddy.

16      Q    It wasn't perfectly dry, was it?

17      A    Correct.

18      Q    Now, Corporal Hunady's body cam, you never

19  see -- from his body cam, you don't see Mr. Victor

20  exiting the vehicle or approaching Corporal Hunady,

21  correct?

22      A    Not from his body cam --

23      Q    I'm talking about his body cam.

24      A    Because of the way he's turning, yes.

25      Q    All right.

1      A     You did not see Mr. Victor exiting the

2   vehicle.

3      Q     That's because he was behind the fire truck?

4      A     Correct.

5      Q     Is that kind of a large, standard size fire

6   truck?

7      A     Yes, sir.

8      Q     If there was a concern about the weapons, do

9   you know why the paramedics and other personnel

10  were -- from the videos were walking around in the

11  area behind the vehicles?

12     A     I can't answer for them or what their

13  reaction were at the time.

14     Q     Well, if you wanted to ensure everyone's

15  safety, would that have been a good way to handle

16  things?

17     A     It could have been, but I think they were

18  also concerned for, for, for the person in the car and

19  they wanted to get to him as quickly as possible.  I

20  don't think there was necessarily concern there was a

21  weapon at that point in time.  I think that was just

22  information they had received and were trying to

23  determine that.

24     Q     Okay.  Aside from the guns, did you also

25  take possession of any other weapons that the other

1    sheriff's officers might have had on them, such as

2    tasers?

3         A    No, sir.

4         Q    And was that because there had just been a

5    shooting and you wanted to just see what happened with

6    respect to the guns as opposed to any other weapons

7    they might have?

8         A    Well, yeah, there was no report of a taser

9    deployment, there was no report of any kind of less

10   than lethal force deployed at the scene.  So, again,

11   for strictly investigating a criminal matter, it

12   really wasn't under our responsibility.

13        Q    Were you able to determine if

14   Corporal Hunady ever backed up away from the fire

15   truck?

16        A    I don't believe he ever backed up from the

17   fire truck.  I think once he took his position there,

18   he stayed there.

19        Q    Now, on the autopsy they determined that

20   Mr. Victor had ketamine in his body, correct?

21        A    Correct.

22        Q    All right.  Did you become aware at some

23   point that the paramedics, when they were trying to

24   save his life, had injected him with ketamine?

25        A    I don't -- I was not aware of that.  My

1    understanding was that nobody touched Mr. Victor.  He

2    would not exit the vehicle or respond to them.

3        Q    No --

4        A    It was done in the helicopter on the ride to

5    the hospital or once he got to the hospital.

6        Q    What about when he was on the ground?  Would

7    the paramedics have injected him with ketamine?

8        A    I, I don't know.  I, I, I don't know that.

9    I'm not saying they didn't.  But, again, that really

10    wasn't our responsibility in investigating whether or

11    not a crime was committed.

12        Q    So in trying to determine if a crime was

13    committed, were you mainly focused on whether Corporal

14    Hunady had committed a crime?

15        A    Whether any deputies had used an excessive

16    amount of force, which would constitute a crime.

17        Q    All right.  Do you know if there had been

18    any other accidents near I-10 that day?

19        A    No, I, I don't know.  I didn't look.  No, I

20    didn't look into that.

21        Q    Have you had any discussions with

22    Mr. McNeill or anyone from his office?

23        A    No, sir.

24        Q    And other than trying to straighten up the

25    court reporter problem yesterday, you haven't had any

1    discussions with me, have you?

2         A    No, I have not.

3         Q    Did you have any discussions with

4    Sheriff Mack about your investigation?

5         A    Yes.

6         Q    All right.  When was the first of those?

7         A    Well, he was there that night.

8         Q    So you talked to him on the scene?

9         A    I did.

10        Q    All right.  What did you say to him and what

11   did he say to you?

12        A    He -- it was pretty much are you aware of --

13   have you been briefed on the case, and I said, "Yes, I

14   have been."  And he said, "You are in charge as the

15   commander due to the protocol of the Major Crimes

16   Unit," and he went about his business and I went about

17   mine.  I did -- I don't know that I actually talked to

18   him.

19             I did coordinate with their office and get

20   him the copies of the body cam videos and whatnot

21   through the investigation as we needed.  And then, of

22   course, we did notify him at the end of the

23   investigation that the case was going to be turned

24   over to the district attorney's office.

25        Q    Okay.  Does the major crimes unit have the

1    option of not bothering to turn it over to the

2    district attorney after it completes its investigation

3    or do you always do that?

4        A    All unintended deaths in the state of

5    Alabama, by law, have to go to a grand jury.

6        Q    Right.  And --

7        A    So, yes, we would have to turn it over.

8        Q    Okay.  I think you mentioned that there was

9    a change from having the State do the investigation to

10   having local, you know, authorities form their own

11   group?

12       A    Yes, sir.

13       Q    What was the reason for that change?

14       A    The State is very shorthanded and very --

15   not well funded.  There was a particular -- several

16   years prior to this case there was another officer-

17   involved shooting in this county, and it took the

18   state 18 months to present it to a grand jury.  And it

19   was at that point that, you know, we didn't think that

20   was fair to all parties involved -- the victim, the

21   family, and the law enforcement -- to have a case be

22   extended that long.

23       Q    In your investigation, did any of the

24   persons there -- leave Corporal Hunady aside -- advise

25   your investigators that Mr. Victor had threatened

1   them?

2       A   I'm sorry, you confused me on that one.  Did

3   anybody take him aside and tell --

4       Q   No, no, no.  No, no, no.  My question is,

5   did any of the other people who were on the scene --

6   all right, civilian witnesses, other sheriff's

7   officers, EMS people -- say that Mr. Victor had

8   threatened them?

9       A   No.

10      Q   You may have answered this.  And nobody said

11  that Mr. Victor had pointed a gun at them, correct?

12      A   Correct.

13      Q   Now, Mr. Victor had acted in an agitated

14  state.  Is that a fair statement?

15      A   I wouldn't say it was unfair.  Confused

16  state at first, maybe.

17      Q   Okay.  Had he barricaded himself in the

18  vehicle?

19      A   What do you mean by "barricaded"?  I mean,

20  he locked himself in and wouldn't answer -- wouldn't

21  answer any of the emergency personnel that were there.

22      Q   He wouldn't open the door to let them help

23  him, right?

24      A   Correct.

25      Q   He didn't come out --

1    A    Correct.

2    Q    -- till later?

3    A    Yes.

4    Q    Do you know if anyone told Corporal Hunady

5    that they were concerned about Mr. Victor's mental

6    state?

7    A    I'm not aware that anybody told him that.

8    Q    Do you know what steps the sheriff's

9    department took to secure the scene to make sure that

10    the people who were there were safe when they arrived?

11    A    No, I don't know what steps they took.  Of

12    course, this is a pretty isolated area.  There's

13    really nothing out there, so -- besides the people

14    that were, you know, stopped in traffic and the few

15    emergency personnel that were there.  It's not like

16    there was a lot of people around.

17    Q    Do you know how the vehicle got stopped

18    after it came off the road?  Did it --

19    A    It got stuck in the ditch.

20    Q    It got stuck.  All right.  And I assume it

21    had to be towed out of there?

22    A    Yes, sir.

23    Q    Did you take possession of the vehicle or

24    did someone?  You did.  I mean --

25    A    No.

1      Q    When I say "you," I mean your agency.

2      A    No.  The Baldwin County Major Crimes Unit

3  took possession of the vehicle.  But my crime scene

4  investigators were done with the vehicle by the time

5  it had left there, so we did not keep it for very long

6  because there was no reason for us to keep that

7  vehicle for an extended period of time.  We had gotten

8  all the evidence that we needed from it.

9      Q    All right.  Are you aware of any training

10  that's provided with respect to barricaded persons?

11      A    There is a lot of training in law

12  enforcement on barricaded personnel.

13      Q    And how they're supposed to handle it?

14      A    Yes, sir.

15      Q    All right.  And, generally, how are they

16  supposed to deal with a situation where someone's

17  barricaded?

18      A    Well, the times have changed.  But,

19  typically, you would call some kind of negotiator or

20  somebody to de-escalate the situation and to -- time

21  is on your side if there is no aggressive action.

22      Q    Okay.  And Mr. Victor before he exited the

23  vehicle hadn't taken -- other than locking himself in

24  and barricaded himself, he hadn't taken any aggressive

25  action, had he?

1      A      Well, it had been reported that there was

2 blood all over him, so he might have been taking

3 aggressive action towards himself.

4      Q      Okay.  Now, you mentioned negotiator.  Did

5 you determine why a negotiator -- Baldwin County

6 Sheriff's Department actually has a negotiations team,

7 correct?

8      A      They do.

9      Q      Did you determine why that team was not

10 called out?

11      A      I did not.  Again, that's an internal thing

12 that they would have to, really, do.  It really didn't

13 concern whether or not a crime was committed.

14      Q      Do you know if the sheriff's department

15 receives training -- are you familiar with the concept

16 of suicide by cop?

17      A      I am.

18      Q      And do you know if people in the sheriff's

19 department receive training in that?

20      A      I don't know what training their officers

21 have been through.  I would be surprised if none of

22 them have been through it, but I don't know of any

23 there that day that have actually been to it.

24      Q      Okay.  Do you remember who determined after

25 the shooting that Mr. Victor in fact did not have a

1  weapon?  Who was the first one?

2      A    I don't.  I know there was several that went

3  up to the vehicle and secured the vehicle and started

4  medical help with the ambulance, the EMS that was

5  there.  I don't know who actually finally made the

6  determination that there was no weapon.

7      Q    Did you have discussions with Ms. Chisesi or

8  any other members of the family directly?

9      A    I did not.

10     Q    Do you have a procedure where you provide

11  updates to the family of someone who may have been the

12  victim of an excessive force situation?

13     A    There's no procedure as in written down on

14  how to handle it.  Every situation is different, every

15  family is different.  So it's really hard to write a

16  procedure on that because you never know how that's

17  going to go.

18     Q    Were any updates given to the family?

19     A    I believe -- yeah, I believe the sheriff

20  talked to some family member that evening.  I believe

21  he tried to keep in touch with them until it got to a

22  point where that was -- I don't want to say

23  confrontational, but not -- no longer friendly.

24     Q    Did you and your agency that was doing its

25  investigation provide updates to the family?

1      A    I think we -- I don't think we did.

2      Q    Why not?

3      A    Because the sheriff was handling that at the

4   time.

5      Q    Was the sheriff at that point in some kind

6   of conflict situation?

7      A    I don't believe so because I don't believe

8   he was necessarily updating the family on the criminal

9   investigation.  I think he was just trying to keep in

10  touch with them.  If they had any questions, he would

11  try and get them answered for them.  So I don't

12  believe it was a conflict because he had no -- he had

13  no control over what we were doing in the criminal

14  investigation.

15     Q    Right.  And you weren't giving him updates

16  on your investigation, were you?

17     A    No, sir, not until it was time to be

18  presented to the district attorney's office for a

19  presentation to the grand jury.

20     Q    And the reason for that, as I understand it,

21  is because his department was involved, right?

22     A    Correct.

23     Q    Okay.  Of all the videos, which one do you

24  believe gives the clearest picture of what happened at

25  the scene?

1      A    Well, it's the video from the officer that

2    was the back of the fire truck.  Now, which one --

3    which deputy that was, I'm not sure off the top of my

4    head.

5      Q    But there aren't any videos, as I recall --

6    I've looked -- of what happened once Mr. Victor got to

7    a position where the fire truck was blocking --

8      A    Correct.

9      Q    -- him?  Is that right?

10     A    Yes.

11     Q    So there are no videos of the actual

12   shooting, is that correct?

13     A    There is sound.

14     Q    There's sounds.

15     A    There's no -- there's no viewable media

16   where it actually captured that.

17     Q    Was Mr. Victor -- when he exited the

18   vehicle, was he walking toward the Deputy Hunady?

19     A    I don't believe he was initially.  I think

20   he paused for a brief moment and then he began to

21   approach the deputy.

22     Q    In a walk, as opposed to running toward him?

23     A    He, he did not run.  Yes, a walk.

24            MR. TENENBAUM:  Randy, we've been going

25   about an hour.  Can we take a five-minute break?

1           MR. McNEILL:  Sure.

2           MR. TENENBAUM:  Okay.  And, Anya, could

3     you set up a breakout room?

4           REPORTER:  Yes.  Give me one second.

5           We are going off the record at 12:28.

6           (Off the record.)

7           REPORTER:  Okay.  We are back on the

8     record at 12:41 p.m.

9     BY MR. TENENBAUM:

10         Q    Did you determine what Mr. Victor was

11    holding when he exited the vehicle?

12         A    He wasn't actually holding anything.  He had

13    a black jacket wrapped around his hand.

14         Q    Was he carrying anything else beside having

15    the black jacket wrapped around his hands?

16         A    Not that I remember.

17         Q    Do you recall having any discussions with

18    Jonathan's father, who was a former police officer

19    with New Orleans Police Department?

20         A    I did not.

21         Q    Do you remember having any discussions with

22    Mr. Chisesi's attorney, Tim Madden?

23         A    I did not.

24         Q    Now, earlier we discussed suicide by cop.

25    You've had training in that?

1      A     Through the training I've been to, that's

2    been a part of it.  I haven't had exclusive training

3    on that.

4      Q     All right.  Do you remember, the training

5    that you have had, what did you learn on how to handle

6    those situations?

7      A     Well, I mean --

8      Q     Oh, first of all, how to identify those

9    situations?

10     A     Well, unfortunately, some of those

11   situations aren't identifiable until after the fact.

12   When you have a person that is in a emotional or state

13   where they no longer are able to function as a, you

14   know, normal thinking person, of course, de-escalation

15   is the way to try and approach that situation.  But,

16   unfortunately, we don't have control over what

17   individuals do.

18     Q     And what steps do you take to de-escalate?

19     A     A lot of talking, a lot of time.

20     Q     Did you ever make a determination about why

21   -- well, let me start over.

22           Corporal Hunady had a taser with him, right?

23     A     Yes.

24     Q     Did you make any determination about why he

25   didn't use it?

1      A      Well, I think -- I, I didn't make a

2   determination 100 percent.  I think it was that there

3   was already information that he possibly had a weapon

4   due to the blood that was in the vehicle and him

5   fumbling around in the car.  So I think that was the

6   consideration that all the deputies on the team took

7   into account when they acted the way they did.

8      Q      Was there any evidence that the blood was

9   caused by a gun?

10     A      No, sir.

11     Q      Anything hear a gunshot go off in the car?

12     A      No, sir.

13     Q      Was the situation ever escalated into a

14  felony stop?

15     A      I believe with Mr. -- I mean, I guess I

16  don't know what you're classifying as a felony stop.

17  When Mr. Victor exited the vehicle and pointed his

18  hands at the deputies, that's when it became a -- the

19  felony type situation.

20     Q      Did he, in fact, commit a felony?

21     A      No, sir.

22     Q      Captain, I told you I'd get you out of here

23  pretty quickly.

24     A      Yes, sir.

25                  MR. TENENBAUM:  Randy, I think I'm

1    done.

2              MR. McNEILL:  Okay.  I think I have a

3    few questions.  Sorry, Captain, to hold your lunch up

4    a little bit longer, but --

5              THE WITNESS:  Sure.  That's okay.

6              MR. McNEILL:  I don't take very long

7    depositions.

8                        EXAMINATION

9    BY MR. McNEILL:

10        Q    Do you recall -- the radio traffic you said

11   that your office received that the call went out as a

12   1033?

13        A    I don't recall that.

14        Q    If the records reflect that the radio

15   traffic did show that it was a call that was by

16   dispatch as 1033, do you have any reason to dispute

17   it?

18        A    No, sir.

19        Q    For the record, do you know what a 1033 call

20   is?

21        A    You're going to have to refresh me on that

22   because a lot of agencies use different lingo.  So --

23        Q    All right.

24        A    -- what one agency uses it as a 10 code or a

25   prompt might not be what another agency uses.

1      Q    There was testimony from Sheriff Mack and

2   Corporal, now Sergeant, Hunady, that the 1033 meant

3   that it was a subject with a gun or a weapon.

4      A    That, that, that's what we use it as, too.

5      Q    And, also, they had the double meaning that

6   to hold all radio traffic until the situation

7   resolved.  Do you have that same?

8      A    Correct.  Yes.

9      Q    Is that done because it's a tense situation?

10  You obviously just don't want other people to stop and

11  cover any other further communications?

12     A    Well, yes, you want the people on scene to

13  be the only ones that can communicate at the time.

14     Q    Would you agree with me that a 1033 call is

15  something that is not done every day?

16     A    No, sir.

17     Q    And it does kind of imply a sense of

18  urgency, is that correct?

19     A    That's exactly what it's used for.

20     Q    All right.  Well, in this case there was

21  some questions regarding whether anybody said that

22  Mr. Victor had a gun.  Are you aware of the statement

23  that was taken by Donald Wayne Alumbaugh,

24  A-L-U-M-B-A-U-G-H?

25     A    Not off the top of my head, but I can try to

1    find it.

2         Q    Certainly.  This appears to have been a

3    summary that was done of that statement, and that's

4    what I'm going to be reading from and see if you --

5    with that when I read it.

6                   MR. TENENBAUM:  Randy, are you going to

7    make this an exhibit?

8                   MR. McNEILL:  His statement?

9                   MR. TENENBAUM:  Yeah.

10                   MR. McNEILL:  Yes, I can.

11                   MR. TENENBAUM:  Okay.

12                   MR. McNEILL:  I guess that would be,

13    for this deposition, Exhibit 1.

14                   MR. TENENBAUM:  Okay.

15                   (Exhibit 1 was marked for

16                   identification.)

17                   MR. TENENBAUM:  What was the name?

18                   MR. McNEILL:  Alumbaugh.  A-L-U-M --

19                   MR. TENENBAUM:  I got it.

20                   MR. McNEILL:  Okay.  Do you have the

21    summary?

22                   MR. TENENBAUM:  I think we're looking

23    at the same thing.

24                   MR. McNEILL:  All right.  Do you have

25    the summary in front of you?  Because a handwritten

1    statement that was --

2                    MR. TENENBAUM:  Prewritten voluntary

3    statement?

4                    MR. McNEILL:  Right.  Good.

5                    MR. TENENBAUM:  In blue ink?

6                    MR. McNEILL:  It was in blue ink, but

7    I'm actually looking more at the summary that was

8    taken with it.

9                    MR. TENENBAUM:  Okay.  I got you.

10                   MR. McNEILL:  Okay.

11                   MR. TENENBAUM:  It was done by

12   Lieutenant Phillips?

13                   MR. McNEILL:  Right.  That's it.

14                   MR. TENENBAUM:  Yes.

15   BY MR. McNEILL:

16       Q    All right.  I want to make sure we're on the

17   same page when we're reading here.  What I show is

18   this.  I want to quote --

19                   MR. McNEILL:  And I will try to read

20   slowly, Anya, because I have a bad habit of talking

21   too fast, and particularly when I read something.

22   Okay?  So I'll try to make a conscious effort.

23   BY MR. McNEILL:

24       Q    Mr. Alumbaugh advised he and his wife, Wendy

25   Kay Alumbaugh, were eastbound on I-10 near the 59 mile

1     marker and observed a silver BMW SUV in the ditch in

2     the median that appeared to have crashed.

3     Mr. Alumbaugh stated he stopped to provide assistance

4     and as he approached the BMW noticed the driver

5     appeared unconscious still pressing the gas pedal of

6     the vehicle and a cigarette still burning in his lap.

7     Alumbaugh also noticed the driver's hand was wrapped

8     in what appeared to be a towel like cloth.

9     Mr. Alumbaugh advised he yelled at the driver and the

10    driver looked up.  As he approached, Alumbaugh stated

11    the driver rolled up the window and locked the doors

12    to the BMW.  Alumbaugh stated the driver was yelling

13    to get away from his car.  Alumbaugh advised he called

14    emergency personnel and, upon arrival, the fire

15    department again attempted to speak with the driver

16    who refused to get out of the vehicle.  Alumbaugh

17    advised prior to Law Enforcement's arrival the driver

18    was moving from the front to the rear of the vehicle.

19    He advised when the deputies arrived they attempted

20    numerous times to direct the driver out of the vehicle

21    and to show them his hands.  Alumbaugh stated when the

22    driver did exit the vehicle from the passenger side it

23    appeared he had a gun and was advancing on the

24    deputies.  Alumbaugh advised the deputies told the

25    driver many times to put his hands up and lay on the

1    ground and the subject was then running toward them

2    making motions like he was shooting when the deputy

3    shot him.  Alumbaugh advised he was positioned east of

4    the scene near the front of the ambulance and had a

5    vivid vantage point of the entire incident.

6           Did I read that correctly?

7    A    Yeah, what I have.

8    Q    Okay.  Now, from Mr. Alumbaugh, just to make

9    clear, is that I-10 runs east/west, correct?

10   A    Correct.

11   Q    And the accident occurred in the eastbound

12   lane, so like if you're coming from Mobile going

13   toward Pensacola, correct?

14   A    Correct.

15   Q    And it appears that Mr. Alumbaugh was on the

16   other side of the accident further east from where the

17   BMW is, at least is how I read the position from the

18   statement.

19   A    I think he passed it.

20   Q    Right, that's what --

21   A    He stopped once he passed it.

22   Q    Okay.  So he did not -- he was not hindered

23   by any view of the fire trucks or any of the emergency

24   personnel because he was down beyond it, correct?

25   A    I don't believe he was, but I think the

1    ambulance was also east of Mr. Victor's vehicle.

2        Q    All right.  And from what you read and from

3    Mr. Alumbaugh's statement, in Mr. Alumbaugh's mind it

4    appeared that Mr. Victor did have a gun, correct?

5        A    Well, I think -- and the way I took that

6    statement just because I've seen the videos, I, I

7    think he's saying that because of the stance that

8    Mr. Victor had and the motions that he was making.

9    Now, that's not to say that Mr. Alumbaugh didn't

10    unconsciously or subconsciously see a weapon.  But

11    just the way that Mr. Victor was standing, I could see

12    where someone would say it looked like he had a gun.

13        Q    And Mr. Alumbaugh wasn't the only person

14    that had that opinion, did they?

15        A    No, sir.

16        Q    I think there was also the -- I never can

17    remember the man's name.  It just popped out of my

18    head.  The driver of the Reddy truck, ice truck --

19        A    Yes.

20        Q    -- he stated on video that he was thinking

21    it appeared that Mr. Victor had a gun, correct?

22        A    Correct.

23        Q    Are you also familiar with the video?  And

24    you guys have noted it as the Jorge video.  That would

25    be of the Hispanic family that was in the vehicle

1    basically right in front of the Reddy truck shown on

2    the videos, correct?

3         A    Yes.  I believe that's where there were.

4         Q    And they had a really good view of the scene

5    as well, correct?

6         A    Correct.

7         Q    It appears that your investigation had the

8    video translated -- transcribed and translated, is

9    that correct?

10         A    Correct.

11         Q    And as I read the transcription of it and

12   the translation of it, there were multiple times in

13   this video where -- of the Jorge video -- that the

14   male, the female, and child all believed that

15   Mr. Victor had a gun, correct?

16         A    I didn't actually listen to the translated

17   version of it, but that was my -- that's what was

18   reported to me, yes.

19         Q    Okay.  And as a matter of fact, the child

20   even said that Mr. Victor was pointing the gun in

21   their direction?

22         A    Yes.

23         Q    Okay.  The questions about whether anybody

24   else took a shot there at the scene, as I recall from

25   the video, wasn't most of the deputies either on the

1  ground or in a position where they really did not

2  clearly have a good shot?

3      A    I, I'm looking at the scene in my mind.  Of

4  all the deputies, Officer -- Corporal Hunady, at the

5  time, was in the best position to give verbal command

6  and take control of the scene.  The rest of them were

7  basically there as backup or safety officers.

8      Q    And Corporal Hunady, as he was there at the

9  scene and he was giving out the commands -- that's

10  what you said, correct?

11      A    Correct.

12      Q    And it also appeared that Mr. Victor was

13  going straight to Corporal Hunady?

14      A    Correct.

15      Q    And from what you remember on the scene

16  would have been that Corporal Hunady had the best

17  angle and view to take the shot?

18      A    Correct.

19      Q    Okay.  The situation there at that scene, if

20  Mr. Victor indeed had a gun, would you agree with me

21  that all the occupants there in the video, in the

22  Jorge video, they were in danger, correct?

23      A    Correct.

24      Q    The Reddy truck driver, he was in danger,

25  correct?

1     A    Correct.

2     Q    The medical personnel were in danger,

3 correct?

4     A    Correct.

5     Q    Other law enforcement officers were in

6 danger, correct?

7     A    Correct.

8     Q    And certainly Corporal Hunady was in danger,

9 correct?

10     A    Correct.

11     Q    The body cam of Corporal Hunady, it does not

12 show the actual shooting; but it does kind of give a

13 timeline of what happened, doesn't it?

14     A    Yes, sir.

15     Q    If I took the notes on this correctly that

16 Corporal Hunady was at the scene -- from the video,

17 from his body cam, when it activates to when he fired

18 the shots, would you agree with me that was 12 minutes

19 and 7 seconds?

20     A    I was going to say about 15 minutes.  I

21 won't argue with you.  It sounds about right.

22     Q    And would you also agree with me that the

23 entire interaction, once Mr. Victor got out of the

24 vehicle, was just barely over a minute, like a minute

25 and two seconds?

1       A     It was very close to a minute, I remember.

2       Q     Okay.  In that minute, would you agree or

3  have any reason to dispute that on 14 different

4  occasions that Corporal Hunady either said, Drop it,

5  or, Show me your hands?

6       A     Yes.

7       Q     I also heard another deputy from another

8  side also said -- you know, I think he used an

9  expletive -- to show me your, expletive, hands.  Do

10  you remember that?

11      A     I remember other deputies saying that.  Now,

12  whether it was one or two, I -- once you're trying to

13  bring all those videos together, it's hard to remember

14  who said what.

15      Q     Sure.  Also, Corporal Hunady said on

16  multiple occasions, "Do not advance," correct?

17      A     Correct.

18      Q     But Mr. Victor ignored those commands,

19  didn't he?

20      A     Correct.

21      Q     Because he went off the video, was blocked

22  by the fire truck, was because Mr. Victor ignored the

23  commands and continued to advance, didn't he?

24      A     Correct.

25      Q     Would you agree with me that Corporal Hunady

1  at that moment had just a few seconds to decide what

2  to do?

3      A    Well, I mean, like you say, he had 62

4  seconds.

5      Q    When he advanced, it was even --

6      A    That time shrunk as Mr. Victor advanced.

7      Q    Prior to Mr. Victor advancing, Corporal

8  Hunady had not fired, had he?

9      A    Correct.

10     Q    And had shown restraint, hadn't he?

11     A    Correct.

12     Q    There's been testimony and questions about

13 Mr. Victor being barricaded in his vehicle.  The fact

14 of the matter is, though, he really end up not being

15 barricaded in the vehicle, was he?

16     A    That's not a term I would use just because

17 he locked the doors and rolled up the windows.  To me,

18 barricaded would be that you use some other equipment

19 to prevent anybody from getting in.  Now, he basically

20 did lock himself in and rolled up the windows.  So,

21 yes, and then he exited.

22     Q    Wouldn't you say a better description,

23 rather than barricaded, was that he just wasn't

24 engaging at that time?

25     A    I would say that was a fair description.

1      Q    Okay.  The questions on whether there was an

2    attempt to de-escalate -- how long did it take you to

3    drive over to -- first off, you said from your

4    residence?

5      A    It was a good 45 minutes to an hour.  And

6    our -- traffic was backed on I-10.  Normally it

7    probably would have taken 25, 30 minutes.

8      Q    Okay.  And do you live in Daphne?

9      A    I do.

10      Q    And for Sam, who doesn't know Alabama

11    geography, Daphne is on Mobile Bay, correct?

12      A    Correct.

13      Q    And so that would be what is commonly known

14    as the Eastern Shore, correct?

15      A    Correct.

16      Q    All right.  This accident occurred almost to

17    the Florida line, correct?

18      A    Correct.

19      Q    And it's on the far eastern side of Baldwin

20    County, correct?

21      A    Correct.

22      Q    And also to help out Sam -- I don't know

23    whether you need this tidbit.  Do you know that

24    Baldwin County is the largest county east of the

25    Mississippi, geographically?

1      A    Landmass-wise, yes.

2      Q    Yeah.  You said normally it would take about

3  25 to 30 minutes from your residence to get there?

4      A    Yes, sir.

5      Q    All right.  This was on a Saturday also,

6  correct?

7      A    Correct.

8      Q    Do you know whether any of the hostage

9  negotiating team or any type of negotiators were on

10  duty at the sheriff's office at that time?

11      A    I don't know for sure.  Most of their

12  negotiators are in investigations, which they don't

13  work on the weekend.

14      Q    So most of them would be a Monday-through-

15  Friday job, correct?

16      A    I'm not sure if there was a trained

17  investigator that might have been transferred back out

18  of the investigative division into the patrol

19  division.  But even then, you're on a one-to-four

20  chance because there's four shifts -- one shift was

21  obviously working that.  So --

22      Q    Let me ask this question:  Where is the

23  sheriff's department located?

24      A    Well, the sheriff's department is in

25  Bay Minette, but they have several satellite

1    locations.  Their investigative unit works out of

2    Baldwin, but ...

3         Q    Where is their headquarters?

4         A    In Bay Minette.

5         Q    And Bay Minette is located about how many

6    minutes from the scene?

7         A    45.

8         Q    About 45 minutes.  And that is --

9         A    On a normal day.

10        Q    On a normal day.

11             So if I have the math right that it was 12

12   minutes that Corporal Hunady was there versus -- that

13   is a substantial amount shorter than 45 minutes,

14   correct?

15        A    Yes, sir.

16        Q    Was there any way possible for

17   Corporal Hunady to have gathered up and called for

18   hostage negotiators to come to the scene in that

19   amount of time?

20        A    Well, he could have called for them, but

21   they wouldn't have made it.

22        Q    They never would have made it, would they?

23        A    Correct.

24        Q    Are you aware that Mr. Victor had -- the way

25   I best describe it is slash marks on his arm?

1          A    I am.

2          Q    Would you say that would be consistent with

3     a suicide attempt?

4          A    I would.

5          Q    There have been questions about suicide by

6     cop and training and how to handle that situation.  In

7     those situations, on suicide by cop, isn't it also

8     possible that -- to make sure that the suicide is

9     taking place that a person trying to commit suicide

10    would actually fire a weapon or use a weapon onto law

11    enforcement or somebody else?

12         A    I have reviewed cases of that exact thing

13    that happened.

14                    MR. McNEILL:  That's all I have.

15                         EXAMINATION

16    BY MR. TENENBAUM:

17         Q    And the suicide by cop situation, is the

18    idea to let them commit suicide, or is it to prevent

19    the suicide?

20         A    I think it's always to prevent the suicide.

21    Unfortunately, people put law -- in that -- in suicide

22    by cop, they put law enforcement in a position where

23    they must act.

24         Q    Okay.  Now, Corporal Hunady is the one who

25    asked Mr. Victor to exit the vehicle and said he was

1   there to help him, correct?

2       A    I'm pretty sure he gave a command to exit

3   the vehicle.  I don't know if he actually said, I'm

4   here to help you.

5       Q    If I told you the tape says he said, "I'm

6   here to help you"?

7       A    I would agree with that.  I, I wouldn't

8   disagree with you.

9       Q    Okay.  Given the situation, is there any

10  reason Corporal Hunady couldn't have waited and called

11  somebody from the negotiating team?

12      A    You could have always waited, but I think

13  with the known particular injuries that Mr. Victor

14  had, I think it was in the -- mind to get to him so

15  the medical personnel could render any aid he needed.

16      Q    All right.  And you get to him by pointing

17  an AR-15 at him?

18      A    I don't know that the AR-15s were pointed

19  until Mr. Victor made the first aggressive move.  I

20  think they were probably ready for that to happen, but

21  I doubt that -- and I'm pretty sure that the guns were

22  not pointed at Mr. Victor until he made an aggressive

23  move.

24      Q    Now, prior to that time, Mr. Victor hadn't

25  attacked -- before he exited the vehicle, he hadn't

1  attacked anybody, had he?

2      A    No, sir.

3      Q    Hadn't shot anybody?

4      A    No, sir.

5      Q    Hadn't brandished a gun?

6      A    No, sir.

7      Q    And, in fact, time is on your side when

8  you've got someone -- I'll use the term "barricaded,"

9  even if you don't want to.  If someone is in a

10  barricaded situation, time is actually on your side,

11  isn't it?

12      A    Well, but when you throw in potential

13  injuries, either due to the wreck or self-inflicted,

14  time becomes a factor.

15      Q    All right.  Well, there's potential

16  injuries, but while Mr. Victor may have been bleeding,

17  he had been unconscious, right, according to

18  Mr. Alumbaugh?

19      A    According to the witnesses, yes.

20      Q    Do you know if Mr. Alumbaugh spoke to

21  Corporal Hunady and provided information to him?

22      A    I don't think there was a conversation

23  between them.

24      Q    All right.  And, also, are hostages only

25  taken between the hours of nine to five on Monday

1  through Friday?

2       A    No.

3       Q    You can have those situations on weekends,

4  can't you?

5       A    Absolutely, but it just takes time.  And I

6  get the point you were trying -- I was trying to make,

7  it takes time to get the correct people in place.

8       Q    Was Officer Stealman on the scene that

9  evening?

10      A    I don't believe so, because he is on the

11 Major Crimes Unit and he is an evidence expert.  So we

12 wouldn't have been using him because they were

13 excluded, and I had the liberty with an expert in

14 evidence collection also.

15      Q    Do you know how long it took Corporal Hunady

16 to get to the scene from the time he heard the call?

17      A    I do not.

18      Q    Do you know if there were people around the

19 negotiating team who were actually closer than

20 Corporal Hunady?

21      A    I do not.

22      Q    Now, Mr. McNeill read to you from a summary

23 from Detective Phillips, correct?

24      A    Correct.

25      Q    All right.  Are you aware that in the

1    handwritten statement that Mr. Alumbaugh's wife

2    prepared -- is there any mention of a weapon in that

3    statement?

4        A   Do you want me to review it real quick or

5    just say I'm not aware of it?

6        Q   Well, review it real quick.  Does it say

7    "weapon" in there at all?

8        A   I do not see a mention of a weapon at all.

9        Q   And, in fact, Mr. Victor was not armed, was

10   he?

11       A   No.

12       Q   So people who thought he had a weapon were

13   mistaken, correct?

14       A   I, I guess you could put it that way, yes,

15   sir.

16       Q   All right.  And Mr. Victor, at least based

17   on some of the reports that were made, was at least

18   well enough and conscious enough, even if he was

19   bleeding, to tell people to get away, lock his doors,

20   reach into his back seat and take other steps in the

21   vehicle, correct?

22       A   Correct.

23       Q   Okay.  Had the airbag deployed?

24       A   No.

25       Q   So when it got stuck in the ditch, the force

1     or the shock hadn't been enough to deploy the airbag,

2     correct?

3          A     Yeah.  He didn't hit anything.

4          Q     All right.

5          A     The vehicle was fully functional.  He just,

6     in a rainstorm, hydroplaned or, or somehow caused him

7     to leave the road and he got down in the wet, Alabama

8     red clay, and the ditch is right there.

9                    MR. TENENBAUM:  Okay.  I have nothing

10    further.

11                   MR. McNEILL:  I have nothing further.

12                   MR. TENENBAUM:  Captain Beedy, you have

13    a choice.  You can either read the deposition and then

14    sign a statement saying that the transcript that Anya

15    has taken is accurate, or you can waive the right to

16    read it and sign it.  And she'll type it up as best

17    she can.

18                   And I know Randy and I -- and we'll

19    have an audio of the recording if either of us think

20    that it's not accurate.  But it's really up to you.

21    And I certainly -- there's not that much of a rush

22    that I don't want to take away from the vacation

23    you're leaving for tomorrow, so ...

24                   MR. McNEILL:  Oh, you mean, I would

25    have to do it now?

1          MR. TENENBAUM:  No, not now, but -- I

2     don't know what the timing will be on it, but ...

3          THE WITNESS:  Yeah, the problem is I'm

4     really not supposed to be back in the office till the

5     2nd.

6          MR. TENENBAUM:  All right.  I mean -- I

7     don't think there would be a rush, so if you'd like to

8     review it --

9          THE WITNESS:  I would like to review

10    it.

11         MR. TENENBAUM:  Okay.  So signature is

12    not waived.  All right.

13         REPORTER:  Okay.  And do we want to

14    place any order at this time?

15         MR. TENENBAUM:  Yeah, I'll order it.

16         REPORTER:  Okay.

17         MR. MCNEILL:  Yeah.  Electronic for me.

18         MR. TENENBAUM:  Me, too.

19         REPORTER:  Both electronic?

20         MR. TENENBAUM:  Right.

21         MR. MCNEILL:  Yes.

22         REPORTER:  Okay.  All right.  Stand by

23    because I do need to get some spellings from you.  But

24    we are off the record at 1:09 p.m.

25              (Signature Reserved.)

1                    (Whereupon, at 1:09 p.m., the

2                    proceeding was concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            CERTIFICATE OF NOTARY PUBLIC

2        I, ANYA JAVADI, the officer before whom the

3 foregoing proceedings were taken, do hereby certify

4 that any witness(es) in the foregoing proceedings,

5 prior to testifying, were duly sworn; that the

6 proceedings were recorded by me and thereafter reduced

7 to typewriting by a qualified transcriptionist; that

8 said digital audio recording of said proceedings are a

9 true and accurate record to the best of my knowledge,

10 skills, and ability; that I am neither counsel for,

11 related to, nor employed by any of the parties to the

12 action in which this was taken; and, further, that I

13 am not a relative or employee of any counsel or

14 attorney employed by the parties hereto, nor

15 financially or otherwise interested in the outcome of

16 this action.

17

18                      ANYA JAVADI

19              Notary Public in and for the

20                     State of Alabama

21 [X] Review of the transcript was requested.

22

23

24

25

1          CERTIFICATE OF TRANSCRIBER

2          I, ANNETTE SALVATA, do hereby certify that

3     this transcript was prepared from the digital audio

4     recording of the foregoing proceeding, that said

5     transcript is a true and accurate record of the

6     proceedings to the best of my knowledge, skills, and

7     ability; that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in

9     which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14

15                              ANNETTE SALVATA

16

17

18

19

20

21

22

23

24

25

1    To: J. RANDALL MCNEILL, ESQ.
2    Re: Signature of Deponent Judson Beedy
3    Date Errata due back at our offices: 2/6/2021
4
5    Greetings:
6    This deposition has been requested for read and sign by
     the deponent.  It is the deponent's responsibility to
7    review the transcript, noting any changes or corrections
     on the attached PDF Errata.  The deponent may fill
8    out the Errata electronically or print and fill out
     manually.
9
10   Once the Errata is signed by the deponent and notarized,
     please mail it to the offices of Veritext (below).
11
12   When the signed Errata is returned to us, we will seal
     and forward to the taking attorney to file with the
13   original transcript.  We will also send copies of the
     Errata to all ordering parties.
14
15   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the
16   court without the signature of the deponent.
17
18   Please Email the completed errata/witness cert page
     to readandsign@veritext.com
19   or mail to
20   Veritext Production Facility
21   2031 Shady Crest Drive
22   Hoover, AL 35216
23   205-397-2397
24
25

ERRATA for ASSIGNMENT #4380211

I, the undersigned, do hereby certify that I have read the transcript of my testimony, and that

\_\_\_ There are no changes noted.

\_\_\_ The following changes are noted:

Pursuant to Civil Procedure, Rule 30. ALA. CODE § 5-30(e) (2017). Rule 30(e) states any changes in form or substance which you desire to make to your testimony shall be entered upon the deposition with a statement of the reasons given for making them.  To assist you in making any such corrections, please use the form below.  If additional pages are necessary, please furnish same and attach.

Page \_\_\_\_\_ Line _____ Change _____

_____

Reason for change _____

Page \_\_\_\_\_ Line _____ Change _____

_____

Reason for change _____

Page \_\_\_\_\_ Line _____ Change _____

_____

Reason for change _____

Page \_\_\_\_\_ Line _____ Change _____

_____

Reason for change _____

Page \_\_\_\_\_ Line _____ Change _____

1  Page _____ Line _____ Change _____

2  _____

3  Reason for change _____

4  Page _____ Line _____ Change _____

5  _____

6  Reason for change _____

7  Page _____ Line _____ Change _____

8  _____

9  Reason for change _____

10  Page _____ Line _____ Change _____

11  _____

12  Reason for change _____

13  Page _____ Line _____ Change _____

14  _____

15  Reason for change _____

16

17

18              _____

                    DEPONENT'S SIGNATURE

19

   Sworn to and subscribed before me this ___ day of

20      _____, _____.

21

22  _____

23   NOTARY PUBLIC / My Commission Expires:_____

24

25

| & | 3 | able 15:7,24 19:1 | advised 58:24 59:9 |
|---|---|---|---|

**&**

**&** 3:18

**0**

**00221** 1:10 6:14

**1**

**1** 5:9 57:13,15
**10** 16:15 27:21
  28:25 35:10 42:18
  55:24 58:25 60:9
  67:6
**100** 54:2
**1033** 55:12,16,19
  56:2,14
**11:29** 2:3 6:20
**12** 64:18 69:11
**12:28** 52:5
**12:41** 52:8
**14** 65:3
**15** 64:20 71:17
**1502** 2:5 6:21
**15s** 71:18
**17** 2:2 6:21 35:3
**17929** 79:14
**18** 35:3 44:18
**1994** 9:22
**1:09** 76:24 77:1
**1:19** 1:10 6:14

**2**

**2/6/2021** 80:3
**2010** 2:2
**2017** 12:14,18 81:7
**2020** 6:21
**2031** 80:21
**205-397-2397**
  80:23
**25** 67:7 68:3
**25499** 78:17
**26** 9:22
**2nd** 76:5

**3**

**30** 16:12 67:7 68:3
  81:6,7
**35216** 80:22
**36117-8053** 3:20
**36526** 2:6 6:22

**4**

**4380211** 2:8 81:1
**45** 67:5 69:7,8,13

**5**

**5-30** 81:6
**55** 5:4
**57** 5:9
**59** 58:25

**6**

**60611-3069** 3:9
**62** 66:3
**6:00** 17:23 18:4
**6:30** 17:23

**7**

**7** 64:19
**70** 5:5
**7475** 3:19
**750** 3:8
**7:00** 18:2

**8**

**8** 27:21 28:25

**9**

**9** 5:3
**9-1-1** 31:11
**911** 38:21
**98** 2:5 6:21
**99** 34:2

**a**

**a.m.** 2:3 6:20
**ability** 27:25 78:10
  79:7

**able** 15:7,24 19:1
  27:18 31:15 33:13
  37:17 41:13 53:13
**absent** 7:1
**absolutely** 73:5
**academy** 10:2
**accident** 18:19
  60:11,16 67:16
**accidents** 42:18
**accomplished**
  18:15
**account** 54:7
**accumulate** 35:23
**accurate** 75:15,20
  78:9 79:5
**acknowledgements**
  6:5
**act** 28:2 70:23
**acted** 45:13 54:7
**action** 47:21,25
  48:3 78:12,16 79:8
  79:12
**actions** 10:19
**activated** 12:4,7,13
  13:17,23 14:23
**activates** 64:17
**actual** 29:11 51:11
  64:12
**additional** 81:9
**additionally** 7:1
**adjacent** 29:12
**administer** 6:6
**administrator** 6:9
**administratrix** 1:6
  3:3
**advance** 65:16,23
**advanced** 66:5,6
**advancing** 59:23
  66:7
**advise** 44:24

**advised** 58:24 59:9
  59:13,17,19,24
  60:3
**affairs** 11:4 20:23
**afternoon** 6:2
  29:14
**agencies** 55:22
**agency** 13:9 47:1
  49:24 55:24,25
**agent** 15:12,14
**aggressive** 47:21
  47:24 48:3 71:19
  71:22
**agitated** 45:13
**ago** 11:8
**agree** 6:24 7:3
  56:14 63:20 64:18
  64:22 65:2,25 71:7
**ahead** 11:24 14:1
  17:5 36:24
**aid** 71:15
**airbag** 74:23 75:1
**al** 3:20 80:22
**ala** 81:6
**alabama** 1:2,12,15
  2:6 3:13,16 6:11,13
  6:22 9:18 10:5
  11:17 44:5 67:10
  75:7 78:20
**alcohol** 24:3
**aligns** 31:20
**alumbaugh** 5:10
  37:3,8 56:23 57:18
  58:24,25 59:3,7,9
  59:10,12,13,16,21
  59:24 60:3,8,15
  61:9,13 72:18,20
**alumbaugh's** 61:3
  61:3 74:1
**ambulance** 18:20
  18:21 31:21 38:1

49:4 60:4 61:1
**amendment** 20:5
**amount** 42:16
69:13,19
**amounts** 37:1
**andrew** 32:23
**angle** 63:17
**annette** 79:2,15
**answer** 20:12,14
21:14 30:17 40:12
45:20,21
**answered** 45:10
50:11
**anya** 2:7 6:3 52:2
58:20 75:14 78:2
78:18
**anybody** 13:21
17:6 19:16 21:8
38:8 45:3 46:7
56:21 62:23 66:19
72:1,3
**apologize** 7:24 19:7
**appeared** 59:2,5,8
59:23 61:4,21
63:12
**appearing** 7:13 8:6
**appears** 57:2 60:15
62:7
**applicable** 7:7
**approach** 51:21
53:15
**approached** 59:4
59:10
**approaching** 39:20
**approved** 12:12,12
**approximately**
32:15
**ar** 26:15 71:17,18
**area** 40:11 46:12
**aren't** 51:5 53:11

**argue** 64:21
**arm** 69:25
**armed** 74:9
**arrest** 24:12
**arrival** 59:14,17
**arrive** 17:21 35:5
**arrived** 13:17 18:8
18:9,10 35:12
37:18,23 38:6
46:10 59:19
**arriving** 31:23
38:12
**arthur** 12:16 13:5,7
18:12,16 34:3
**aside** 38:4 40:24
44:24 45:3
**asked** 70:25
**asphalt** 29:11
**asserted** 20:4
**assess** 38:11
**assign** 15:11
**assigned** 6:3 15:12
**assignment** 81:1
**assist** 19:5 38:1
81:8
**assistance** 59:3
**assistant** 11:9 15:6
15:8,11
**assume** 16:4 46:20
**assumed** 32:4,5
**attach** 81:9
**attached** 5:12 80:7
**attacked** 71:25
72:1
**attempt** 67:2 70:3
**attempted** 18:21,25
59:15,19
**attempting** 16:19
**attended** 10:1,25
**attorney** 44:2
52:22 78:14 79:10

80:12
**attorney's** 22:2
43:24 50:18
**atypical** 23:6
**audio** 19:7 75:19
78:8 79:3
**authorities** 44:10
**authorized** 6:5
**automatic** 27:15,17
**autopsies** 22:6
**autopsy** 41:19
**aware** 24:16,18,19
31:6 33:3 34:6,8
37:8 38:20,25 39:1
41:22,25 43:12
46:7 47:9 56:22
69:24 73:25 74:5

**b**

**b** 5:7 7:21 56:24
**back** 10:10,11 19:8
22:6 30:18 33:18
33:24 36:18 37:15
38:22 51:2 52:7
68:17 74:20 76:4
80:3
**backed** 41:14,16
67:6
**background** 9:17
22:12 27:23 34:5,9
**backup** 63:7
**bad** 58:20
**baldwin** 1:11,15
3:13,15 6:11,13
11:5,10,13,21
12:16 19:4 20:22
21:2,11 28:8,17
34:3 47:2 48:5
67:19,24 69:2
**barely** 64:24
**barricaded** 45:17
45:19 47:10,12,17

47:24 66:13,15,18
66:23 72:8,10
**based** 74:16
**basically** 6:19
10:19 62:1 63:7
66:19
**basis** 11:19 31:16
**bay** 67:11 68:25
69:4,5
**beach** 17:18,19
**beedy** 2:1 6:7 7:20
7:21,23 8:1,12,12
8:14 9:3 75:12 80:2
**began** 13:16 18:14
51:20
**behalf** 3:2,12
**believe** 12:19 13:6
19:12,21 27:17
32:19 34:14,17
41:16 49:19,19,20
50:7,7,12,24 51:19
54:15 60:25 62:3
73:10
**believed** 62:14
**ben** 32:22
**best** 63:5,16 69:25
75:16 78:9 79:6
**better** 66:22
**beyond** 60:24
**big** 23:17
**bill** 17:12 21:12,17
**bishop** 17:14 35:9
**bit** 16:15 17:24
18:1 55:4
**black** 52:13,15
**blackness** 25:3
**bleeding** 72:16
74:19
**blocked** 65:21
**blocking** 51:7

**blood** 19:2 30:25
  48:2 54:4,8
**bloody** 37:9
**blue** 58:5,6
**bluhm** 3:6
**bmw** 59:1,4,12
  60:17
**board** 12:12,12,18
**body** 15:25 16:5
  18:6 25:2 36:15,16
  39:18,19,22,23
  41:20 43:20 64:11
  64:17
**bothering** 44:1
**brandished** 72:5
**break** 51:25
**breakout** 52:3
**brief** 51:20
**briefed** 43:13
**briefing** 18:11
  38:14
**briefly** 33:11
**bring** 65:13
**broke** 11:23
**burke** 32:22
**burning** 59:6
**business** 43:16

**c**

**c** 1:10 3:1 6:1,14
**call** 38:22 47:19
  55:11,15,19 56:14
  73:16
**called** 8:15 11:6
  19:4 33:25 34:14
  38:9 48:10 59:13
  69:17,20 71:10
**calls** 37:25
**cam** 16:5 36:15,16
  39:18,19,22,23
  43:20 64:11,17

**camera** 25:2
**cams** 15:25
**can't** 40:12 73:4
**capacity** 1:11,14
  3:13,15 6:11,13
**capital** 12:3
**captain** 9:3,9,13,24
  12:16 13:5,7 34:3
  54:22 55:3 75:12
**captured** 51:16
**car** 18:22 19:1,3
  24:5 29:13 31:1,5
  32:4 38:2 40:18
  54:5,11 59:13
**career** 11:1
**carrying** 52:14
**cars** 37:15
**case** 1:9 12:11
  13:15,24,25 14:4
  14:12,13,14,20
  15:11,14,16 16:2
  20:7 21:11 43:13
  43:23 44:16,21
  56:20
**cases** 70:12
**casings** 36:14
**caused** 54:9 75:6
**caution** 31:23
**center** 28:16 29:1
**cert** 80:18
**certainly** 57:2 64:8
  75:21
**certificate** 78:1
  79:1
**certified** 7:3
**certify** 78:3 79:2
  81:2
**chad** 17:3
**chance** 68:20
**change** 44:9,13
  81:11,13,14,16,17

81:19,20,22,23
  82:1,3,4,6,7,9,10
  82:12,13,15
**changed** 47:18
**changes** 80:7 81:4
  81:5,7
**charge** 15:3 34:1
  43:14
**chicago** 3:9 10:18
**chief** 12:8
**chiefs** 11:15 12:20
  12:21,23
**child** 62:14,19
**chisesi** 1:5 3:2 4:2
  6:8 49:7
**chisesi's** 52:22
**choice** 75:13
**cigarette** 59:6
**circumstances**
  11:14
**cities** 11:21
**city** 9:7,22
**civil** 81:6
**civilian** 9:20 45:6
**civilians** 37:6,13
**claimed** 30:18
  31:14
**classes** 11:1
**classifying** 54:16
**clay** 75:8
**clear** 33:25 60:9
**clearest** 50:24
**clearly** 63:2
**click** 10:10
**clinic** 3:6
**clinkerton** 32:25
**close** 65:1
**closely** 28:9 31:19
**closer** 73:19
**closest** 33:6

**cloth** 59:8
**code** 55:24 81:6
**cohen** 4:4 6:15
**collected** 35:24
  36:11,14,15 37:1
  37:13
**collecting** 15:15
  26:21
**collection** 11:12
  73:14
**collins** 17:12
**come** 19:4 28:19
  29:14 45:25 69:18
**coming** 60:12
**command** 63:5
  71:2
**commander** 11:9
  12:9,10,14 15:6,7
  15:11,13,18,21
  43:15
**commanders** 15:7
  15:8
**commands** 33:3,6
  63:9 65:18,23
**commission** 82:23
**commit** 54:20 70:9
  70:18
**committed** 21:4,7
  21:10 24:15 42:11
  42:13,14 48:13
**commonly** 67:13
**communicate**
  56:13
**communications**
  20:24 56:11
**completed** 80:18
**completes** 44:2
**complied** 22:17
**computer** 27:3
  36:20

concept 48:15
concern 6:23 13:1
  40:8,20 48:13
concerned 40:18
  46:5
concluded 77:2
concrete 34:11
condition 29:5
  33:22
conducted 20:23
conflict 13:9 50:6
  50:12
confrontational
  49:23
confused 45:2,15
connection 16:11
conscious 58:22
  74:18
consider 23:4,10
consideration 54:6
consistent 70:2
constitute 7:11
  42:16
contact 11:17 12:9
  16:20,21 28:19
contacted 13:5,6,7
  18:4
continued 65:23
control 27:3 50:13
  53:16 63:6
conversation 72:22
coordinate 43:19
cop 48:16 52:24
  70:6,7,17,22
copies 16:7,7 43:20
  80:13
corporal 19:13
  20:4 22:19,20
  25:15,19 26:8,14
  27:14,19,23 28:25
  31:25 32:8 33:5

36:8 37:18,22 38:5
39:18,20 41:14
42:13 44:24 46:4
53:22 56:2 63:4,8
63:13,16 64:8,11
64:16 65:4,15,25
66:7 69:12,17
70:24 71:10 72:21
73:15,20
correct 8:2,4,5 14:4
  14:6 15:23 22:3,9
  23:14,19 32:12,13
  36:9 39:17,21 40:4
  41:20,21 45:11,12
  45:24 46:1 48:7
  50:22 51:8,12 56:8
  56:18 60:9,10,13
  60:14,24 61:4,21
  61:22 62:2,5,6,9,10
  62:15 63:10,11,14
  63:18,22,23,25
  64:1,3,4,6,7,9,10
  65:16,17,20,24
  66:9,11 67:11,12
  67:14,15,17,18,20
  67:21 68:6,7,15
  69:14,23 71:1 73:7
  73:23,24 74:13,21
  74:22 75:2
corrections 80:7
  81:9
correctly 34:10
  60:6 64:15
counsel 7:16,18
  8:19 78:10,13 79:7
  79:10
county 1:11,15
  3:13,15 6:11,13
  11:6,10,13,16,21
  12:16 19:4 21:3,11
  28:9,17 34:3 44:17

47:2 48:5 67:20,24
67:24
county's 20:22
couple 16:16
course 10:23 29:7
  36:11 38:10 43:22
  46:12 53:14
court 1:1 17:8
  42:25 80:16
cover 56:11
covered 33:20
crashed 59:2
crest 80:21
crime 16:16 17:17
  21:4,7,10 24:15,17
  24:20 33:12,12
  35:15,16 42:11,12
  42:14,16 47:3
  48:13
crimes 11:6,10 12:4
  12:11 13:17 14:8
  21:3 35:5 43:15,25
  47:2 73:11
criminal 9:19 28:2
  28:23 41:11 50:8
  50:13
custody 11:22 12:3
cv 1:10 6:14

**d**

d 5:1 6:1 7:21,21
danger 63:22,24
  64:2,6,8
daniel 32:22
daphne 2:6 6:21
  9:7,22 17:15 67:8
  67:11
date 2:2 14:24 80:3
day 14:24,25 42:18
  48:23 56:15 69:9
  69:10 82:19

de 47:20 53:14,18
  67:2
deal 47:16
dealing 19:9
death 11:22 12:3
deaths 44:4
deceased 1:7 3:4
  6:10
december 2:2 6:21
decide 12:10 66:1
decided 11:16
decision 10:20
deep 39:4
defendants 1:16
  3:12 7:19
degree 9:19
department 9:8,10
  9:13,15 12:17 13:6
  13:22 15:21 17:4
  17:12,13,14,15,15
  17:19,20 18:12,18
  19:4 20:22 28:18
  31:20 32:18 34:4
  34:15 35:9 36:19
  38:1,23 46:9 48:6
  48:14,19 50:21
  52:19 59:15 68:23
  68:24
deploy 75:1
deployed 41:10
  74:23
deployment 41:9
deponent 80:2,6,7
  80:10,16
deponent's 80:6
  82:18
deposition 2:1 6:7
  7:9 57:13 75:13
  80:6 81:8
depositions 55:7

deputies 13:15,21
25:1 26:22 30:21
31:23 32:11,18
36:2 42:15 54:6,18
59:19,24,24 62:25
63:4 65:11
deputies' 20:2
deputy 1:12 3:14
6:12 34:17 51:3,18
51:21 60:2 65:7
describe 10:13
16:10 26:2 69:25
description 5:8
66:22,25
designees 12:9
desire 81:7
detective 9:14,25
11:2 15:12 73:23
determination 21:9
49:6 53:20,24 54:2
determine 21:7
27:18 28:24 31:16
32:8 34:6 37:17
40:23 41:13 42:12
48:5,9 52:10
determined 27:21
41:19 48:24
died 22:23
different 49:14,15
55:22 65:3
difficult 30:1
digital 78:8 79:3
dinkins 32:23
direct 59:20
direction 62:21
directly 49:8
disagree 71:8
discharged 38:16
discussed 52:24
discussions 42:21
43:1,3 49:7 52:17

52:21
dispatch 37:24,25
38:4 55:16
dispute 55:16 65:3
district 1:1,2 22:2
43:24 44:2 50:18
ditch 18:20 29:13
29:25 30:4 39:9
46:19 59:1 74:25
75:8
ditches 39:8,8
division 1:3 9:15,24
9:25 11:2 68:18,19
documents 14:13
doesn't 64:13
67:10
doing 49:24 50:13
donald 5:10 37:3
56:23
donna 1:5 3:2 4:2
6:8
don't 16:6 26:9
34:25 39:19 41:25
42:19 49:2,22
53:16 55:6 56:10
68:12 72:9
door 45:22
doors 59:11 66:17
74:19
double 56:5
doubt 71:21
downloaded 36:19
drawn 32:12
dried 29:11,11
drier 39:11
drive 3:8,19 16:12
67:3 80:21
driver 59:4,9,10,11
59:12,15,17,20,22
59:25 61:18 63:24

driver's 59:7
driving 24:5
drop 25:16,22,22
26:3,3,5,9 65:4
drugs 23:20
dry 39:7,16
due 6:23 11:13 13:8
43:15 54:4 72:13
80:3
duly 8:15 78:5
duties 9:13
duty 68:10

**e**

e 3:1,1 5:1,7 6:1,1
7:21,21 81:6,7
earlier 52:24
east 60:3,9,16 61:1
67:24
eastbound 58:25
60:11
eastern 67:14,19
educational 9:17
effect 34:12
effort 58:22
eight 16:22,24
32:17,18 37:15
eighth 3:8
either 62:25 65:4
72:13 75:13,19
electronic 76:17,19
electronically 80:8
eley 3:18
elli 6:15
ellie 4:4
email 80:18
emergency 45:21
46:15 59:14 60:23
emotional 53:12
employed 9:6,7
78:11,14 79:8,11

employee 78:13
79:10
ems 45:7 49:4
ended 16:22
enforcement 10:22
28:9,19 44:21
47:12 64:5 70:11
70:22
enforcement's
59:17
engaging 66:24
ensure 40:14
entered 81:8
entire 22:8 60:5
64:23
equipment 66:18
eric 4:3
erik 32:24
errata 80:3,7,8,10
80:12,13,15,18
81:1
es 78:4
escalate 38:23
47:20 53:18 67:2
escalated 54:13
escalation 53:14
especially 11:1
25:11
esq 80:1
esquire 3:5,17
established 27:6
estate 1:6 3:3 6:9
evening 17:24
49:20 73:9
event 38:24
everyone's 40:14
evidence 15:16
17:17,17 22:6
26:20 35:22 36:11
37:2 47:8 54:8
73:11,14

**evidentiary** 7:8
**exact** 25:25 26:17 32:5 70:12
**exactly** 56:19
**exam** 10:23
**examination** 5:2 9:1 26:23 55:8 70:15
**examine** 33:8,10
**examined** 8:17
**excessive** 42:15 49:12
**excluded** 13:10 73:13
**exclusive** 53:2
**excuse** 11:16
**exhibit** 5:9,12 57:7 57:13,15
**exit** 42:2 59:22 70:25 71:2
**exited** 30:22 31:8 32:3 39:2,6 47:22 51:17 52:11 54:17 66:21 71:25
**exiting** 31:5,15 39:20 40:1
**expecting** 6:15 20:20
**experienced** 11:12 28:6
**expert** 73:11,13
**expires** 82:23
**expletive** 65:9,9
**extended** 44:22 47:7
**extent** 25:7,9
**extremities** 29:2

**f**

**facility** 80:20
**fact** 24:8 28:7 48:25 53:11 54:20

62:19 66:13 72:7 74:9
**factor** 72:14
**facts** 22:1
**fair** 44:20 45:14 66:25
**fairly** 39:8
**familiar** 10:15 26:25 27:4,7 48:15 61:23
**family** 34:16 44:21 49:8,11,15,18,20 49:25 50:8 61:25
**far** 16:1 27:18 67:19
**fast** 58:21
**father** 52:18
**fbi** 10:2
**feet** 27:21 28:25
**felony** 54:14,16,19 54:20
**female** 62:14
**fidgeting** 19:2
**fifth** 20:4
**file** 13:25 14:4,12 14:14,20 15:17 16:2 19:20,22 21:1 80:12
**filed** 80:15
**fill** 80:7,8
**finally** 49:5
**financially** 78:15 79:11
**find** 23:20 57:1
**finding** 37:21
**fingerprint** 27:5
**fire** 18:18 31:20 33:1 38:1 40:3,5 41:14,17 51:2,7 59:14 60:23 65:22 70:10

**firearm** 23:2
**firearms** 28:6
**fired** 27:15,16,19 36:6,6,7 64:17 66:8
**firing** 26:8 32:7
**first** 8:15 30:8,10 30:10,16,18 35:4,6 43:6 45:16 49:1 53:8 67:3 71:19
**five** 16:18,24 32:17 51:25 72:25
**fleeing** 24:17
**floor** 3:8
**florida** 67:17
**focused** 42:13
**foley** 17:13
**following** 81:5
**follows** 8:17
**force** 10:3,15,16 41:10 42:16 49:12 74:25
**foregoing** 78:3,4 79:4
**forensics** 22:6 26:23
**form** 20:8 44:10 81:7,9
**former** 52:18
**forward** 80:12
**found** 23:25 24:3
**four** 16:18 22:7 32:17 68:19,20
**friday** 68:15 73:1
**friendly** 49:23
**front** 19:3 31:4 57:25 59:18 60:4 62:1
**fully** 75:5
**fumbling** 31:3,22 54:5

**function** 27:7 53:13
**functional** 75:5
**funded** 44:15
**furnish** 81:9
**further** 56:11 60:16 75:10,11 78:12 79:9

**g**

**g** 6:1 56:24
**gardner** 32:24
**gas** 59:5
**gathered** 69:17
**general** 13:2,18 33:22 36:23,25
**generally** 9:12 47:15
**geographically** 67:25
**geography** 67:11
**getting** 17:9 38:9 66:19
**give** 11:14 12:24 52:4 63:5 64:12
**given** 26:22 33:3 49:18 71:9 81:8
**gives** 50:24
**giving** 33:5 50:15 63:9
**glad** 11:14
**glenn** 17:13
**go** 11:24 14:1 17:5 18:24 30:18 33:20 33:24 36:24 44:5 49:17 54:11
**goes** 10:10
**going** 11:17,19,24 16:16,17 19:7 26:10 34:1,17 36:24 38:11 43:23 49:17 51:24 52:5 55:21 57:4,6 60:12

63:13 64:20
**good** 6:2 9:5 40:15
58:4 62:4 63:2 67:5
**gotten** 29:10 38:14
47:7
**graduate** 10:2
**graduated** 9:18
10:3
**grand** 21:12,20
44:5,18 50:19
**grass** 29:12
**greetings** 80:5
**ground** 25:2,12
29:5,17,19,23
39:11,14 42:6 60:1
63:1
**group** 44:11
**guess** 28:10 30:11
54:15 57:12 74:14
**gulf** 17:3,11,12
**gun** 27:15 28:7
31:6,9 45:11 54:9
56:3,22 59:23 61:4
61:12,21 62:15,20
63:20 72:5
**guns** 32:12 40:24
41:6 71:21
**gunshot** 22:23
54:11
**guys** 14:7 61:24

**h**

**h** 5:7 56:24
**habit** 58:20
**hadn't** 47:23,24
66:10 71:25 72:3,5
75:1
**halcyon** 3:19
**half** 11:8
**hammer** 23:11
**hammers** 23:7

**hand** 8:10 52:13
59:7
**handle** 40:15 47:13
49:14 53:5 70:6
**handling** 50:3
**hands** 37:10 52:15
54:18 59:21,25
65:5,9
**handwritten** 57:25
74:1
**happen** 26:12
37:12 71:20
**happened** 18:11
35:10 37:15,16
41:5 50:24 51:6
64:13 70:13
**hard** 49:15 65:13
**hartenstein** 17:13
**harvell** 32:24
**head** 12:21 25:24
31:19 32:6 37:5
51:4 56:25 61:18
**headed** 16:20
**headquarters** 69:3
**hear** 11:25 25:4,14
31:24 38:21 54:11
**heard** 34:17 65:7
73:16
**hearing** 8:8
**helicopter** 42:4
**help** 18:25 45:22
49:4 67:22 71:1,4,6
**hereto** 78:14 79:11
**he's** 39:24 61:7
**high** 10:20
**highway** 2:5 6:21
**hindered** 60:22
**hired** 9:21
**hispanic** 61:25
**history** 22:14,16

**hit** 28:25 29:1 75:3
**hogrefe** 4:3
**hold** 9:23 55:3 56:6
**holding** 52:11,12
**hoover** 80:22
**hospital** 18:7 23:23
42:5,5
**hoss** 1:13 3:14 6:12
**hostage** 68:8 69:18
**hostages** 72:24
**hour** 51:25 67:5
**hours** 72:25
**huey** 1:13 3:14 6:12
**hunady** 1:10 3:12
6:10 19:13 20:4,17
22:20 25:15,19
26:8,14 27:14,19
28:25 31:25 32:8
33:5 37:18,22 38:5
39:20 41:14 42:14
44:24 46:4 51:18
53:22 56:2 63:4,8
63:13,16 64:8,11
64:16 65:4,15,25
66:8 69:12,17
70:24 71:10 72:21
73:15,20
**hunady's** 27:11,23
36:8 39:18
**hydroplaned** 75:6

**i**

**ice** 61:18
**idea** 13:2 70:18
**identifiable** 53:11
**identification**
57:16
**identify** 7:14 53:8
**ignored** 65:18,22
**il** 3:9
**immediately** 24:14

**imply** 56:17
**incident** 11:9 12:6
13:10 34:7 60:5
**include** 10:1
**including** 16:25
25:15
**independent** 1:5
3:2 6:8
**individual** 1:10,13
3:13,15 6:10,12
**individuals** 53:17
**inflicted** 72:13
**information** 22:16
30:25 34:12 40:22
54:3 72:21
**informed** 38:9
**initially** 51:19
**injected** 41:24 42:7
**injuries** 71:13
72:13,16
**ink** 58:5,6
**inquiries** 38:5
**inquiry** 38:8
**institute** 10:3,16
**instruct** 25:25
**instructed** 37:25
**intended** 7:6
**interaction** 64:23
**interest** 13:9
**interested** 78:15
79:12
**internal** 10:25 11:4
20:23 21:4 28:1,22
48:11
**internet** 10:9
**interstate** 29:8,11
29:12
**interview** 30:5
**interviewed** 30:12
37:14

investigate 11:18
12:5 21:3 22:14
investigated 35:2,3
investigating 41:11
42:10
investigation 11:1
13:8,11,13,23
14:17,19 15:4,8,14
16:11 20:23 22:4
22:11 34:1 43:4,21
43:23 44:2,9,23
49:25 50:9,14,16
62:7
investigations
68:12
investigative 68:18
69:1
investigator 19:21
68:17
investigators 11:13
11:20 12:5 16:17
16:18,20 33:12
35:11 44:25 47:4
invoked 20:21
involved 10:4,14,24
10:25 11:18 12:2
13:3,9,13 15:22
34:22,23,24 44:17
44:20 50:21
isn't 70:7 72:11
isolated 46:12
it's 7:20 10:8,18,22
10:22 11:6 16:12
18:17 19:9,9 21:24
22:7 27:5 28:22
46:15 49:15 51:1
56:9,19 65:13
67:19 70:20 75:20
75:20
i'd 12:24 54:22

i'm 6:14 7:23 10:4
34:2 71:3,5
i've 51:6

**j**

j 3:5,17 7:21 80:1
jacket 37:10 52:13
52:15
jason 17:11
javadi 2:7 6:3 78:2
78:18
jim 17:15,16
job 2:8 68:15
john 32:24
johnson 17:19
join 6:15
jonathan 1:7 3:3
6:9
jonathan's 52:18
jorge 61:24 62:13
63:22
jud 6:7
judson 2:1 7:20
8:12,14 80:2
jury 21:12,20 44:5
44:18 50:19
justice 9:19

**k**

kay 58:25
keep 19:7,8 36:24
47:5,6 49:21 50:9
ketamine 41:20,24
42:7
kind 10:9 11:19,19
23:3,8 27:3,5 28:10
34:19 35:22 40:5
41:9 47:19 50:5
56:17 64:12
knew 16:16,17
know 10:8 12:4
13:15 14:3,5,15

16:1,5,6,9 17:16
18:24 19:16,22
20:3 21:2,21 22:16
25:21 26:13,24
27:11,14 28:3,5,8
28:10,11,11,12
33:22 34:11,19
35:25 36:15 37:3
37:13,14 38:4,7
40:9 42:8,8,17,19
43:17 44:10,19
46:4,8,11,14,17
48:14,18,20,22
49:2,5,16 53:14
54:16 55:19 65:8
67:10,22,23 68:8
68:11 71:3,18
72:20 73:15,18
75:18 76:2
knowledge 78:9
79:6
known 26:25 67:13
71:13

**l**

l 56:24 57:18
lake 3:8
lambert 17:3
landmass 68:1
lane 60:12
lap 59:6
large 29:14 40:5
largest 67:24
law 3:7 10:21 28:9
28:19 44:5,21
47:11 59:17 64:5
70:10,21,22
law.northwestern...
3:10
laws 7:8
lay 59:25

laying 25:1
learn 53:5
leave 44:24 75:7
leaving 75:23
left 16:13 47:5
legal 3:6
lethal 41:10
letting 6:18
let's 14:14,25 30:18
liberty 73:13
licensed 10:4
lieutenant 11:2
58:12
life 41:24
line 67:17 81:11,14
81:17,20,23 82:1,4
82:7,10,13
lingo 55:22
lisa 17:19
list 18:14 32:20,22
listen 62:16
little 9:16 16:15
17:24 18:1 55:4
live 67:8
lived 34:15
local 11:19 44:10
located 68:23 69:5
location 2:4
locations 69:1
lock 66:20 74:19
locked 45:20 59:11
66:17
locking 47:23
long 10:23 22:4
44:22 47:5 55:6
67:2 73:15
longer 11:17 16:15
49:23 53:13 55:4
look 19:23 26:18
27:22 33:10,13
42:19,20

**looked** 33:11 51:6
59:10 61:12
**looking** 29:4 57:22
58:7 63:3
**lost** 10:6
**lot** 12:5,21 23:8
25:1,2 28:13 36:11
36:14 46:16 47:11
53:19,19 55:22
**lower** 29:1
**lumped** 20:1
**lunch** 55:3
**lusk** 32:23

**m**

**m** 56:24 57:18
**mack** 1:13 3:14
6:12 43:4 56:1
**madden** 52:22
**mail** 80:10,19
**major** 11:6,10 12:4
12:11 13:16 14:8
21:3 35:4 43:15,25
47:2 73:11
**majority** 11:21
**making** 10:20 60:2
61:8 81:8,8
**male** 62:14
**manner** 7:9
**manpower** 13:19
**manually** 80:8
**man's** 61:17
**marked** 57:15
**marker** 59:1
**marks** 69:25
**marksman** 28:11
**mass** 28:16 29:1
**math** 69:11
**matter** 6:8 13:4
28:23 41:11 62:19
66:14

**matthew** 1:10 3:12
6:10
**mcneill** 3:17 5:4
6:16 7:18,18 8:22
10:6,11 14:6 20:8
20:14 42:22 52:1
55:2,6,9 57:8,10,12
57:18,20,24 58:4,6
58:10,13,15,19,23
70:14 73:22 75:11
75:24 76:17,21
80:1
**mean** 14:24 16:4,5
22:6 23:7 25:7
29:16 31:18 33:19
34:25 35:2 36:2
45:19,19 46:24
47:1 53:7 54:15
66:3 75:24 76:6
**meaning** 56:5
**means** 7:10 33:21
**meant** 36:23 56:2
**media** 51:15
**median** 59:2
**medical** 22:14,15
49:4 64:2 71:15
**medication** 34:19
**medicine** 34:10
**meet** 16:16,17
**member** 49:20
**members** 49:8
**mental** 34:6,9 46:5
**mention** 74:2,8
**mentioned** 44:8
48:4
**mess** 33:11
**microphones** 25:9
**middleton** 32:23
**mile** 58:25
**mind** 13:24 14:2
61:3 63:3 71:14

**mine** 43:17
**minette** 68:25 69:4
69:5
**minute** 11:23 16:12
51:25 64:24,24
65:1,2
**minutes** 19:23
35:10 64:18,20
67:5,7 68:3 69:6,8
69:12,13
**mississippi** 67:25
**mistaken** 74:13
**mobile** 9:20 60:12
67:11
**moment** 51:20 66:1
**monday** 68:14
72:25
**montgomery** 3:20
**months** 9:21 22:7
44:18
**motions** 60:2 61:8
**move** 71:19,23
**moving** 59:18
**muddy** 39:14,15
**muffled** 25:10
**multiple** 62:12
65:16
**murder** 12:3

**n**

**n** 3:1 5:1 6:1 7:21
**name** 6:2 8:11
57:17 61:17
**names** 12:24 16:23
32:20
**narrative** 19:21
**nathan** 32:23
**national** 10:2
**naval** 9:20
**near** 42:18 58:25
60:4

**necessarily** 38:7,13
40:20 50:8
**necessary** 81:9
**need** 67:23 76:23
**needed** 18:15 43:21
47:8 71:15
**negotiating** 68:9
71:11 73:19
**negotiations** 48:6
**negotiator** 47:19
48:4,5
**negotiators** 68:9,12
69:18
**neither** 78:10 79:7
**never** 39:18 49:16
61:16 69:22
**new** 12:23 52:19
**night** 43:7
**nine** 9:21 16:24,24
72:25
**normal** 53:14 69:9
69:10
**normally** 67:6 68:2
**north** 3:8
**northwestern** 3:6
**notarized** 80:10
**notary** 2:7 6:5 78:1
78:19 82:23
**noted** 61:24 81:4,5
**notes** 13:25 64:15
**noticed** 19:1 59:4,7
**notify** 34:16 43:22
**noting** 80:7
**number** 27:16
35:17
**numerous** 10:1
37:1 59:20

**o**

**o** 6:1 7:21
**oaths** 6:6

**object** 20:8
**objection** 7:1 8:8
  20:11
**observed** 59:1
**obviously** 56:10
  68:21
**occasions** 65:4,16
**occupants** 63:21
**occurred** 60:11
  67:16
**office** 22:2 42:22
  43:19,24 50:18
  55:11 68:10 76:4
**officer** 6:3 9:20
  10:3,14,25 11:18
  11:22 12:2 20:17
  34:22 44:16 51:1
  52:18 63:4 73:8
  78:2
**officers** 25:15
  28:16 41:1 45:7
  48:20 63:7 64:5
**offices** 80:3,10
**oh** 22:5 36:18,24
  39:13 53:8 75:24
**okay** 6:18,19 7:22
  8:1,7,23 9:16 10:11
  11:5,11 12:14,22
  13:20 14:16,22
  15:24 16:10,21
  17:21 18:10 19:6,9
  19:20 20:19 21:6
  22:8 23:13 24:1,24
  26:6,24 27:14 30:1
  30:5,23 31:5 33:1
  33:15,24 34:5,19
  35:1,4,8,13,22 36:4
  36:13,22 37:7
  38:15 40:24 43:25
  44:8 45:17 47:22
  48:4,24 50:23 52:2

52:7 55:2,5 57:11
  57:14,20 58:9,10
  58:22 60:8,22
  62:19,23 63:19
  65:2 67:1,8 70:24
  71:9 74:23 75:9
  76:11,13,16,22
**once** 13:14,23 22:5
  30:3,22 39:6,6
  41:17 42:5 51:6
  60:21 64:23 65:12
  80:10
**ones** 56:13
**open** 45:22
**operators** 28:13
**opinion** 11:15
  61:14
**opposed** 26:3 41:6
  51:22
**option** 44:1
**orange** 17:18,19
**order** 27:6 76:14
  76:15
**ordering** 80:13
**organization** 10:18
**original** 80:13,15
**orleans** 52:19
**outcome** 78:15
  79:12
**outside** 6:25
**oversee** 15:13
**overseeing** 35:16

**p**

**p** 3:1,1 6:1
**p.m.** 52:8 76:24
  77:1
**page** 5:2,8 58:17
  80:18 81:11,14,17
  81:20,23 82:1,4,7
  82:10,13

**pages** 81:9
**palmer** 17:18
**pandemic** 6:23
**paperwork** 15:16
  15:16
**paramedics** 38:22
  40:9 41:23 42:7
**part** 15:7 19:9 32:2
  53:2
**participant** 6:24
**participating** 13:11
**particular** 13:14
  44:15 71:13
**particularly** 58:21
**parties** 6:24 7:2
  44:20 78:11,14
  79:8,11 80:13
**passed** 60:19,21
**passenger** 39:2
  59:22
**patrol** 9:14,24
  68:18
**paused** 51:20
**pdf** 80:7
**pedal** 59:5
**pensacola** 60:13
**people** 16:21 45:5,7
  46:10,13,16 48:18
  56:10,12 70:21
  73:7,18 74:12,19
**percent** 34:2 54:2
**perfect** 10:21
**perfectly** 39:16
**period** 47:7
**permitted** 7:6
**person** 23:21,22,24
  26:21 35:15 38:2
  40:18 53:12,14
  61:13 70:9
**personally** 22:13
  24:22 31:12

**personnel** 13:12
  40:9 45:21 46:15
  47:12 59:14 60:24
  64:2 71:15
**persons** 44:24
  47:10
**ph** 32:25
**phillips** 58:12
  73:23
**phone** 18:23
**photographer** 35:13,16
**photographs** 35:17
**physical** 35:22
**picture** 50:24
**pictures** 16:8
**place** 70:9 73:7
  76:14
**plaintiff** 1:8 3:2 4:2
  7:17
**please** 7:14 8:10
  32:21 80:10,18
  81:9,9
**point** 11:3 13:14
  28:7 39:5 40:21
  41:23 44:19 49:22
  50:5 60:5 73:6
**pointe** 3:19
**pointed** 38:19
  45:11 54:17 71:18
  71:22
**pointing** 62:20
  71:16
**police** 9:8,10,13,20
  12:8 17:3,11,12,13
  17:14,15,18,19
  52:18,19
**popped** 61:17
**portion** 31:24
**position** 11:8 33:6
  41:17 51:7 60:17

63:1,5 70:22
**positioned** 60:3
**positions** 38:11
**possession** 23:1
40:25 46:23 47:3
**possible** 40:19
69:16 70:8
**possibly** 31:20 32:4
34:10 54:3
**potential** 72:12,15
**practice** 13:18
28:13
**preliminary** 38:5
**prepared** 74:2 79:3
**presence** 7:1
**present** 4:1 21:20
25:15 44:18
**presentation** 50:19
**presented** 21:11
50:18
**pressing** 59:5
**pretty** 23:15 27:13
30:20 38:8 39:7
43:12 46:12 54:23
71:2,21
**prevent** 66:19
70:18,20
**prewritten** 58:2
**print** 80:8
**prior** 24:14 26:8
30:4 31:5,15 32:7
34:7 35:12 44:16
59:17 66:7 71:24
78:5
**pritzker** 3:7
**probably** 16:12
18:1 35:3 39:7 67:7
71:20
**problem** 42:25 76:3
**problems** 34:7,9

**procedural** 7:7
**procedure** 49:10
49:13,16 81:6
**proceed** 8:19
**proceeding** 2:4 6:4
7:5 77:2 79:4
**proceedings** 78:3,4
78:6,8 79:6
**process** 22:9
**produced** 7:4 14:4
14:7
**production** 80:20
**professional** 9:17
**prompt** 55:25
**protocol** 43:15
**provide** 14:8 21:1
49:10,25 59:3
**provided** 16:9
47:10 72:21
**public** 2:7 6:24
78:1,19 82:23
**pull** 27:16
**pursuant** 81:6
**put** 14:14,16,25
15:3,16 21:25 26:1
59:25 70:21,22
74:14

**q**

**qualified** 78:7
**question** 20:20
21:14 22:19 23:22
30:11,17 45:4
68:22
**questions** 50:10
55:3 56:21 62:23
66:12 67:1 70:5
**quick** 74:4,6
**quickly** 12:6 39:7
40:19 54:23
**quote** 58:18

**r**

**r** 3:1 6:1
**radio** 55:10,14 56:6
**rainstorm** 29:14
75:6
**raise** 8:10
**randall** 3:17 80:1
**randy** 7:18 8:20
20:11,13 51:24
54:25 57:6 75:18
**rank** 9:24
**ranks** 9:23 10:1
**reach** 74:20
**reaction** 40:13
**reactions** 10:20
**read** 57:5 58:19,21
60:6,17 61:2 62:11
73:22 75:13,16
80:6 81:2
**readandsign** 80:18
**reading** 57:4 58:17
**ready** 71:20
**real** 74:4,6
**really** 21:25 23:23
29:3 41:12 42:9
46:13 48:12,12
49:15 62:4 63:1
66:14 75:20 76:4
**rear** 59:18
**reason** 15:20 44:13
47:6 50:20 55:16
65:3 71:10 81:13
81:16,19,22 82:3,6
82:9,12,15
**reasons** 81:8
**recall** 39:5 51:5
52:17 55:10,13
62:24
**receive** 48:19
**received** 40:22
55:11

**receives** 48:15
**recommendation**
21:18,21,23
**recommendations**
21:19
**record** 6:4,6 7:2,14
8:11 52:5,6,8 55:19
76:24 78:9 79:5
**recorded** 7:9 78:6
**recording** 7:4
75:19 78:8 79:4
**records** 55:14
**recover** 15:24
23:11
**recovered** 23:9
**red** 75:8
**reddy** 61:18 62:1
63:24
**reduced** 78:6
**refer** 13:24 14:2
**reference** 32:3
**reflect** 55:14
**refresh** 55:21
**refused** 59:16
**regarding** 56:21
**related** 14:13 15:16
78:11 79:7
**relative** 78:13
79:10
**remember** 14:22
19:22 26:7,11,17
31:19 32:2,14
37:11,12,21 48:24
52:16,21 53:4
61:17 63:15 65:1
65:10,11,13
**remote** 2:4
**remotely** 6:25 7:14
**render** 71:15
**report** 14:16,18
21:22,24 31:13,17

38:15,18 41:8,9
**reported** 2:7 23:25
  31:22 48:1 62:18
**reporter** 6:2,18
  7:22,24 8:2,6,18
  17:8 42:25 52:4,7
  76:13,16,19,22
**reports** 74:17
**requested** 27:10
  78:21 80:6
**research** 10:19
**reserved** 76:25
**residence** 16:13
  67:4 68:3
**resigned** 11:7
**resolved** 56:7
**respect** 41:6 47:10
**respond** 38:3 42:2
**responded** 18:19
**responsibility**
  41:12 42:10 80:6
**responsible** 15:15
  26:21 29:4 35:15
**rest** 20:1 63:6
**restraint** 66:10
**retrieve** 36:20
**return** 21:12
**returned** 80:12,15
**review** 24:22 31:11
  74:4,6 76:8,9 78:21
  80:7
**reviewed** 70:12
**rex** 17:14 35:9
**ride** 42:4
**rifle** 26:15
**right** 8:10 9:3,5,9
  9:12 10:13 12:25
  13:12 14:10,22
  15:10,20 16:10,23
  18:3,6,13,16 20:3
  20:11,13,21 21:6

21:15 23:13,17
  25:2,4,5,11,14,23
  26:2,8,16,18 27:9
  27:22 28:15,21,24
  29:9,16 30:14 31:2
  31:13 32:20 35:17
  36:7,10,16 37:3,22
  38:4 39:2,25 41:22
  42:17 43:6,10 44:6
  45:6,23 46:20 47:9
  47:15 50:15,21
  51:9 53:4,22 55:23
  56:20 57:24 58:4
  58:13,16 60:20
  61:2 62:1 64:21
  67:16 68:5 69:11
  71:16 72:15,17,24
  73:25 74:16 75:4,8
  75:15 76:6,12,20
  76:22
**rights** 20:4
**rivers** 17:15,16
**road** 46:18 75:7
**rob** 17:18
**robertsdale** 17:14
**role** 11:5 13:22
  21:25
**roll** 12:21
**rolled** 59:11 66:17
  66:20
**room** 52:3
**rose** 9:23,25
**rounds** 36:15
**rule** 81:6,7
**rules** 7:8
**run** 51:23
**running** 51:22 60:1
**runs** 60:9
**rush** 75:21 76:7

**s**
**s** 3:1,10 5:7 6:1
  7:21
**safe** 46:10
**safety** 6:24 27:5
  40:15 63:7
**salvata** 79:2,15
**sam** 7:16 67:10,22
**samuel** 3:5
**satellite** 68:25
**saturday** 68:5
**save** 41:24
**saw** 31:9,21 32:8
**saying** 26:3 37:11
  42:9 61:7 65:11
  75:14
**says** 71:5
**scene** 13:15,17,20
  15:5,13,19 16:17
  16:20 17:17,22
  18:21 19:19 24:17
  26:22 33:12,12
  35:5,11,14,15,16
  35:25 37:6,19,23
  38:6 41:10 43:8
  45:5 46:9 47:3
  50:25 56:12 60:4
  62:4,24 63:3,6,9,15
  63:19 64:16 69:6
  69:18 73:8,16
**school** 3:7
**science** 10:3,15,16
**scientific** 10:19
**scissors** 23:7,13,15
**seal** 80:12
**search** 23:24
**seat** 19:3 31:4
  33:16,18 74:20
**second** 35:6 52:4
**seconds** 64:19,25
  66:1,4

**secure** 46:9
**secured** 49:3
**see** 20:1 32:22
  33:15,19,21,21
  39:8,19,19 40:1
  41:5 57:4 61:10,11
  74:8
**seeing** 20:16
**seen** 27:4 30:16,19
  35:18 61:6
**self** 72:13
**send** 80:13
**sense** 56:17
**sergeant** 56:2
**set** 23:17 52:3
**seven** 16:24 32:17
**shady** 80:21
**she'll** 75:16
**shears** 23:17
**sheriff** 1:14 3:15
  6:13 11:15 12:8,20
  13:6 43:4 49:19
  50:3,5 56:1
**sheriff's** 1:12 3:14
  6:11 12:17 13:22
  15:21 18:12 19:4
  20:22 28:18 32:18
  34:3,14 36:19
  38:22 41:1 45:6
  46:8 48:6,14,18
  68:10,23,24
**she's** 6:16
**shift** 68:20
**shifts** 68:20
**shock** 75:1
**shoot** 26:10 28:16
**shooting** 10:4,25
  12:3 14:25 15:22
  41:5 44:17 48:25
  51:12 60:2 64:12

**shootings** 10:14,21
  10:22 11:18 34:22
**shore** 3:8 67:14
**shores** 17:3,11,12
**short** 13:19
**shorter** 69:13
**shorthanded** 44:14
**shot** 22:20 34:25
  60:3 62:24 63:2,17
  72:3
**shots** 64:18
**show** 55:15 58:17
  59:21 64:12 65:5,9
**shown** 62:1 66:10
**shrunk** 66:6
**shut** 16:14
**side** 39:2 47:21
  59:22 60:16 65:8
  67:19 72:7,10
**sign** 75:14,16 80:6
**signature** 76:11,25
  78:17 79:14 80:2
  80:16 82:18
**signed** 80:10,12,15
**silver** 59:1
**single** 18:19 38:2
**sir** 14:21 19:15
  21:2 22:10,22,24
  23:2,22 24:4,7,10
  24:13,21 25:6,13
  25:17 27:2 28:1
  30:7 31:7,10,18
  33:2 34:21 35:19
  36:3,18 37:20
  38:17 39:3 40:7
  41:3 42:23 44:12
  46:22 47:14 50:17
  54:10,12,21,24
  55:18 56:16 61:15
  64:14 68:4 69:15
  72:2,4,6 74:15

**situation** 47:16,20
  49:12,14 50:6
  53:15 54:13,19
  56:6,9 63:19 70:6
  70:17 71:9 72:10
**situations** 10:21
  53:6,9,11 70:7 73:3
**six** 12:19 16:24
  32:16,17 37:15
**size** 40:5
**skills** 78:10 79:6
**slash** 69:25
**slowly** 58:20
**small** 23:15 39:9
**smart** 26:25 27:1,8
  27:12
**soggy** 29:6,23
**somebody** 13:7
  18:19 19:18 47:20
  70:11 71:11
**someone's** 47:16
**somewhat** 27:7
**sorry** 6:14 11:23
  18:23 20:9 27:10
  45:2 55:3
**sound** 51:13
**sounds** 51:14 64:21
**south** 9:18
**southern** 1:2,3
  29:14
**speak** 19:6,13
  59:15
**speaking** 8:3
**spellings** 76:23
**spent** 36:14
**spoke** 72:20
**spoken** 37:9,18
**spot** 36:17
**stance** 61:7
**stand** 76:22

**standard** 40:5
**standing** 29:24
  30:3 39:4 61:11
**start** 7:15 53:21
**started** 49:3
**state** 8:10 10:5
  11:17 22:17 44:4,9
  44:14,18 45:14,16
  46:6 53:12 78:20
**stated** 31:25 59:3
  59:10,12,21 61:20
**statement** 5:9
  19:16,18,20,25
  20:17 26:11 45:14
  56:22 57:3,8 58:1,3
  60:18 61:3,6 74:1,3
  75:14 81:8
**statements** 13:16
  13:21 20:2
**states** 1:1 81:7
**station** 9:20
**stayed** 41:18
**stealman** 73:8
**stenographic** 7:10
**stephanie** 32:24
**stepped** 39:6,10
**steps** 16:11 46:8,11
  53:18 74:20
**steve** 12:16 18:12
**stipulation** 7:11
**stipulations** 8:21
**stolen** 24:6
**stop** 18:23 54:14,16
  56:10
**stopped** 46:14,17
  59:3 60:21
**straight** 63:13
**straighten** 42:24
**stress** 10:20
**strictly** 41:11

**stuck** 18:20 46:19
  46:20 74:25
**student** 4:3,4
**students** 6:17
**stuff** 23:8,8 27:5
  33:20
**style** 26:15
**subconsciously**
  61:10
**subject** 18:22 56:3
  60:1
**subpoenas** 22:17
**subscribed** 82:19
**substance** 81:7
**substantial** 69:13
**suicide** 48:16 52:24
  70:3,5,7,8,9,17,18
  70:19,20,21
**summary** 5:9 14:16
  14:18 21:22,24
  57:3,21,25 58:7
  73:22
**supervise** 9:14
**supervised** 22:8
**supervising** 15:18
**supervisor** 11:3
  15:5
**supposed** 47:13,16
  76:4
**supposedly** 31:25
  34:20
**sure** 7:25 10:10
  12:20,24 16:4 17:2
  18:17 25:24 27:13
  28:17 30:17 32:5
  34:2 36:5 46:9 51:3
  52:1 55:5 58:16
  65:15 68:11,16
  70:8 71:2,21
**surprised** 48:21

**suspicious** 30:24
**suv** 59:1
**swat** 28:3,5,12,13
**swear** 6:25 8:8
**sworn** 7:2 8:15
78:5 82:19
**system** 36:20

**t**

**t** 5:7
**take** 6:4,5 15:9
19:19,23 26:18
40:25 45:3 46:23
51:25 53:18 55:6
63:6,17 67:2 68:2
74:20 75:22
**taken** 6:8 18:7
36:18 47:23,24
56:23 58:8 67:7
72:25 75:15 78:3
78:12 79:9
**takes** 73:5,7
**talked** 43:8,17
49:20
**talking** 27:8 39:23
53:19 58:20
**tape** 31:24 32:2
71:5
**tapes** 31:11,14
**taser** 41:8 53:22
**tasers** 41:2
**tasks** 18:14
**team** 28:3,5,12 48:6
48:9 54:6 68:9
71:11 73:19
**technology** 19:10
**tell** 8:16 9:5,16
18:16 25:15 26:9
32:16 38:21 45:3
74:19
**tenenbaum** 3:5,10
5:3,5 7:15,16,16

8:5,20,23 9:2 10:12
14:10,11 20:10,12
20:18 51:24 52:2,9
54:25 57:6,9,11,14
57:17,19,22 58:2,5
58:9,11,14 70:16
75:9,12 76:1,6,11
76:15,18,20
**tense** 56:9
**term** 25:20 26:25
66:16 72:8
**terms** 27:25 28:15
**testified** 8:17
**testifying** 78:5
**testimony** 56:1
66:12 81:2,7
**thank** 8:7,18
**that's** 8:1 14:20
20:11 27:8 28:1
29:3 40:3 47:10
48:11 49:16 53:1
54:18 55:5 56:4,19
57:3 58:13 60:20
61:9 62:3,17 63:9
66:16 70:14
**thereto** 24:14
**there's** 19:21 21:23
21:23 22:19 46:12
49:13 51:14,15,15
66:12 68:20 72:15
75:21
**thing** 28:1,22 33:25
48:11 57:23 70:12
**things** 40:16
**think** 11:6 16:7,8
16:22 17:24 19:18
21:2 22:15 30:20
30:24 32:3,16 33:5
35:18,21 37:14,24
37:25 38:8,10,11
38:13 40:17,20,21

41:17 44:8,19 50:1
50:1,9 51:19 54:1,2
54:5,25 55:2 57:22
60:19,25 61:5,7,16
65:8 70:20 71:12
71:14,20 72:22
75:19 76:7
**thinking** 53:14
61:20
**thought** 36:23
74:12
**threatened** 38:19
44:25 45:8
**three** 16:18 22:7
32:17
**throw** 72:12
**thursday** 2:2
**tidbit** 67:23
**till** 46:2 76:4
**tim** 52:22
**time** 2:3 6:14,20
7:13 11:3,8,22
12:19 13:8 14:24
17:21 19:14,17
20:3 22:20 23:24
24:8,11,14 28:13
29:10 30:21 39:10
40:13,21 47:4,7,20
50:4,17 53:19
56:13 63:5 66:6,24
68:10 69:19 71:24
72:7,10,14 73:5,7
73:16 76:14 80:15
**timeline** 64:13
**times** 27:16 47:18
59:20,25 62:12
**timing** 76:2
**today** 8:4
**told** 33:25 34:13
37:9,23 46:4,7
54:22 59:24 71:5

**tomorrow** 75:23
**top** 12:20 25:24
28:7 31:19 32:6
37:5 51:3 56:25
**totally** 22:5
**touch** 34:16 49:21
50:10
**touched** 42:1
**towed** 46:21
**towel** 59:8
**traffic** 46:14 55:10
55:15 56:6 67:6
**trained** 28:16
68:16
**training** 10:14
28:15 47:9,11
48:15,19,20 52:25
53:1,2,4 70:6
**trainings** 10:1
**trains** 28:18
**transcribed** 62:8
**transcriber** 79:1
**transcript** 7:4
75:14 78:21 79:3,5
80:7,13,15 81:2
**transcription** 62:11
**transcriptionist**
78:7
**transferred** 68:17
**translated** 62:8,8
62:16
**translation** 62:12
**tried** 22:15 49:21
**trigger** 27:16
**truck** 40:3,6 41:15
41:17 51:2,7 61:18
61:18 62:1 63:24
65:22
**trucks** 60:23
**true** 21:12,16 78:9
79:5

**truth** 8:16,16,17
**try** 25:25 34:15
50:11 53:15 56:25
58:19,22
**trying** 19:8 21:6
30:21 40:22 41:23
42:12,24 50:9
65:12 70:9 73:6,6
**turn** 19:8 22:1 44:1
44:7
**turned** 43:23
**turning** 39:24
**two** 10:22 15:6
32:17 64:25 65:12
**type** 26:13 54:19
68:9 75:16
**typewriting** 78:7
**typical** 23:4 28:18
**typically** 23:10
28:12 47:19

**u**

**u** 7:21 56:24,24
57:18
**unconscious** 59:5
72:17
**unconsciously**
61:10
**undersigned** 81:2
**understand** 7:3
30:11 50:20
**understanding**
42:1
**unfair** 45:15
**unfortunately**
53:10,16 70:21
**unintended** 44:4
**unit** 11:6,10,11
12:4,10,11,15
13:17 14:8 21:3
35:5 43:16,25 47:2
69:1 73:11

**united** 1:1
**university** 3:6 9:18
**updates** 49:11,18
49:25 50:15
**updating** 50:8
**urgency** 56:18
**use** 24:8 53:25
55:22 56:4 66:16
66:18 70:10 72:8
81:9
**uses** 7:6 55:24,25
**usual** 8:20

**v**

**v** 1:9
**vacation** 75:22
**vaguely** 32:2
**vantage** 60:5
**vehicle** 18:19 23:9
23:20 24:6 30:22
31:8,15 33:7,8,13
33:23 36:12 38:2,3
39:6,9,10,20 40:2
42:2 45:18 46:17
46:23 47:3,4,7,23
49:3,3 51:18 52:11
54:4,17 59:6,16,18
59:20,22 61:1,25
64:24 66:13,15
70:25 71:3,25
74:21 75:5
**vehicles** 40:11
**verbal** 63:5
**verbiage** 25:25
32:5
**veritext** 6:3 80:10
80:20
**veritext.com** 80:18
**version** 62:17
**versus** 69:12
**viable** 12:11

**victim** 44:20 49:12
**victor** 1:7 3:3 6:9
13:3 21:10 22:21
22:23,25 24:5,8,11
24:15,17 25:16
26:3,9 27:19 30:9
31:25 33:4 37:9
38:15,18 39:1,19
40:1 41:20 42:1
44:25 45:7,11,13
47:22 48:25 51:6
51:17 52:10 54:17
56:22 61:4,8,11,21
62:15,20 63:12,20
64:23 65:18,22
66:6,7,13 69:24
70:25 71:13,19,22
71:24 72:16 74:9
74:16
**victor's** 18:6 22:11
23:21 29:1 34:5
46:5 61:1
**video** 10:7 16:6
19:7 36:15 37:13
51:1 61:20,23,24
62:8,13,13,25
63:21,22 64:16
65:21
**videoconference**
2:1 3:5,17 4:2,3,4
**videos** 16:7,8 36:16
40:10 43:20 50:23
51:5,11 61:6 62:2
65:13
**videotaped** 35:21
**videotapes** 24:22
35:20
**view** 60:23 62:4
63:17
**viewable** 51:15

**violations** 21:5
**virtually** 7:4
**vivid** 60:5
**voluntary** 58:2
**volunteer** 18:18
**vonbergen** 32:24
**vs** 6:10

**w**

**waited** 71:10,12
**waive** 75:15
**waived** 76:12
**walk** 30:1 51:22,23
**walking** 40:10
51:18
**want** 12:23 17:1,6
24:2 26:12 30:16
33:11,24,24 38:23
49:22 56:10,12
58:16,18 72:9 74:4
75:22 76:13
**wanted** 13:1 24:19
26:2 36:5 40:14,19
41:5
**warrants** 24:11
**wasn't** 23:17 24:2
30:4 35:6 39:16
41:12 42:10 52:12
61:13 62:25 66:23
**watch** 10:9
**water** 29:24,24
30:3 39:4
**way** 14:3,14 15:1,6
16:14,19 39:24
40:15 53:15 54:7
61:5,11 69:16,24
74:14
**wayne** 5:10 56:23
**weapon** 22:25 23:3
23:5,6,10 24:9
25:16,20,21 26:9
26:13,17,19,24

27:1,7,11,12,20,25
30:9,19,19 31:14
32:1,4,7,9 33:1
38:16,19 40:21
49:1,6 54:3 56:3
61:10 70:10,10
74:2,7,8,12
**weapons** 26:22
27:8 28:14 35:24
36:1,5,6 40:8,25
41:6
**webb** 3:18
**webbeley.com** 3:21
**week** 10:22,23
**weekend** 68:13
**weekends** 73:3
**wendy** 58:24
**went** 9:19 23:23
43:16,16 49:2
55:11 65:21
**weren't** 36:6 50:15
**west** 2:5 6:21 60:9
**wet** 29:6,17,20,21
39:12 75:7
**we've** 35:18 51:24
**whatnot** 43:20
**what's** 16:9 26:24
**who's** 32:22
**wife** 58:24 74:1
**window** 59:11
**windows** 33:21
66:17,20
**wise** 68:1
**witness** 6:25 7:2,3
7:23 8:9,15 10:8
13:16 19:24 20:9
20:16 30:8 55:5
76:3,9 78:4 80:18
**witnesses** 30:6,12
45:6 72:19

**wondering** 20:6
**won't** 64:21
**woodruff** 17:11
**work** 9:19 68:13
**worked** 13:2 15:6
**working** 68:21
**works** 28:9 35:9
69:1
**wounds** 22:23
**wrap** 37:9
**wrapped** 52:13,15
59:7
**wreck** 72:13
**write** 49:15
**writing** 17:6
**written** 7:11 49:13
**wschaller** 3:21

**x**

**x** 5:1,7 78:21

**y**

**y** 7:21
**yeah** 17:8 26:1
33:17 37:1 41:8
49:19 57:9 60:7
68:2 75:3 76:3,15
76:17
**year** 11:8
**years** 9:22 44:16
**yelled** 59:9
**yelling** 59:12
**yesterday** 42:25
**you'd** 76:7
**you've** 52:25 72:8

**z**

**zachary** 32:23
**zoom** 6:4

(e) Submission to witness; changes; signing. When
the testimony is fully transcribed the deposition
shall be submitted to the witness for examination
and shall be read to or by the witness, unless such
examination and reading are waived by the witness
and by the parties. Any changes in form or
substance which the witness desires to make shall
be entered upon the deposition by the officer with
a statement of the reasons given by the witness for
making them. The deposition shall then be signed by
the witness, unless the parties by stipulation
waive the signing or the witness is ill or cannot
be found or refuses to sign. If the deposition is
not signed by the witness within thirty (30) days
of its submission to the witness, the officer shall
sign it and state on the record the fact of the
waiver or of the illness or absence of the witness
or the fact of the refusal to sign together with
the reason, if any, given therefor; the deposition
may then be used as fully as though signed unless
on a motion to suppress under Rule 32(d)(4) the

court holds that the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

(F) Certification and filing by officer; exhibits; copies; notice of filing.

(1) The officer shall certify on the deposition that the witness was duly sworn by the officer and that the deposition is a true record of the testimony given by the witness. Unless otherwise ordered by the court, the officer shall then securely seal the deposition in an envelope indorsed with the title of the action and marked "Deposition of [here insert name of witness]" and shall promptly file it with the court in which the action is pending or send it by registered or certified mail to the clerk thereof for filing.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.