# EXHIBIT 5

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF ALABAMA
2                   SOUTHERN DIVISION

3                    CASE NO. 1:19-cv-00221-C

4    DONNA CHISESI, AS INDEPENDENT
     ADMINISTRATRIX OF THE ESTATE
5    OF JONATHAN VICTOR, DECEASED,

6         Plaintiff,

7    vs.

8    MATTHEW HUNADY, in his
     individual capacity, as a
9    Baldwin County, Alabama,
     Sheriff's Deputy, and HUEY
10   HOSS MACK, in his individual
     capacity, as the Sheriff
11   of Baldwin County, Alabama,

12        Defendants.
     _____/
13
                      DEPOSITION OF
14                    W. KEN KATSARIS

15            Taken on Behalf of DEFENDANTS

16        DATE:          December 18, 2020
          TIME:          11:00 a.m. - 1:38 p.m.
17        PLACE:         For the Record Reporting
                         1500 Mahan Drive, Suite 140
18                       Tallahassee, Florida

19        Examination of the witness taken before:

20             JEFFREY R. BABCOCK
                 Court Reporter
21         For the Record Reporting, Inc.
            1500 Mahan Drive - Suite 140
22          Tallahassee, Florida 32308

23

24

25

APPEARANCES OF COUNSEL:

On behalf of the PLAINTIFF:
(Appearing via Zoom)
JACK SAMUEL TENENBAUM, ESQUIRE
Northwestern Pritzker University
School of Law
375 East Chicago Avenue
Chicago, Illinois, 60611
Phone:  312-953-7185
Email:  s-tenebaum@law.northwestern.edu

On behalf of the DEFENDANTS:
(Appearing via Zoom)
J. RANDALL MCNEILL, ESQUIRE
Webb and Eley, P.C.
PO Box 240909
Montgomery, Alabama 36124-0909
Phone:  334-262-1850
Email:  rmcneill@webbeley.com

Also Present via Zoom:

WILLIAM HAMELINE
ERIC HOGREFE
DONNA CHISESI

```
 1                      INDEX TO WITNESS

 2   W. KEN KATSARIS                                   PAGE

 3           Examination by MR. MCNEILL                  4
             Examination by MR. TENENBAUM              102

 4                          * * *

 5                     E X H I B I T S

 6   NUMBER                 DESCRIPTION              PAGE

 7   For the Defendant:

 8     1   Expert Report                              9
 9     2   Attachment A                              10
       3   Barricaded Subjects                       20
10     4   Suicide by Cop                            20

11                          * * *

12   Certificate of Oath                            106
     Certificate of Reporter                        107
13
                             * * *
14
```

```
 1                    D E P O S I T I O N
 2  Whereupon,
 3                    W. KEN KATSARIS
 4  was called as a witness, having been first duly sworn to
 5  speak the truth, the whole truth, and nothing but the
 6  truth, was examined and testified as follows:
 7            THE WITNESS:  I do.
 8                  E X A M I N A T I O N
 9  BY MR. MCNEILL:
10       Q.   If you would, state your name for the record,
11  please, sir.
12       A.   William Kenneth Katsaris, K-a-t-s-a-r-i-s.
13       Q.   Katsaris; correct?  Almost like "thesaurus," but
14  Katsaris.  That way I can keep it straight in my head,
15  because I am terrible at names sometimes --
16       A.   Yes.
17       Q.   -- need to get -- what is your current
18  occupation?
19       A.   I am a law enforcement trainer and consultant.
20       Q.   And do you have any businesses that you work out
21  of for this job?
22       A.   I do not.  There's no LLC, there's no
23  Incorporation, I work under W. Ken Katsaris, Consultant.
24       Q.   And I take it you were just a sole proprietorship
25  then; correct?
```

1      A.   I was what, sir?

2      Q.   A sole proprietorship, as --

3      A.   Oh, yes, sole proprietor; that's correct, sir.

4      Q.   Before we took the deposition, we were chatting,

5  and you teach a great deal, it appears.  Where do you

6  teach?

7      A.   Well, I teach all over the United States, either

8  for individual agencies or seminars that individual

9  agencies register for, throughout the country.  I teach --

10     Q.   It --

11     A.   But I also teach at the Pat Thomas Law

12 Enforcement Academy, which is the academy serving the

13 entire State of Florida, as well as eight counties for

14 city and county officers; as well as all of the state

15 agencies and the Public Safety Institute of the State of

16 Florida, which serves primarily the whole region of the

17 south, but if they want to come from other locations for

18 advanced training, they can.

19     Q.   I take it, then -- and this is why I was getting

20 to this question -- you are familiar, then, with the

21 states that make up the 11th Circuit:  Georgia, Florida,

22 Alabama; correct?

23     A.   Oh, of course.  Yes.

24     Q.   And have you taught classes in all three of those

25 states?

1    A.   I probably have taught everybody from all three

2  states, but sometimes they come to me, and it's not always

3  in that state.  I'm trying to -- I know I've taught in

4  Georgia; I'm trying to remember if I actually put on a

5  class in Alabama.  I've been doing this a long time.  I

6  don't recall for sure.  I've been all over the country,

7  obviously, with law enforcement agencies.  I know I've

8  consulted a lot in Alabama, but you know, whether I

9  actually taught recruits I don't recall that.

10   Q.   When you say you consulted here in Alabama --

11  now, I don't need to know all of them -- if you could just

12  kind of give me a quick survey of different law

13  enforcement agencies that you have consulted with.

14   A.   Oh, gosh.  There's too many.  But I mean, to

15  Montgomery, Mobile -- especially Mobile.

16   Q.   How about Baldwin County, because --

17   A.   I had a plaintiff case involving Baldwin County a

18  long time ago, but I don't think -- I don't know whether

19  they attended any of my seminars.  I don't have class

20  rosters.

21   Q.   Do you know if you had taught at any of the

22  municipalities, such as Fairhope, Daphne, Spanish Fort,

23  Bay Minette, Gulf Shores, Orange Beach?

24   A.   I had a defense case in Gulf Shores, I believe;

25  that sounds familiar.

1    Q.   Okay.

2    A.   But whether I taught them or we just consulted on

3 policy, I don't know.

4    Q.   Are you familiar with Baldwin County and its

5 geography?

6    A.   Well, you know, I haven't studied it.  And you

7 know, I fly in and get a car and drive, I don't always

8 recall exactly locations and geography, no.  I -- it's

9 been a while since I had that file.

10    Q.   Sure.  Kind of fun fact: Baldwin County is the

11 largest geographic county east of the Mississippi.

12    A.   Okay.  I don't know that I remembered that.

13    Q.   Okay.  It takes you an hour-and-a-half to drive

14 north and south in that county, maybe two hours.  It's a

15 very long, wide county as well.

16    A.   I work with large counties.  Jacksonville, which

17 is Duval County in Florida, Dade County; and then out

18 west.  When you get to San Bernalillo County, when you get

19 to San Bernadino, when you get to Las Vegas and Clark

20 County, some of those deputies have to stay overnight to

21 get from one end to the other.

22    Q.   Yeah, I bet.

23    A.   So --

24    Q.   -- that a large geographic county would put a

25 strain on the law enforcement resources; in other words,

1 to be able to get to a scene quickly?

2     A.  Well, I'm sure it could.  I mean, you know,

3 depending on circumstances, sure, absolutely.

4     Q.  Okay.  Following back on the questionnaire, how

5 long have you been teaching?

6     A.  How long have I been teaching?

7     Q.  Teaching, yes, sir.

8     A.  50 years.

9     Q.  I actually really remember you from back in the

10 70s, when you were a sheriff in Leon County.

11     A.  You remember that?

12     Q.  I actually do remember that.

13     A.  You've been watching Netflix, then.

14     Q.  I have watched Netflix.  But I remember that

15 beforehand, just --

16     A.  All right.  They cast a nice looking guy in the

17 movie that played my part:  Kevin McClatchy.  He sent me a

18 photograph of he and the lead, Zach Efron.  They were

19 doing my part where I didn't do what they did:  Ordered an

20 inmate to be beaten up.  I never did that, so don't

21 believe it.

22     Q.  Oh, I didn't believe that.  I didn't believe

23 that.  But I'm a former prosecutor, a prosecutor for 25

24 years before I retired, and that's how I was familiar with

25 some of your work.  I'm not going to quibble about your

1  qualifications, you've got ample qualifications to come in

2  and testify and give opinion; what I'm going to talk to

3  you about mostly is your report.  Now, I am not the best

4  at this share file function -- share screen function, but

5  I'm going to try to do that, okay?

6      A.   You're going to put it on the screen?

7      Q.   Yeah, I'm about to in just --

8      A.   I don't know if I can see it.  It's a small

9  square way far away from me.

10      Q.   Well, I may not.

11      A.   You might just want to refer to the page; I've

12  got it in front of me, maybe we can just coordinate that

13  way.  I wouldn't be able to --

14      Q.   I have "Host disabled participant screen

15  sharing," what does that mean?

16            MR. TENENBAUM:  That means the reporter shut

17      it down, so the reporter can turn it on.

18            MR. MCNEILL:  Okay.  I'm going to close out

19      of that.  Can the reporter turn that on for me?

20            (Brief Pause.  Discussion off the record.)

21            MR. MCNEILL:  Exhibit 1 for this deposition

22      is going to be his report.

23            MR. TENENBAUM:  Okay.

24            (Exhibit Number 1 was marked for

25      identification.)

1  BY MR. MCNEILL:

2      Q.  Mr. Katsaris, if you would, look at your report.

3  I show that it is 17 pages, and it is signed by you and

4  dated 11th November 2020.  Just want to make sure I'm

5  looking at the same and correct file.

6      A.  I'm going to look at the date, sir.

7      Q.  All right.

8      A.  I'm going to look at it right now.  I have an

9  Attachment A, it's 17 pages.  It is signed by me and it is

10 on the 11th of November.

11     Q.  All right.  Now, you just got to my next

12 question.

13            MR. MCNEILL:  Sam, Exhibit 2 is going to be

14      the Attachment A.

15            (Exhibit Number 2 was marked for

16      identification.)

17            THE WITNESS:  Yes.  Attachment A is the

18      materials reviewed.

19 BY MR. MCNEILL:

20     Q.  And the Attachment A, did you prepare that

21 contemporaneously with the report?

22     A.  I prepared it, yes.  I mean, we had some

23 indication of materials sent.  I went through and made

24 certain I had the materials, and I reorganized it; but

25 this is the attachment of -- from me as to what I had.

1    Q.   Okay.  Had there been any other addendums to this

2  report since you dated it?

3    A.   No.  I continually ask for depositions, which I

4  take came after the deadline for the exchange of reports

5  by experts, and I do not have the depositions.  And of

6  course, the caveat is I can't really finalize anything

7  until I see sworn testimony.  I'm sure there's a lot of

8  questions that would be answered that are not in this file

9  of materials, which I'm sure you appreciate by reading

10  what they are.

11    Q.   I did, and I did appreciate that.  You just kind

12  of led me to my next question is that since the report was

13  dated, we have taken the depositions of Sheriff Mack, the

14  Plaintiff; then-Corporal/now-Sergeant Hunady; my expert,

15  Shane Healy.  Yesterday we took one of the person who did

16  the investigation -- or was in charge of the

17  investigation, Captain Beedy, at Daphne Police Department.

18  And I've taken that from your comment you just made you

19  have not had the opportunity to review any of those

20  depositions?

21    A.   I have not.  And it is my policy that I attempt

22  in every way possible not to write a report before I have

23  depositions, because the issues need to be fleshed out and

24  answers need to come to questions that are not necessarily

25  part of a criminal investigation file; that relate more to

1  civil-related issues that would impact my assessments.

2       Q.   Certainly.  I understand that.  That kind of goes

3  to my next question, then, because as I was reading your

4  report, I just -- kind of reading between the lines that

5  you were basically saying that your report on the Exhibit

6  1 is incomplete because you don't have all the

7  information?

8       A.   Well --

9       Q.   Am I reading your intent, or what you were

10 implying correctly?

11      A.   I didn't say it's incomplete, let's call it

12 "preliminary."

13      Q.   Fair enough.

14      A.   Perhaps to be supplemented, which is an

15 unfortunate situation, because I feel for you.  You're

16 inquiring of me, and I don't have all of the answers which

17 puts you and me in a bad position for this particular

18 deposition.

19      Q.   I actually -- I also kind of feel for you,

20 because it does put you in a spot.  I agree with that.  If

21 I ask questions that seem to be terse, I'm not trying to

22 be rude or anything, I'm just trying to understand and

23 trying to do the best I can to complete the report so that

24 the trier of fact, and particularly the judge in this

25 case, can make a determination what your opinions are,

1  okay?

2      A.   I understand, sir.  This is a deposition, and you

3  aren't to be easy on me, and I won't be easy on you

4  either; so let us both agree that alligators have a good,

5  tough skin, and we're going to adopt being alligators.

6  And that's an independent school that we won't have to

7  worry about, University of Florida, even though it's a

8  rival of both of us.

9      Q.   That's right.  And hopefully we'll handle that

10  one tomorrow.

11      All right, on Exhibit A, I just want to make sure --

12  there's several things that you referenced that you had

13  examined; but I don't see a reference of them, really, in

14  the report that you did.  Most importantly, I don't see

15  where you referenced the statements of Donald Wayne

16  Alumbaugh, A-l-u-m-b-a-u-g-h; the statement of Jorge

17  Gutierrez; the statement of Joseph Devore, III -- and I

18  thought it was "Devoid" from his handwriting --

19  D-e-v-o-r-e is what you have on your report.  I also

20  really don't see where you referenced in your report the

21  complete dash-cam -- the Hunady dash-cam.

22      A.   I say that on second page, "dash-cam" --

23      Q.   Right.  On the second page.  I see --

24      A.   Dash-cam and body cam.

25      Q.   -- see where you examined it, but I don't see

1  where it was really referenced in your report.

2      A.   Well, I don't -- sir, just so you know, I don't

3  reference everything in my report, I draw conclusions.

4  These are the materials I drew conclusions from.

5  Sometimes the statements were statements made that might

6  have been included in another document.

7      Q.   Okay.  So this is why I'm asking this question,

8  let me pull this up, and you kind of answered it.  So my

9  first question is, of everything that is shown on Exhibit

10  2, this Attachment A, in preparing the -- before preparing

11  this report, you reviewed this material?

12      A.   That's correct.

13      Q.   Okay.  In your report on page 1, you speak in the

14  opening paragraph and you -- let me read this correct.

15      A.   Page 1?

16      Q.   Page 1, paragraph 1.  "The materials reviewed and

17  listed in Attachment A are of the type typically relied

18  upon by consultants and experts when conducting an

19  analysis of law enforcement and private security issues,

20  and were sufficient to provide me enough relevant data to

21  develop my opinions to a reasonable degree of professional

22  certainty."

23      A.   Correct.

24      Q.   And then below that you say that you -- next

25  paragraph, you say that you conducted an intensive review.

1  What do you mean by an "intensive review"?

2      A.  Well, I very carefully reviewed everything that

3  was sent to me.  And understand that, since I told you

4  what I reviewed, you know that I reviewed that material.

5      Secondly, this is the type of material typically

6  reviewed.  What I share with you later in my report is I

7  don't have a lot of material, which means that I didn't

8  say that this is sufficient, but for me to reach

9  conclusions based on what I did have, I believe that I

10 reached the proper conclusions for what I had; but I did

11 protest a little bit in my report that I don't have

12 depositions.  So I said later that I need more.

13     Q.  The best of your recollection, about how much

14 time did it take you to review the material in Attachment

15 A, Exhibit 2?

16     A.  I believe I have about 18 hours altogether in

17 reviewing the videos, reading the material, and putting

18 together this particular report.

19     Q.  That seems about right.  Let me go on, then, to

20 some of your findings.

21     A.  Just give me the page and paragraph and we'll

22 go --

23     Q.  I am.  I am.  Let's -- first I want to talk about

24 what you do on page 8, which is your methodology.

25     A.  Yes, sir.  The *Daubert* standard.  I wanted you to

1  know that I try to adhere to the *Daubert* standard, and

2  that unless I have something that gives me evidence, I'm

3  not going to try to assess credibility -- basically that's

4  the bottom line -- and what my methodology is; and that is

5  that I read everything, and then I try to overlay it

6  against the recognized and accepted procedures; and that

7  my opinions have been accepted well over a hundred times

8  in federal and state courts throughout the land.

9      Q.   You answered my question.  So your methodology is

10  basically reading the materials, then use the materials

11  that you read and base it upon the policies and procedures

12  that you believe ought to be applicable; correct?

13      A.   Yes.  And it's wider than, of course, the local

14  policy.  It's wider.  It's what is generally recognized.

15  Your expert, Captain Healy, alluded to, of course -- he

16  tried to pull in internationally-recognized, you know,

17  issues -- mainly national -- but from the International

18  Association of Chiefs of Police.

19      Q.   Correct.

20      A.   Of course, you know, he did so to what was his

21  advantage, because he left off what the International

22  Association of Chiefs of Police also has adopted about

23  recognized and accepted procedures, he took the one that

24  was most beneficial to him; but other than that, we both

25  recognize there are generally-recognized national

1  procedures.

2      Q.  My next question regarding this in your

3  methodology, though, is that do you use a survey of the

4  case law; and particularly in our case, it would be a

5  survey of the case law --

6              (Telephonic Interference.)

7              THE WITNESS:  I'm sorry, I had a distraction.

8      Wait a minute, let me put this on mute.

9              MR. MCNEILL:  Go ahead and do what you need.

10             THE WITNESS:  I forgot to do that, and these

11     things that are in your pocket tend to become a

12     disturbance, and I want to eliminate that.

13             (Brief pause.)

14 BY MR. MCNEILL:

15     Q.  I was asking, I believe was -- on your

16 methodology, is do you use a survey of cases within the

17 U.S. Supreme Court, 11th Circuit opinion, State of Alabama

18 opinion when you are trying to come to any type of

19 conclusion?

20     A.  Well, sir, I do not believe, first of all, that

21 it's proper for an expert to try to research case law in

22 the circuit to render opinions.  I know your expert did.

23     I believe that experts in the field should remain

24 discussing the recognized and accepted adopted procedures

25 for law enforcement officers that are the practices they

1  are directed to implement, because your Officer Hunady

2  probably could not tell you -- I'm not going to say he

3  could or couldn't -- but probably couldn't cite case laws.

4  What he would respond to, what he should respond to, what

5  he must respond to is the recognized and accepted

6  practices of law enforcement.

7      I'm a recognized and accepted police practices expert.

8  If I go off telling the judge what I think the case law is

9  in the 11th Circuit, you will probably find that he's

10 going to strike it; however, I am familiar generally --

11 for example, your expert cited the *Santana* case in Dade

12 County; that was my case.  I was the expert for Dade

13 County on the *Santana* case.  I found it humorous that he

14 mentioned that case, because while the court had an

15 opinion, it had an opinion based on the facts of the case,

16 and the facts of the case had nothing to do with the kinds

17 of facts we're dealing with here.

18     I am familiar with case law, but the last thing I want

19 to do is impress you with my knowledge of the case law

20 unless it's seminal opinions from the U.S. Supreme Court,

21 because those do apply, we do train them in the academy.

22     Of course, those are the cases that drive all the 11th

23 Circuit cases, because in the 11th Circuit cases, even the

24 ones that were mentioned by your expert, they all

25 concluded based on U.S. Supreme Court cases.  Like the

1  *Santana* case, the judge references *Plumhoff* -- which is

2  P-l-u-m-o-f-f -- *versus Arkansas*, which is a U.S. Supreme

3  Court case on the use of deadly force during a pursuit.

4      Obviously, the court applies various legal concepts,

5  but you have to base it on the facts that the judge is

6  aware of.  And like in the *Santana* case, the officers

7  there were SWAT officers, they weren't field officers.

8  They had all the gear necessary to do a search warrant,

9  and in fact, the guy pointed a gun directly at them and

10  they saw the gun and they responded to the gun itself.

11  Facts are totally different.

12      I don't get into case law because -- unless it's U.S.

13  Supreme Court case, either *Tennessee versus Garner*, *Graham*

14  *versus Connor*.  For example, I may cite *Plumhoff versus*

15  *Rickard*, because again, it applies to standards for law

16  enforcement.  There's the *Coweta County* pursuit case,

17  which the Supreme Court ruled on deadly force using an

18  automobile.  I'm familiar with them.

19      I have presented to over ten thousand attorneys

20  throughout the United States on how policy is driven by

21  U.S. Supreme Court cases, and how U.S. Supreme Court cases

22  end up becoming not only part of policy, part of training,

23  but also part of state law.  Anyhow, I won't lecture any

24  further.

25      Q.  And that was my point.  And that was my point is

1  that on the U.S. Supreme Court cases, would you agree with

2  me that proper policies and procedures are going to be

3  somehow or another tied back to a U.S. Supreme Court

4  decision?

5      A.  Yes.  And all of that discussion I just gave you,

6  you'll have to forgive me, I'm a teacher, so I tend to

7  elaborate, but it's because I teach and I want to be

8  precise.  But U.S. Supreme Court cases are different than

9  circuit cases because they don't always stand, and they

10 have individual judges looking at different sets of facts.

11 And if your expert -- or if I had, for example, gotten

12 into citing all kind of case, which I have no problem

13 doing, you would have said "Mr. Katsaris, you're not a

14 lawyer, are you," and I'm going to say no.

15     Q.  No, I agree with that.

16     A.  You know?

17     Q.  I'm just trying to get back to what the policies

18 that you were looking at were, because when I looked over

19 these policies --

20          MR. MCNEILL:  And I might as well as go

21      ahead, Sam -- the Barricaded Subjects policy that's

22      attached to his report, I'm going to mark that one as

23      Exhibit 3.  And the Suicide by Cop Protocol and

24      Training Guide is going to be Exhibit 4, okay?

25          (Exhibit Numbers 3 and 4 were marked for

1    identification.)

2                    MR. TENENBAUM:  Okay.

3                    MR. MCNEILL:  All right.  Now --

4                    THE WITNESS:  You'll provide those?

5                    MR. MCNEILL:  I'm sorry, what?

6                    THE WITNESS:  Are you going to provide those

7        for the case?

8                    MR. MCNEILL:  Yes, I am.  I'm sure the court

9        reporter is going to give me his email at the end, and

10       I'll shoot him those --

11                   THE WITNESS:  Okay.

12   BY MR. MCNEILL:

13       Q.  All right.  As I was reading the Exhibits 3 and

14   Exhibit 4, the Barricaded Subjects and the Suicide by Cop

15   protocol, being a lawyer and having done this for a number

16   of years, I read and I can see that they kind of go back

17   and seem to have their roots in *Graham v. Connor*, and

18   *Tennessee v. Garner*, as most of these use-of-force-type of

19   cases -- situations do.

20       Are you also -- are you familiar with the opinion

21   that I think that's also relevant, and I don't know if you

22   have a -- the policies you used relied on any of these

23   cases:  *Mendez versus the County of Los Angeles*?

24       A.  Yes, I am, sir.

25       Q.  Okay.  And -- because I saw some tendencies on

1  that one as well, and -- oh, goodness, *Sheehan versus the*
2  *City of San Francisco*?

3       A.   Yes, I am, sir.  I teach those cases to attorneys
4  and police officers.

5       Q.   Good.  Okay.  It appears to me that, if you would
6  agree with me, that the Barricaded Subjects and Suicide by
7  Cop protocols seem to really go back and look at
8  particularly the *Sheehan versus the City of San Francisco*
9  case --

10      A.   Yes.

11      Q.   -- would you agree with me on that?  Okay.  All
12  right.  So on page 8 of your report, if you would go back
13  to that please?

14      A.   I'm at page 8.  You said 8?

15      Q.   All right.

16      A.   That's the methodology.

17      Q.   Yes, sir.  Yes, sir.  About the middle of the
18  first paragraph, you write the sentence "I understand that
19  an expert's testimony must be relevant and of assistance
20  to the jury in understanding the evidence"?

21      A.   Yes.

22      Q.   Is it your testimony that your report, Exhibit 1,
23  is written with that standard in mind?

24      A.   Yes, sir.  To the extent that I protested that I
25  didn't have depositions; but yes.

1    Q.   With that caveat, everything else, though, you

2 believe would be relevant; correct?

3    A.   I believe so, yes, sir.

4    Q.   And you believe that it would assist the jury?

5    A.   I believe that it would, sir.  I don't think they

6 understand Suicide by Cop, Barricaded Subjects, or a

7 police officer's position making decisions at a scene.  I

8 think it's pretty simple to understand that, because

9 they're not in that position.

10    For example, your expert, Captain Healy, seems to

11 spend a lot of time talking about how citizen witnesses

12 were talking about they thought he had a gun.  I put down

13 on the margin "that's irrelevant what citizens might

14 think;" we're talking about trained police officers.

15 Trained police officers have got to explain to the jury

16 why they're trained to handle a particular case given

17 certain sets of facts and circumstances.

18    The eyewitnesses assessing what a police officer

19 assesses needs assistance to understand what a police

20 officer is seeing and reacting to, and whether they have

21 options or alternatives.

22    Q.   On the videos that you observed -- I've got a few

23 questions following that point -- on the videos that you

24 observed, did you ever see Corporal Hunady go to the

25 vehicle and observe what was inside the vehicle while

1  Mr. Victor was in the vehicle?

2      A.  I don't recall him going up to the vehicle, no,

3  unless I missed it.

4      Q.  I don't --

5      A.  I don't recall him, no.

6      Q.  Do you recall any law enforcement at all --

7      A.  No, I saw -- I know citizens did, and that was an

8  admission.  I know that fire/medic -- fire did, and that

9  was an admission -- or testimony or reporting, however you

10 want to put it.

11     Q.  It was a report.

12     A.  And medics did.  I don't believe law enforcement

13 did, no.

14     Q.  If you would, turn to page 2 of Exhibit 2.

15     A.  Which is Exhibit 2?  Barricade or the Suicide?

16     Q.  Neither.  It's Attachment A.

17     A.  It's what?

18     Q.  Attachment A.

19     A.  Oh, Attachment A.

20     Q.  Yes, sir.

21     A.  Okay.

22     Q.  At the bottom of the page, it appears that you

23 heard (unintelligible) multiple W-A-V or WAV and WMA

24 files --

25     A.  I'm sorry, you're speaking kind of away from the

1  mic.  What page --

2      Q.   I'm sorry.  I have a bad tendency, being a older

3  southerner, to lean back when I talk.

4      A.   Well, I know, and the sound is a long distance

5  away from me.  What page, first of all?

6      Q.   I'm going to pull my computer a little bit closer

7  to me as well, so I can have the best of both worlds.  It

8  appears that you listened to "Multiple WAV and WMA files

9  titled 911 Call 1, 911 Call 2, Admin Call 1, Admin Call 2,

10  Admin Call 3, Admin Call 4, Admin Call 5 and 6, Shooting

11  I10"?

12      A.   Yes.  I had all those WAV files.

13      Q.   Did you hear the radio dispatch of the call --

14      A.   Did I hear the dispatch?

15      Q.   -- there, did you hear that?  The radio dispatch?

16      A.   Yeah, I believe so.  Yeah, I mean, I didn't

17  review it in the last week, so I -- yeah, I mean, I

18  reviewed those things to come to my conclusions.

19      Q.   Sure.  Are you familiar with -- obviously for as

20  long as you been in this -- with 10 codes?

21      A.   Well, it depends on the agency.  You know, they

22  use different codes throughout the country, you know?

23  There was a 10 code that I -- I wasn't explicitly sure

24  what they were dispatching, but I was critiquing more what

25  the officer responded to.

1      Q.  And this actually kind of puts you at a

2  disadvantage, this is one of these things.  There's been

3  testimony and it's been established that the call went out

4  as a 10-33, do you remember that 10 code?

5      A.  Yes, I do.  Yes.

6      Q.  10-33, from what it was testified to, means

7  "subject with a weapon, clear all radio traffic until the

8  situation is resolved."

9      A.  I don't believe that it refers to "subject with a

10 weapon," but I will agree that it is "clear all channels."

11 That is the generally-recognized 10-33 code, and that's

12 what I accepted it to be; but it does not -- I would have

13 to have more information, which is why I want depositions.

14 I did not want to assume anything, so I did not.  I want

15 you to know that I left it without assumptions; however

16 10-33 is universally recognized as "clear the channels."

17     Now, "clear the channels" is for an emergency.  If

18 somebody extrapolated that the emergency in this case was

19 "armed with a gun," okay, I want to know that; but I want

20 to see where they put down on their 10-33 that it actually

21 means specifically "armed with a gun."  I do not at this

22 time believe that it means that; however, it can be proven

23 to me by testimony sworn to under oath, or by providing

24 the document.

25     Q.  Sure.  I can get you those, if Sam doesn't, the

1  deposition testimonies --

2      A.  I've given you the caveat.

3      Q.  -- Hunady and --

4          MR. TENENBAUM:  I'll --

5          MR. MCNEILL:  -- and of Captain Beedy.

6          MR. TENENBAUM:  I'll be getting all the

7      deposition testimony, including what Corporal Hunady

8      said he was responding to.

9          MR. MCNEILL:  Right.

10  BY MR. MCNEILL:

11      Q.  Did you also hear on the radio traffic,

12  Mr. Katsaris, that the deputy -- excuse me, that the

13  medical personnel contacted dispatch and asked them to,

14  quote/unquote, "step it up" --

15      A.  Yes.

16      Q.  -- there to the scene?

17      A.  Yes.

18      Q.  Do you remember that reference?

19      A.  Yes.  Don't blame them.

20      Q.  Don't blame them?

21      A.  No, I mean they've got a subject in a car that

22  doesn't want help, and they're at a loss for what to do;

23  you know, this be becomes a law enforcement issue.

24  Medical can't help somebody that doesn't want to be

25  helped, they're not allowed to.

1    Q.   Medical also can't help somebody if they believe

2    the person has a weapon; correct?

3    A.   There was no reason -- yes, that's correct, sir,

4    but there's no reason in this file that I could find, shy

5    of deposition testimony, that anybody thought there was a

6    gun involved.

7    You may recall that I cited very carefully that

8    somebody saw a "cigarette" in his lap; and then another

9    person -- I can't recall whether -- I think I cited it --

10   whether it was medical or fire -- said "something" was in

11   his lap.  That's all we have, and that he retrieved the

12   backpack or the bag from the back seat, which does not, in

13   any way, shape or form, indicate that a firearm is

14   involved.  I could not find anything in this file at this

15   time to indicated that he had a firearm.

16   Q.   Would you agree with me, though, that Corporal

17   Hunady has to go on the information that was provided?

18   A.   Well, he has to certainly listen to it; I'm not

19   too sure he has to go by it, other than the fact that he

20   has to confirm it.

21   See, one of my criticisms here is that they had plenty

22   of time.  You noticed that I took away the *Graham versus*

23   *Connors* standard that the court tended to give deference

24   to split-second decisions under circumstances that are

25   tense and rapidly evolving?  I did not see that here.

1    Corporal Hunady had a long time to really pull
2  together everything.  That needed to be fleshed out:
3  "What did you see?  When did you see it?"  They needed to
4  have a perimeter, an inner perimeter, an outer perimeter;
5  they needed to get all of the citizens out of the area;
6  they needed to get all of the people that are not armed or
7  not law enforcement out of the area and under cover.  This
8  is all cited as recognized and accepted police procedures,
9  and he would have found out nobody saw a gun; but he
10  didn't.
11    Q.  What do you mean by "a long time?"
12    A.  Well, it was over 15 minutes, I believe.
13    Q.  No, sir.  No, sir.
14    A.  Well, it was a long time, I don't know that I
15  archived the exact number of minutes, but it was a good
16  long time.  Ten minutes at least.
17    Q.  By the time Corporal Hunady got to the scene and
18  to when Mr. Victor got out of the vehicle was 12 minutes 7
19  seconds.
20    A.  Okay.  12 minutes.  I was estimating.
21       MR. TENENBAUM:  You know, I'm going to object
22    to that, because Mr. Victor got out of the car at the
23    request of Hunady.  Hunady could have taken whatever
24    time he needed before he asked Victor to get out of
25    the car.

1           MR. MCNEILL:  Fair question, fair objection,

2    but you can still go ahead and answer.

3           MR. TENENBAUM:  Yeah.

4           THE WITNESS:  Well, I don't --

5           MR. MCNEILL:  Would you agree with me that as

6    soon as Corporal Hunady --

7           THE WITNESS:  I don't need speaking

8    objections, because I am aware of the circumstances,

9    but generally I want you to know I know my subject

10   well enough I don't need an attorney to assist me;

11   however --

12          MR. TENENBAUM:  I wasn't trying to.

13          MR. MCNEILL:  Yeah, Sam.

14          MR. TENENBAUM:  I wasn't trying to, that was

15   just the professor in me.  That's why I've been

16   keeping my mouth shut.

17          THE WITNESS:  Professor --

18          MR. MCNEILL:  Too many teachers, one lawyer.

19          THE WITNESS:  -- I was tweaking you.  I am

20   known to take on both counsels in cases.  I'm not

21   bashful, I think I told the professor that already.  I

22   taught law school; I was a graduate professor; I have

23   trained well over a 150,000 officers of every rank,

24   including sheriffs, commanders, colonels; you know, I

25   served as a sheriff, so I tend not to be too bashful.

1  BY MR. MCNEILL:

2      Q.  Back to my question, though.  So it appears to me

3  from how I was looking at the video -- and I'm going on

4  Hunady's dash -- excuse me, body cam video, that's where

5  you hear the best audio is that -- that almost the moment

6  that he gets there and positions himself behind -- you

7  know, beside the fire truck and, you know, is shielded by

8  fire truck, that the -- he is immediately asking for

9  Mr. Victor to get out of the car?

10     A.  Right.

11     Q.  Okay.  All right.  So if I'm reading your report

12 correctly -- and I don't want to ask too much of an

13 open-ended question, but how I'm reading it, and correct

14 me if I'm wrong -- that you believe that Corporal Hunady,

15 as soon as he got to the scene, should have asked for

16 other resources such as SWAT to come in, or hostage

17 negotiator; correct?

18     A.  It would have been relevant, obviously.  What I

19 really wanted him to do was to establish a perimeter and

20 treat this as a barricaded subject who they said rolled up

21 the windows and didn't want to come out.  Now, at that

22 time, they knew he was bleeding, they knew he had his hand

23 wrapped in a towel, and I don't believe that Corporal

24 Hunady ever got that information.  He did not take time to

25 collect information, and since he was in the car and, at

1  that time, only a threat to himself and no one else at

2  that moment, as long as they stood behind cover, they

3  should have taken time to collect information.

4      Hunady should have found out, either through someone

5  else collecting it, someone covering the car and putting

6  together, "What did you see," and "How was he acting?"

7  And they would have said he's bleeding profusely, he's got

8  a towel wrapped around his arm; that he's not acting

9  coherently, he's crazy, he's out of it, he's drugged, he's

10 unconscious, whatever, all those things that were said.

11 Those are all relevant to exactly what should happen.

12     Certainly other resources would be good; however,

13 Corporal Hunady didn't -- did not even handle the

14 procedures as a first officer -- second, third, fourth,

15 officer -- as an officer on the scene.  I'm critical

16 about --

17     Q.  All right.  I'm still kind of confused -- I don't

18 mean to interrupt you, I'm sorry, but it's hard to do.

19     A.  I said I'm critical as how he handled it.

20     Q.  And "it" -- I'm making sure I understand what the

21 antecedent of that pronoun is -- "it" would be that you

22 believe that he did not gather enough information?

23     A.  And had the time to do so; that's correct, sir.

24     Q.  What do you mean by "and had the time to do so"?

25     A.  Because the man was in his car and he only got

1  out of his car because he kept on insisting with a gun

2  pointed at him to get of the car.  You see, when he got

3  out of the car, he still had the towel wrapped around his

4  arm -- something's happened with the screen, I don't know

5  what's going on.

6         MR. MCNEILL:  I'm showing him here.

7         MR. TENENBAUM:  Yeah, we can see you fine.

8         MR. MCNEILL:  I can see you.

9         THE WITNESS:  Yeah, I can see both of you,

10     but something went down in -- okay.  It would have

11     been important for him to know that somebody saw a

12     cigarette in his lap, who obviously made a very

13     detailed observation to know what was in his lap.

14     Because another individual, whether it was fire or

15     medic, I don't recall right this moment, said that

16     there was "something" in his lap; and then, you know,

17     it gets translated into "a gun."

18         It would have been important for him to know

19     that, while he was in the car, he had a towel wrapped

20     around his arm, because that's how he got out of the

21     car, and that he was very severely injured and

22     bleeding a lot.  They said there was a lot of blood,

23     and that was expressed by people that are in the know

24     about blood.

25  / / / / /

BY MR. MCNEILL:

Q. All right. Two points, and then I want to make sure I understand where you're getting at: First -- and you and I are handicapped on this -- does it change your opinion on anything if, as testified by Sheriff Mack, Corporal Hunady, and Captain Beedy, that the 10-33 call meant also "subject with weapon"?

A. Well, to the extent that the dispatcher was giving information that might have come from an unreliable source, the officer certainly should take that into consideration; but since the dispatcher is far away and is taking information from somebody who may not know or is speculating, the officer needs to take the time, because if there is a gun, he wants to know how do we know he has a gun? Who saw the gun? And now he's on the scene with the people that were there, and he does nothing to collect that information for himself.

Q. All right. Let me see if I can do this: I don't know whether it will play or not, that's why I'm just -- pulling it up. If I share the screen of the body cam video, it's just the first part of it, maybe you can hear it if I do this; if you can't and it doesn't work, just let me know and I will just ask you questions as I made notes on the video, okay?

A. Okay, sir.

1      Q.  I want to see if I can show you the whole video,

2  because I don't think it would be fair for the --

3      A.  And it's a very small screen, though --

4           MR. TENENBAUM:  And this is the Hunady body

5     cam video?

6           MR. MCNEILL:  Yes.  Hunady body cam video,

7     assuming that I have it.

8           (Brief recess.)

9           MR. MCNEILL:  All right.  For the record, I'm

10    going to play -- and I don't think I need -- Sam, it's

11    up to you, do you see why I need to put this in as an

12    exhibit for this deposition?  I can't hear you.

13          MR. TENENBAUM:  Just identify it, that's

14    fine.

15          MR. MCNEILL:  Thank you.  All right, for the

16    record, I'm playing the body cam of Corporal Hunady.

17    This is for the first part of it.

18          MR. TENENBAUM:  Randy, is there audio?

19          MR. MCNEILL:  Yeah, and I was about to say

20    could you hear that audio that was being said at that

21    time?

22          MR. TENENBAUM:  No.

23          THE WITNESS:  No.

24          MR. TENENBAUM:  I -- oh, Randy, on your

25    screen you have to hit -- with the share screen at the

1    bottom, there should be a thing "share computer
2    audio."
3              MR. MCNEILL:  Really?
4              MR. TENENBAUM:  Yeah.  That's a button; if
5    you don't press that, then you can't hear what's on
6    the screen.
7              THE WITNESS:  I can't hear it either here.
8    Ken Katsaris.
9              MR. TENENBAUM:  No, I know.  No, he's got to
10   do a setting on his screen.
11             MR. MCNEILL:  All right.  So all I'm showing
12   on this one is a play, reverse --
13             MR. TENENBAUM:  No, that's not it.  No, it's,
14   like, one screen back.  You may have to stop screen --
15             MR. MCNEILL:  Oh, whoa, whoa, whoa, whoa,
16   whoa.
17             MR. TENENBAUM:  You may have to stop screen
18   share, okay?  Then when you go to screen share, you'll
19   see a place where you can check "share computer
20   audio."
21             MR. MCNEILL:  All right, let's do that again.
22   I swear, guys, we're going to get this straight in a
23   minute, okay?  Probably should have taken this CLE.
24             (Brief recess.)
25             (Video played.)

1  BY MR. MCNEILL:

2      Q.  I'm going to hit stop right there.  It's hard to

3  make out everything, but it appears that Corporal Hunady

4  was talking to somebody at the scene.

5      A.  I don't know, sir.  That's why I like depositions

6  where they can watch it and say what they were saying.

7  They usually can identify it better than anybody

8  themselves, but I couldn't understand it.

9      Q.  Okay.  Well, it's hard to understand.  I'll

10  continue playing.  And for the record, I'm going to play

11  about the first two-and-a-half minutes, okay?

12      A.  Can I ask a question?

13      Q.  Yes, sir.

14      A.  Can you tell me the objective of this so I'll

15  know what --

16      Q.  Yeah, you'll see in a minute.  You'll see in a

17  minute.

18      A.  Okay.

19                  (Video played.)

20  BY MR. MCNEILL:

21      Q.  That.  Did you hear what he said?

22      A.  "Y'all need to stay behind the truck."

23      Q.  No, first:  "If he has a freaking gun, you need

24  to stay behind the truck."

25      A.  If he has a gun.

1      Q.   Right.  Would you agree with me that Corporal

2  Hunady, when he is at this scene, is now under the

3  impression that Mr. Victor had a gun --

4      A.   No.

5      Q.   -- or a possibility he had a gun?

6      A.   No.

7      Q.   If he had a gun -- "if he has a freaking gun, you

8  need to stay behind the truck."

9      A.   Yes, sir.  He said "if."  You know, we do that --

10  basically law enforcement is taught that we have to make

11  some assumptions about anybody resistant could -- it's a

12  "could" -- you want to take the precautions that he just

13  said "Hey, stay behind the truck."  They didn't, but on

14  the other hand he did say that, yes.

15      Q.   Okay.  Also speaking of taking precautions, this

16  is not just a scene in a quiet neighborhood, is it?

17      A.   Well, no, it's off the interstate.

18      Q.   Right.  With stopped traffic?

19      A.   I assume.

20      Q.   Testimony I think is going to -- has been that by

21  the time that Corporal Hunady -- you saw -- well, take it

22  back:  You watched his dash-cam; correct?  You watched his

23  dash-cam?

24      A.   Did I watch his dash-cam?

25      Q.   Right.

1     A.   Yes.

2     Q.   Corporal Hunady's dash-cam.  All right.  With

3 watching his dash-cam, did you see where traffic looked

4 like it had been backed up approximately a half-mile at

5 that point?

6     A.   Yeah.  I believe that it was.  Like I said, it's

7 an assumption.  Yes.

8     Q.   Okay.  And if there is an armed suspect, wouldn't

9 that put everybody that is stuck in that traffic snarl in

10 danger?

11    A.   Wouldn't it put everybody in traffic -- repeat

12 that?

13    Q.   If there was indeed an armed subject, doesn't

14 that put a -- everybody that is stuck in that snarled

15 traffic in danger?

16    A.   It could, yeah.  If indeed there was a gun

17 involved, yeah.

18    Q.   Okay.  I'm going to go to I think around 6:25,

19 and of course I can go past it.  I'm starting at 6:12.

20            (Video plays.)

21 BY MR. MCNEILL:

22    Q.   Did you hear the radio traffic?

23    A.   I couldn't understand it.

24    Q.   If I represent to you that the radio traffic came

25 back and said they had no history on the subject --

1    A.   That would be correct, yeah.  I recall that.
2  It's just that it's fuzzy in here.  The room is narrow and
3  long, and it may be good sound, but it also, you know, is
4  not in an area meant for sound.
5    Q.   And I'm somebody that has a hard time trying to
6  listen to radio traffic on a good day anyway, so I
7  understand.  If I read your criticisms correctly, it does
8  appear, though, that Baldwin County Sheriff's Office or
9  somebody was attempting to get background information on
10 the subject?  That would be Mister --
11   A.   Well, yeah, criminal.  They did go to Jefferson
12 Parish Louisiana, they communicated trying to get previous
13 criminal history which probably wasn't -- I mean, it
14 wasn't a bad idea, but you know, we --
15   Q.   Well --
16   A.   -- it wasn't about his criminal history, but I
17 don't -- that's good, it's admirable that they did that,
18 but it came back --
19   Q.   Let me hit play.
20   A.   It came back --
21   Q.   Let me hit play, because I think there's more
22 information.  Let me hit play.
23              (Video Played.)
24 BY MR. MCNEILL:
25   Q.   Did you hear that?

1    A.   No.

2    Q.   All right.  That was radio traffic saying "Okay,"

3  basically, "can you have somebody go by his current

4  address to see who lives there and see what information

5  they can find out?"

6    A.   Yes, sir.  Good thing.

7    Q.   That's a good thing.  All right.

8    A.   Sure.

9    Q.   I'll come back to that in a minute.  Why do you

10 call this a barricaded subject?

11    A.   It meets the definition completely as outlined by

12 barricaded subject from the International Association of

13 Chiefs of Police.  As I indicated, Captain Healy has

14 already said that he referenced the International

15 Association of Chiefs of Police, and we do -- throughout

16 the country, they are recognized.

17    I did not go to my listserv to determine whether the

18 sheriff was a member.  I would not be surprised if he's

19 not -- I mean, if he is; most sheriffs join the

20 International Association of Chiefs of Police.

21    I'm a life member of the National Sheriff's

22 Association, and I know that he is there.  I believe that

23 my long history with the International Association of

24 Chiefs of Police would lead me to believe that he is there

25 as well.

1    These are recognized and accepted procedures, and your

2 captain, obviously opposing me on the views of what

3 occurred, does respond to the fact that they have these

4 recognized procedures.  And the definition I cited, rather

5 than looking up there, I actually wrote it in my report at

6 the bottom of page 12, and you will notice that it

7 basically tracks exactly what we have here.

8    Q.  All right.  And what we have here, I think that's

9 Exhibit 3 is the barricaded subjects policy, do you have

10 that in front of you?

11   A.  Yes, I do.

12   Q.  All right.  I'm going to see if I can read this.

13 This is on page 2 of it.

14   A.  2?

15   Q.  Page 2, um-hmm.  Looks like this is a definition

16 section.  "Barricaded subject:  A person who is not

17 subjected" -- excuse me.  If I can read -- "A person who

18 is not suspected of committing a crime, but is the focus

19 of a legitimate police intervention effort -- most often

20 involving threats of suicide or mental illness -- who has

21 taken a position in a physical location, most often a

22 structure or vehicle; that does not allow immediate police

23 access -- whether fortified or not -- and who is refusing

24 police orders to exit.  A barricaded subject may be known

25 to be armed, thought to be armed, have access to weapons

1  in the location, or be in an unknown weapon status."  Is
2  that what you're talking about as to how Mr. Victor met
3  that definition?
4       A.  Correct.  I cited that on page 12 of my report.
5       Q.  Did you also take in consideration, to follow
6  this down, Safety Priorities?  Where it says "The basis of
7  the agency's operational and tactical decisions
8  compromising the following:  Hostages" -- which doesn't
9  apply -- well, this one does, "innocent involved
10  civilians?"
11      A.  I'm sorry, what page are you on?
12      Q.  Page 2.
13      A.  Where --
14      Q.  Right down below.
15      A.  You're under Safety Priorities?
16      Q.  Yes, sir.
17      A.  Okay.
18      Q.  So as I read that, the priorities should also
19  take into (inaudible) as a priority hostages, innocent
20  involved civilians, police officers, suspects and
21  subjects?
22      A.  Yes, I totally agree.  Sure.
23      Q.  And in this situation with snarled traffic, we
24  have innocent involved civilians; correct?
25      A.  Correct.

1    Q.   Also we have innocent involved medical personnel?

2    A.   Yes.

3    Q.   Innocent involved fire personnel?

4    A.   What?

5    Q.   Fire personnel.  Fire.

6    A.   Fire?  Yes.

7    Q.   And innocent involved law enforcement officers;

8  correct?

9    A.   Yes.

10   Q.   All right.

11   A.   And suspects and subjects.  You also take into

12  consideration as a priority the suspect or subject that's

13  barricaded.  That --

14   Q.   But I noticed something here.

15   A.   Yeah.

16   Q.   This appears to be a pecking order.

17   A.   No.

18   Q.   Innocent involved civilians, police officers,

19  suspect/subjects?

20   A.   No, it's not supposed to be a pecking order, but

21  of course you want to -- you want to certainly try to

22  be -- to do the best you can with hostages and involved

23  civilians.  Police officers are going to be down on the

24  line.  The suspect has to be considered.  Where along

25  those lines each of those occurs depends on the facts of

1  the circumstances, and what you know and what the set-up

2  is.

3      Q.   Wouldn't you agree that an innocent involved

4  civilian would take a priority over law enforcement

5  officers or even, and in particular, the suspect; their

6  safety?

7      A.   Are they what, sir?

8      Q.   Their safety of an innocent involved civilian --

9      A.   Yes.

10     Q.   -- have a higher priority over the safety of

11 police officers or of the suspect?

12     A.   I don't want to go into court saying who is the

13 most likely to be sacrificed; I don't think that that's

14 what we talk about.  In training, we try to say "These are

15 all priorities.  It all depends on what you're confronted

16 with."  What we don't want to do is ever say "Well, my

17 life is more important than the citizens that are around;"

18 it may, it may not be.  If the citizens put themselves --

19 impose themselves as a risk, and you can't do anything

20 about it, that's one thing.  If you can put the suspect's

21 safety above others because of the circumstances, then you

22 do so.

23     For example, if you're far away and you've got

24 somebody in a car and the person isn't getting out, then,

25 you know, you can put that safety of that person first,

1 almost, by not demanding that they get out.  Because when

2 you tell them to get out, you need to know what you're

3 confronted with.  And in this case, he did not know what

4 he was confronted with because he did not get the

5 description of exactly what he looked like in the car.

6      Had he taken a moment to say "How did he appear?  What

7 did it look like?"  He would have found out he's bleeding

8 badly, looks like cuts on him, and that he's got one arm

9 wrapped in a towel, because that would have been

10 significant upon his exit to see that he's got an arm

11 that's injured, and he's coming out with his arm extended

12 like it's injured, and it's wrapped in a towel.  That

13 would have been extremely important to know for the safety

14 of the individual that's the subject.  This is all --

15      Q.   Mr. Katsaris?

16      A.   -- scenarios, and we go through this --

17      Q.   Mr. Katsaris, is it truly your testimony that, as

18 you view the videos that were taken, that Mr. Victor was

19 putting his arm in a position to merely show that he was

20 injured?

21      A.   I think that a person who has got his arm wrapped

22 in a towel wouldn't necessarily come out with his arm

23 hanging down the side, because he's holding the towel in

24 position.  The more important part, sir, is that the towel

25 was there prior to his getting out of the car.  In other

1  words, it's how they found him when they first walked up

2  to the car.  That's why it's important to find out from

3  everyone there, establish perimeters, get information.

4  That's all I'm saying, sir.

5     Q.  Okay.  We'll get to that other question in a

6  moment.  All right.  If you would, flip over to the next

7  page, I think it's page -- the policy that's under Roman

8  Numeral III, Policy?

9     A.  Yes.

10    Q.  All right.  Second paragraph, "Should the

11 situation involve overtly dangerous or assaultive behavior

12 directed toward officers or involved citizens, or it

13 involve suspects wanted on serious felony crimes, the

14 tactical element shall immediately respond and address the

15 problem through primary and secondary resolution options."

16 All right.  Now, we can go ahead and say, on this case,

17 there is no suspect wanted for a serious felony crime.

18    A.  No.

19    Q.  But I want to go back to "overtly dangerous or

20 assaultive behavior directed towards officers or involved

21 citizens."  You watched the end of the video; correct?

22    A.  Correct.  This paragraph does not apply to the

23 end, we're talking about what the officer knows and is

24 confronted with at the beginning.  That's not what the

25 paragraph refers to.

1    Q.   Knows at the beginning.

2    A.   Yes.  "Should the situation involve."  In other

3    words, that's not what this situation involved; you're

4    talking about after the officer commanded, at gun point,

5    that he get out of the car.  Now, at that point, it does

6    involve him getting out of the car, and his position; but

7    sir, it does not involve that when the officer arrives.

8    That's not what he was involved in.  They did not know.

9    Q.   But situations evolve, do they not?

10   A.   Situations evolve, but you're reading from a

11   paragraph about what the situation involved and it did not

12   involve.

13   Q.   But a situation can evolve into an

14   overtly-dangerous or assaultive behavior directed toward

15   officers or involved citizens, can it not?

16   A.   It did not involve that.  It evolved --

17   Q.   I didn't say "involve."  The situation evolved

18   into that overtly dangerous, did it not?

19   A.   It did not.  May I explain?  May I explain?

20   Q.   You go ahead and explain, and then I'll ask you a

21   few questions.  Go ahead and explain.

22   A.   The reason why it did not evolve is because the

23   officer was mandating the conclusion.  In other words,

24   that's not what it involved, and it would not have evolved

25   that way.  In other words, in training and during

1 scenarios, we do not count how it evolves if you make it

2 evolve that way.

3     In other words, the training is very specific about

4 these circumstances. You're taking a few pages that we

5 have to apply overlaying a lot of circumstances; but if it

6 evolves because all of a sudden the person jumps out of

7 the car, has a gun, puts it over the car, puts everybody

8 in some kind of danger, then it had evolved. It doesn't

9 evolve if you force what is the circumstance. And this --

10     Q. Wait a second. Wait a second. Wait a second.

11 Are you telling the trier of facts in this court that

12 Corporal Hunady forced Mr. Victor to get out of that BMW?

13     A. Correct, sir.

14     Q. Did he run down there and throw him out of the

15 car?

16     A. He kept shouting at him to exit the car. He made

17 him. There was no need to force that at that moment. He

18 did not have in place a plan, he did not have in place

19 resources that -- I never saw him ask for it. I know that

20 you and I had a discussion about, you know, how far away

21 resources may have been, but I don't know that, number

22 one.

23     I don't know that a supervisor didn't have additional

24 resources. I don't know a lot of things that could have

25 been fleshed out in a deposition, but I do know this: He

1  did not even ask for those resources, he did not try to

2  find out if there were, and I overlay that against the

3  fact that he had the time to do so.  It was only Corporal

4  Hunady that kept insisting that this situation come to a

5  critical conclusion quickly because he kept telling him to

6  get out of the car, which he did do.

7      And when he did, he emerged with a towel that his --

8  was wrapped around his arm, the same way it was in the

9  car -- which he did not know -- and he was holding his arm

10 out -- and I would make a conclusion -- to keep the towel

11 from slipping off his arm.  If he put his arm down, it

12 would have probably slipped off.

13      Q.  Couple of questions there:  Number one, how can

14 you say that the towel was in the same position as it was?

15 You said that it was wrapped around his arm.  When you go

16 ahead and look at the video, it's not wrapped around his

17 arm, it's wrapped around his hands.

18      A.  I'm saying --

19      Q.  That's --

20      A.  I'm sorry.

21      Q.  Arm, hands (indicating.)  Different, wouldn't you

22 agree?

23      A.  My issue was he never attempted to find out about

24 that.  In other words, the fire medic and the other

25 citizens and individuals were not debriefed, which they

1  had time to do.  They had four officers there, one of them

2  could have kept cover on the vehicle while information is

3  collected from the people that were knowledgeable that

4  were looking in the car at one point, and to find out.

5      My criticism isn't that it was exactly in the same

6  position, but what was the position?  We don't know.  Now,

7  is that fleshed out in a deposition?  I'm not sure.

8      Q.  Is there also, though, conversation that you

9  heard on the video about -- and statements made by

10  Corporal Hunady on his body cam -- that he, Mr. Victor,

11  had been reaching in the back seat area of the car?

12      A.  Yes, I heard that he reached in the back of the

13  car.

14      Q.  Did you hear that the windows were tinted to make

15  it very difficult to see precisely what Mr. Victor was

16  doing inside the vehicle?

17      A.  From a distance, yes.  But they saw clearly from

18  up -- in fact, his windows were rolled down -- or window

19  was rolled down, and he rolled his window up.  So the

20  people that were there first saw clearly.

21      Q.  Maybe I'm recalling it differently, but I recall

22  that the testimony -- well, the witness statements, and I

23  expect testimony, would be that the windows were initially

24  cracked.

25      A.  But they saw in the car enough to see a cigarette

1  in his lap; that tells me they could see in the car.

2    Q.   Okay.  All right.  Did you -- I think what I'm

3  having also a disconnect with you on this:  If Corporal

4  Hunady cannot see clearly into the car, as I think we

5  establish that from his distance and the tinted windows,

6  if Corporal Hunady is able to see movement from the back

7  and through the car, shouldn't also Corporal Hunady take

8  into -- oh, one more thing:  And if the radio call came

9  out as a 10-33, subject with weapon, clear all traffic, if

10 all those things are at hand, shouldn't Corporal Hunady

11 also, most -- as important to (inaudible) Victor, take

12 into consideration the lives and the safety of everybody

13 stuck in that traffic jam?

14   A.   I'm sorry, "should he take into consideration

15 everything that" -- and I didn't get it after.

16   Q.   The lives and the safety of every person stuck in

17 that traffic jam, knowing, A, you can't see clearly in the

18 car; B, he does see movement inside the car going from the

19 back seat to the front seat; and C, most importantly, the

20 call came about 10-33, subject with weapon, clear all

21 traffic -- radio traffic?

22              MR. TENENBAUM:  Objection --

23              MR. MCNEILL:  Those three things.

24              THE WITNESS:  Yeah --

25              MR. MCNEILL:  Shouldn't those three things,

1   which the testimony in this case has establish has

2   happened, should he not -- Corporal Hunady not take

3   into consideration the safety of every single person

4   there at that scene, the innocent people in traffic,

5   and the fire medics and everybody else at that scene?

6           MR. TENENBAUM:  Objection.  Misstates the

7   evidence.  Go ahead and answer if you can.

8           THE WITNESS:  Every officer should take into

9   consideration the safety of everyone anywhere around.

10  There are ways to do that, and there was time to do

11  that, and there were sufficient officers to do that.

12          For example, there are circumstances where

13  you have people that may be at risk in cars, you don't

14  leave them in their cars.  You might have an officer

15  assigned to tell everybody to get out the other side

16  of the car giving them protection, and "move back away

17  from the scene, leave your car."  You had four

18  officers, I think, additional officers, that were not

19  paying attention to even the people moving around,

20  because there were people viewed that were at risk

21  moving around even as he was giving commands to the

22  car.

23          The whole issue here is he had time.  He had

24  time.  He wasn't getting out of the car and he was

25  facing --

1  BY MR. MCNEILL:

2       Q.   He had time.  All right, so if I understood

3  correctly, by the time Corporal Hunady got to the scene --

4  and I can show you the body cam, but you may have to agree

5  with this -- that in approximately 11 minutes is when he,

6  Mr. Victor, gets out of the car.  I can play it if you

7  want to.

8       A.   Do you want to take a moment and spend 11 minutes

9  in silence and see how long that is?  I don't want to

10  but --

11       Q.   I understand that.  I understand that.

12       A.   Okay.

13       Q.   But also 11 minutes he, being Corporal Hunady, is

14  there having to be trained on that one person in that

15  vehicle; correct?

16       A.   No.

17       Q.   Wait a second.  You don't think that he needs to

18  be looking to see what is -- if he is the person that is

19  unfortunately at the point position in this thing, that he

20  should not be the one looking and making sure what's going

21  on in that vehicle?

22       A.   Doesn't have to be, there's four other officers

23  there.

24       Q.   Okay.

25       A.   They're all trained.  Obviously --

Q.   The other officers didn't --

A.   Hunady didn't --

Q.   But the other officers weren't involved in that part of it.  They were as he got out of the vehicle.

A.   Sir, he was in --

Q.   I want to make sure -- wait a second.  Wait a second, let me finish my question.  Is your testimony that Corporal Hunady -- I'm going to ask it this way:  is it your testimony that Corporal Hunady's first priority while there at the scene should not be his eyes trained on that vehicle?

A.   Not necessarily, as long as he has somebody that is.  In other words, everybody should be behind cover, and somebody, whether it's Hunady or someone else that he directs -- if he's going to be in charge, he needs to direct the perimeter being set up, getting everybody out, directing somebody to handle the people that are stuck in traffic, direct one person to be in charge of getting everybody else to safety.  Somebody needs to keep an eye on the car -- that is, a law enforcement officer -- and everybody else needs to be behind cover.

What I'm saying is if Corporal Hunady decided he was the one that was going to keep an eye on the car, that's fine; but he has to have somebody else implement an emergency plan for what happens if he exits the car.  When

1 he gets out of the car, be prepared.

2      We don't know whether he has a gun or not.  And if we

3 don't know, and if we never see a gun and we're not

4 absolutely certain of it, we have options that we may have

5 to utilize.  What resources do we have here?  What

6 resources can we get to the scene?  Is there anybody that

7 is a supervisory officer that has better or more

8 equipment, or do we have less-lethal with us that we might

9 be able to implement, because this man is acting crazy.

10      This man is out of it.  This guy might be on drugs.

11 He's mentally ill, he's bleeding.  Has he attempted to

12 commit suicide?  He's got a towel wrapped around his arm

13 already, which means he's aware that something's wrong

14 with him.  He's not acting right, so let us do what we

15 can.

16      We don't know that he's ever committed a crime.  We

17 don't have a criminal history.  He hasn't done anything to

18 commit a crime to bring us here.  He had an accident and

19 he's off the road.  He was described as being unconscious

20 when the first person arrived at the scene.  His foot was

21 on the gas pedal as if he was out of it, and there was a

22 rooster tail coming from his car.  They only know that

23 they're dealing with a strange, perhaps decompensated

24 individual, maybe mental, maybe on drugs, maybe out of it,

25 possibly armed; but we need to handle it as if we're going

1  to attempt to not treat him as a criminal, if we can.

2  Q.  All right.  I have a couple questions on that.

3  First off, what do you mean by "perimeter"?

4  A.  A perimeter means you get everybody away from the

5  immediate location to a safe area.  They didn't need some

6  of those individuals there, and they either needed to get

7  and stay behind cover, or move to another location.  And

8  start addressing the people in traffic, the ones that are

9  the closest who may be vulnerable; get them out of their

10 cars to another side, stay down, don't expose yourself.

11 They needed to set up a perimeter.

12 Q.  So you think it would have been safer for the

13 people stuck in traffic to leave out of their cars and

14 expose themselves out in the open rather than stay in

15 their cars?

16 A.  No, you didn't hear what I said initially.  I

17 said from the opposite side of the vehicle, keeping cover

18 and down, with an officer directing them, one or two at a

19 time; cars to get out from the opposite side giving them

20 cover and moving to a position crouched behind

21 automobiles.

22 Q.  Did you see in -- I think it was in the Jorge

23 Gutierrez video that the deputy was trying to get that car

24 to back up but they couldn't move because of the circle of

25 traffic?

1    A.  You're making my case.  He was making an effort

2  to only move the cars; where the cars can't move, you move

3  the people and you move them from the opposite side.  For

4  example, sir --

5    Q.  Well --

6    A.  No, I'm not finished.  I'm not finished.  For

7  example --

8    Q.  Go ahead, finish your answer.

9    A.  I'm not finished.  For example --

10    Q.  Go ahead.

11    A.  For example, when you have an apartment complex

12  with four apartments and you've got people -- you've got

13  one armed, barricaded subject -- like I had one time --

14  you got a guy in the right-hand upper apartment, you don't

15  know if he could shoot a gun down below or into the

16  opposite walls.  What you do is you address the people

17  that are in those apartments to either tell them move to

18  the far side of the apartment, get down on the ground

19  behind furniture and don't move, and/or try to evacuate

20  them.  It's just standard procedure.

21    In my case, the guy did have a gun because he shot at

22  a police officer, but we still got on the phone and got

23  the phone numbers of those individuals and called them and

24  told them to "Move to the far side of their apartment, get

25  behind furniture, into the bathroom and lock -- stay

1  behind doors, don't expose yourself. We have a situation

2  in the upper right-hand apartment facing the apartment

3  building." I mean, it's just what you do automatically,

4  and it depends on the facts and circumstances that you're

5  confronted with.

6      Q. Okay. My -- all right, on a perimeter.

7      A. That's somewhat of an inner perimeter. You could

8  establish an outer perimeter as well for anybody that

9  approaches otherwise.

10      Q. And would you also agree on a perimeter that it

11  would be people that could get views onto whatever the

12  situation is? Because --

13      A. Far away and behind cover; correct.

14      Q. All right. Number two.

15      A. Number 2 where? What are you talking about?

16      Q. I'm thinking my next -- my next point I was going

17  to bring. You made a reference that Hunady was in charge

18  of this situation, and controlled the situation.

19      A. I said "if he was."

20      Q. Actually who was in control of the situation was

21  Jonathan Victor, wasn't it?

22      A. Was who?

23      Q. Jonathan Victor.

24      A. Victor?

25      Q. Jonathan Victor, the subject.

A. Was in charge?
Q. Certainly.
A. No.
Q. He controlled the whole situation, didn't he?
A. No. He ended up in a position off the road stuck in the mud in a car, and it was up to the law enforcement officers at this time to make decisions how to handle it. The person that was in charge was the one yelling and screaming the commands.
Q. Okay. And if Jonathan Victor had chosen to come out of the car with his hands up, as the commands were, to show the hands, this never would have happened, would it? There would have been no shooting.
A. I don't think he could have under the circumstances of his injuries, but he did get out of the car with his hand up, but not in the position that we typically choose, because he has his arm wrapped in the towel. That made it very difficult. We --
Q. Wait a second. Did you ever hear any testimony whatsoever that Mr. Victor said "I can't show my hands because my arm is injured"? I never --
A. No, he didn't say anything. What I'm saying is the officers did not collect the information from the people that had close observation about his bleeding and injuries. And the fact that they had time to, one, set a

1 perimeter, get everybody behind cover; two, not insist

2 that he get out of the car until they had a plan; three,

3 get resources there if at all possible; four, if they

4 can't get resources, identify that they had Tasers, for

5 example.

6     Q.  Wait a second --

7     A.  Under these circumstances that that was another

8 plan that could have been set.

9     Q.  Time out.  Wouldn't it be important to get him

10 out of the car as quickly as possible if he was, in fact,

11 injured and bleeding, to get --

12     A.  No.  No.

13     Q.  So if he is severely injured and they allow him

14 to bleed to death --

15     A.  You're not --

16     Q.  -- in the car, that you think is more acceptable

17 than for them to demand to get out of the vehicle?

18     A.  Not if you believe --

19     Q.  -- that your testimony?

20     A.  I thought you were through.

21     Q.  Is that your testimony?

22     A.  No.  Not if you believe that there's a potential

23 for a firearm.  I mean, if they're reacting to the

24 potential of a firearm -- remember that in my report I put

25 down that one of the best things to do is time is on your

1  side.  That's in the materials.  Two --

2      Q.  I agree with that.

3      A.  Let me finish, sir.

4      Q.  Sure.  Go ahead.

5      A.  And it might be that officers should take the

6  best course of action and stand down; that's in the

7  materials about how to handle these kinds of situations.

8      Even if the person may be injured, you're not

9  responsible for giving that person aid at that time.

10  Number one, he turned the aid away from the medics and the

11  fire personnel, so he made a choice about his injuries;

12  now you must be concerned for your safety, the safety of

13  others, and try to make this as safe as possible for him.

14  That was not done, in my opinion.

15      Q.  So your testimony is, then, that injuries there

16  in the car, bleeding, take a lower priority over whether

17  he had a gun or not?

18      A.  I didn't say that, I said that if you do suspect

19  that --

20      Q.  But that --

21      A.  Let me finish, sir.  I know this is hard on you.

22  If you should suspect there's a firearm and you've got a

23  bleeding subject, you have to go with the fact that, you

24  know, you're not responsible for his injuries.  You are

25  responsible for the potential of what you might do to

1  injure him further, or what might happen to someone else

2  if you start thinking "I now have ordered him out of the

3  car and I put everybody at risk, now I gotta shoot him."

4  If you know that these, to a moral certainty, are issues

5  which a Barricaded Subject and/or Suicide by Cop are

6  indeed the directions for how you handle these things,

7  then you must handle it accordingly.

8      And by the way, I need deposition testimony and

9  training records, because I don't know whether they were

10  trained on these issues or not.  And if they were not,

11  then we have a case of a reckless disregard to a known

12  risk of harm by the fact that they were not given

13  instruction about how to handle this.  I did not know,

14  that's why I implored, "I need deposition testimony" to

15  flesh out whether he even new about the procedures.

16      Q.  You'd agree with me, then, that Corporal Hunady

17  is basically facing a two-headed monster here.  He is

18  facing somebody that is in a vehicle that he has reported

19  that is armed; and also reported that is injured and

20  bleeding.  Do you agree with me on that?

21      A.  Yeah.  I mean -- but I don't know that he knew

22  about his injuries and bleeding, no.  I don't think that

23  Hunady collected all of that information.  I don't have

24  his deposition transcript, but I don't see anywhere where

25  he collected that information.

Q. Would you agree with me that, on the video, he says "Hey, come on out." He says, "We can help you"?

A. Yeah, but "help you," I assume, was because everybody was saying that he was acting "crazy, unconscious, out of it, on drugs, mental," whatever might be the case; and some of those were professionals that had been up to the vehicle that I quoted in my report. So "help you" does not mean because you're injured.

And you know, basically under the Supreme Court ruling of *DeShaney versus Winnebago*, an officer doesn't have a duty under those circumstances.

Q. Right. I'm aware of that case. Are you aware of any case -- U.S. Supreme Court case, 11th Circuit case, Alabama Supreme Court case, that adopt as a matter of law the barricaded subject policies of the International Association of Chiefs of Police that you outlined?

A. The court has ruled -- I don't have the case -- the court has ruled that recognized procedures that are generally available to law enforcement officers may be considered by an expert. I'm sorry, I can't cite that case.

Q. I agree with that. I agree with that, but also the other part of it; that they don't create constitutional law for the procedure?

A. Does not --

1    Q.   Create constitutional --

2    A.   Make that one consistent statement so I can

3 respond to it.

4    Q.   Sure.  My first question was this:  do you know

5 of any U.S. Supreme Court case, 11th Circuit case, Alabama

6 Supreme Court case or statute that adopts the barricaded

7 policy (inaudible) subject's policy of the International

8 Association of Chiefs of Police?

9    A.   They do not -- the court did not specifically

10 address those issues.  Obviously in *Graham versus Connor*,

11 the court established the constitutional standard.  In

12 *DeShaney versus Winnebago*, they adopted the duty standard.

13    Q.   Right.

14    A.   In other cases, whether it be *Plumhoff* or others

15 that we know about -- in *Sheehan*, of course the court, you

16 know, ignored their duty and they didn't really come up

17 with a decision as such.  In *Mendez*, they were looking at

18 particular circumstances of what the officer did

19 unlawfully to start with, which was an unlawful

20 constitutional violation, and then whether or not the

21 subsequent use of force would still be considered.

22    There's a lot of things that are considered by the

23 court and policies are not necessarily specifically

24 addressed; however, the court has, in the past, indicated

25 that experts may apply those things that are generally

recognized in establishing their opinions for what the
police officers knew or should have known about the
circumstances.

The court applies the basic totality of the
circumstances, which, in *Graham versus Connor*, was "what
was the seriousness of the crime"?  Well, in this case, as
they approached, they did not have a seriousness of the
crime.  We all agreed they didn't know he committed any
crime.

The second was whether the person was resisting or
attempting to flee.  We know the person wasn't attempting
to flee, and the only resistance was he didn't want to get
out of the car, but he had his arm wrapped and he had
injuries and he was bleeding, and that may very well meant
what he was doing.

The third is whether the officer is in imminent
danger, or others, of harm; and they weren't until, of
course, the officer made him get out of the car, and then
the officer made an assessment.

So the court looks at a constitutional standard; I
look at both.  I'm telling you how officers are trained,
and in *Canton versus Harris*, you know that the Supreme
Court determined that an officer can be deliberately
indifferent to a circumstance if the officer does not have
the knowledge.

1    In this case, I don't know whether they had the

2  knowledge or not, but I will tell you that there may be a

3  case; although I probably wouldn't render it in terms of

4  deliberate indifference.  I would talk about whether or

5  not they carelessly or unadvisedly, with knowledge,

6  performed an action for which they were not trained to do,

7  which is *Canton versus Harris*.

8    So the court -- you have to look at the court's

9  totality of application of procedures and processes --

10 this is what I teach and have taught to tens of thousands

11 throughout the country -- and put it all together.  That's

12 what officers are given in the way of policy, because

13 their policy should -- or their policies should reflect

14 the totality of the U.S. Supreme Court's guidance.

15    And in this case, there is no recognition whatsoever

16 at this time -- and I will modify my opinion in the

17 future -- that these officers were implementing what the

18 U.S. Supreme Court had ruled collectively about the

19 circumstances that these officers were in.

20    Q.   And I think the whole standard is -- basically is

21 that whether the officer acted reasonably; correct?

22    A.   Well, reasonably is obviously a circumstance --

23    Q.   What any officers would do in that same --

24    A.   You cut me off again.

25    Q.   I know I did, because I didn't want

1 (unintelligible.) It was a -- reasonable would be what a

2 other officer would do in the same situation.

3 A. Okay. I'm a police officer, I totally disagree;

4 so I believe others would. If they're presented with

5 Suicide by Cop, which is a recognized and accepted

6 procedure, if they were presented with Barricaded Subject

7 and they were told "I want you to apply these two

8 absolutely recognized -- adopted and recognized by two of

9 the most authoritative think tanks and organizations in

10 the country, did this officer act objectively reasonable?"

11 They would have to say, have to say, no, in my opinion.

12 Q. Then back to my next question: Do you know of

13 any Supreme Court case, 11th Circuit case, Alabama Supreme

14 Court case or statute that adopted the Police Executive

15 Research Forum policies on Suicide by Cop Protocol and

16 Training Guide, which is Exhibit 4?

17 A. I don't know of any court that adopted them

18 specifically as their standard; however, we know that the

19 police are developing these procedures -- to have in place

20 procedures that follow what the court has established as

21 the constitutional standard. The constitutional standard

22 is the only thing the court is considering.

23 We take, in law enforcement, the constitutional

24 standard and give the best guidance possible for officers

25 to act objectively, like other officers similarly situated

1  and trained would act --

2      Q.  All right.

3      A.  -- and under the circumstances, reasonably.  In

4  order to do that, they have to act under the constitution

5  in accordance with how they're trained, which is what

6  *Canton v. Harris* said.  *Canton v. Harris*, they had a

7  lieutenant who made a decision about a person's medical

8  condition, and had no training to do so.

9      Here, the officer is making a decision about a

10  person's mental/medical condition, and I don't know

11  whether he had the training or not, but the court would

12  then have said that he did not if he hasn't been trained

13  this way; and therefore, in my opinion, it does indeed

14  adopt the objective, which means what a reasonable officer

15  would do.

16      Where does that come from?  The objective reasonable

17  standard comes from how that officer was trained, because

18  we have *Canton versus Harris* that says you've got to act

19  the way you're trained.  It is there, sir.

20      Q.  Okay.  Is it your testimony, then, that Officer

21  Hunady -- or excuse me, Corporal Hunady acted

22  unreasonably directing Mr. Victor to get out of the car?

23      A.  Yes, sir.

24      Q.  It is your testimony that Corporal Hunady acted

25  unreasonably by following the radio traffic and the radio

1  call, the 10-33, subject armed, and assuming that

2  Mr. Victor was armed?

3       A.   Compound question.   Divide it.

4       Q.   Okay.   Was he acting unreasonably by following

5  what was dispatched, a 10-33, subject armed?

6            MR. TENENBAUM:   Objection, misstates the

7       evidence.   Go ahead and answer.

8            THE WITNESS:   An officer has to take into

9       consideration, not follow directions.   The officer's

10      on the scene, the dispatcher's collecting citizen

11      information, it's not reliable.   The officer has to

12      establish it.   And on getting out of the car, at some

13      point, sure; but my opinion about the objective

14      reasonableness of directing him to get out of the car

15      was not at that time, not under those condition.

16 BY MR. MCNEILL:

17      Q.   Wouldn't it be the only way to establish it would

18 be to get him out of the car?

19      A.   I'm sorry, you cut me off and I -- I couldn't

20 hear you.

21      Q.   Wouldn't it be the only way he could establish if

22 Mr. Victor was armed would be to get him out of the car?

23      A.   I'm not saying that you're going to be there for

24 four days, I'm simply saying there are procedures that

25 were not followed up to when you might ask him to get out

1  of the car and you have a plan in place.  There was no

2  plan.

3          MR. TENENBAUM:  Randy, could we take three

4      minutes?  We've been going over an hour-and-a-half.

5          MR. MCNEILL:  Okay.  You can.  I'm going --

6      I'm not too much longer, either.  Go ahead.

7          MR. TENENBAUM:  All right, thanks.

8          (Brief recess.)

9  BY MR. MCNEILL:

10     Q.  Would you agree -- I'm going to go back to your

11 report, and I think it's on page 10.

12     A.  10?

13     Q.  Yeah, I think.  Hang on a second -- no, hang on.

14 Oh, no, 11.  I'm sorry.

15     A.  What page?

16     Q.  Page 11, paragraph 2.

17     A.  11.  Okay.  Paragraph 2.  All right.

18     Q.  What do you mean by "the situation was a

19 prolonged stand-off"?

20     A.  I'm sorry, I got to find -- you said what?

21     Q.  On paragraph 2, "It's my opinion that the only

22 implementation of a strategy or tactic dealing with

23 someone presenting as Victor did, was Hunady yelling to

24 Victor that he wanted to help him.  But, clearly, it was a

25 prolonged stand-off of a situation that can only be

1  defined in law enforcement training as a barricaded

2  subject."  What do you mean by a "prolonged stand-off"?

3      A.   That 12 minutes that we've come to at least say

4  was, you know, in the vicinity of the time frame.

5      Q.   And your -- that would meet the definition of

6  "prolonged"?

7      A.   Under these circumstances, yes.  I've known of

8  stand-offs that have gone on for 11 to 20 hours.  In other

9  words, what we train is time is on your side as long as

10  the threat is not imminent, and don't force the

11  confrontation where you do not have to force it.  So I

12  call this "prolonged" to the extent that there was time to

13  do more that they did not do, and that it was a forced

14  circumstance by Hunady.

15      Q.   And the forced circumstance would be -- by Hunady

16  would be directing Victor to get out of the car?

17      A.   Right, which was the last thing he needed to do

18  at that time, given that he did not collect any

19  information or have a plan set up as to how they were

20  going to respond.

21      They could reposition vehicles; they could have a plan

22  to use their Taser -- we've got a 25-foot, you know,

23  projection of a Taser; we have lethal cover; we have

24  less-lethal on the scene.  There was no plan to

25  reposition a vehicle to put them into a situation where

1 they would have cover and the application of less-lethal.

2 They did not have confirmation that there actually was

3 a gun. I'll leave it at "there was speculation," but even

4 when he got out, they didn't know if he had a gun, they

5 couldn't see a gun.

6 And I disagree with anything that says that that was

7 an objective decision that they knew, even to a probable

8 cause standard, which I believe your Captain Healy, I

9 believe, said something to the extent about probable

10 cause. I just don't believe it was to a probable cause

11 standard. It was certainly suspicion, perhaps, but not a

12 probable cause standard; but they had less-lethal

13 available to them.

14 Q. That being -- I'm sorry, what do you mean by

15 "that"? What's the antecedent of that pronoun?

16 A. I'm sorry, I don't --

17 Q. Lead what to a probable --

18 A. Oh, that -- they could have some suspicion that a

19 gun was involved, but they didn't have it to a probable

20 cause standard, in my opinion, and that --

21 Q. That a gun was involved?

22 A. They had -- right. They had time to reposition a

23 vehicle, to put themselves into a position to where they

24 could keep cover but still apply less-lethal. There was

25 options. There was no plan. There was no discussion

1    about resolving this at anything but getting him out of

2    the car and then making a decision, which in my opinion,

3    is wrong.

4        Q.  All right.  But let me back up on this.  When you

5    talk about the less-lethal, you are familiar with the

6    use-of-force continuum, obviously; correct?

7        A.  We don't use a use-of-force continuum in the

8    country any longer, but I'm familiar with how you could

9    apply it, yes.  The constitutional standard is now

10   generally accepted as the proper evaluation for a police

11   officer to assess and determine how he or she is going to

12   respond.

13       Q.  Okay.  Using, though, the use-of-force continuum,

14   if the situation presents where the officer believes that

15   a weapon is involved, they're not supposed to match it

16   with less-than-lethal, they're supposed to match it with

17   lethal force; correct?

18       A.  Yes, sir.  But the policy of the Baldwin County

19   Sheriff's Office does not use the use-of-force continuum,

20   they are using a constitutional standard, and --

21       Q.  They are?

22       A.  -- when we --

23       Q.  They are?  But they matched force with force.

24       A.  It's objectively reasonable force under the

25   *Graham versus Connor* standard, which is an assessment

1  obviously that you could apply somewhat the continuum.

2  And yes, we've always said that you don't match with the

3  same level of force as the person, there's that "plus-one"

4  rule that we used to teach a long time ago.  I concur.

5      And you know, if somebody attacks you with a knife,

6  you don't have to pull out a knife and try to see if you

7  can defend yourself.  You have to assess whether or not

8  you have acted reasonably up to the circumstance, and

9  then, given the circumstance, did you act as an

10  objectively reasonable police officer would under the

11  circumstances; and whether or not you do have a

12  split-second decision, or whether or not you have

13  developed a plan like an objectively-reasonable officer

14  would.

15      By your own admission, by the admission of your own --

16  I don't know whether --  I'll call him an expert.  I don't

17  know Captain Healy, but he's in law enforcement, so I'll

18  call him an expert -- he uses the standard, but then he

19  wants to deviate from it.  He wants to say "act as an

20  objectively-reasonable police officer," but he doesn't

21  want to use what the objectively-reasonable officer would

22  have been trained to do.  You can't, in my opinion, do

23  that.

24      If you're going to present yourself as an expert, if

25  you're going to present policies or procedures or model

1  policies of a organization, then you've got to consider

2  all of them that are used to train police officers.

3      He was a SWAT officer, and I will tell you the first

4  thing they train SWAT officers to do is handle barricaded

5  subjects.  It would be inconceivable for a person to be

6  assigned to SWAT -- or even K-9, and he was assigned to

7  both in this case, the officer, Hunady -- it would be

8  inconceivable that he would not know about deescalation,

9  and he would not know about handling the mentally-ill or

10  the emotionally-disturbed or the suicidal.  And it would

11  be inconceivable for me to believe that he didn't know

12  anything about barricaded subjects.

13      I will say this:  he didn't apply any of that, so what

14  we are looking at is an officer that did not act

15  objectively reasonable, because he did not follow what is

16  considered to be objective for a police officer, and that

17  meets the constitutional standard of what objective is,

18  given the totality of the circumstances as the court has

19  applied it.

20      Q.  And on page 13 of your report -- three, four,

21  five, six, seven -- eight bullet points -- nine.  Nine

22  bullet points.

23      A.  Yes.

24      Q.  I take it from your testimony that these nine

25  bullet points would come into play if Corporal Hunady had

1  not directed the -- Mr. Victor to come out of the car, and

2  some of these steps could have been taken?

3      A.  Well, first of all, I didn't say that he should

4  not have directed him to come out of the car, I just said

5  not at that time.

6      Q.  So when he got to the scene, he shouldn't have

7  directed him to come out of the car?

8      A.  Well, until certain other things are in place,

9  because there was no rush.  The courts have ruled that if

10 a person dies in the process because you're trying to act

11 with the safety of everybody concerned, then you're not

12 responsible for that; or if they kill themselves -- there

13 are court cases right on target.  If they should kill

14 themselves while you're trying to safely handle this,

15 you're not responsible for that, because you have to take

16 into consideration how you're trained, and the safety of

17 everyone.  If in the process they do something, or die as

18 a result of already-inflicted injuries, you're not

19 responsible for that because you are applying the

20 objective standards for police officers.

21     Q.  Wouldn't you agree with me that really what

22 Mr. Victor was trying to do was kill himself?

23     A.  I didn't hear you.

24     Q.  Wouldn't you agree with me that what Mr. Victor

25 was trying to do was to kill himself?

1     A.   Was he trying to kill himself?

2     Q.   Yes.

3     A.   Well, I think he did try, yeah.

4     Q.   Yeah.  The whole thing was nothing but a suicide,

5 wasn't it?

6     A.   Well, that's why I cited Suicide by Cop and how

7 you handle it.

8     Q.   Right.

9     A.   I didn't see your expert discuss that at all and

10 the procedures, that's why I actually gave you the

11 procedures from PERF.  Yes, I think this --

12     Q.   He probably didn't --

13     A.   -- may very well --

14     Q.   He probably didn't because he's familiar with the

15 *Mendez* case.

16     A.   I don't think *Mendez* applies.  *Sheehan* maybe more

17 so, but the supreme court really didn't render an opinion

18 on *Sheehan*.

19     Q.   The other -- on page 15, again, kind of goes back

20 to your explanation that there was plenty of time --

21     A.   15?

22     Q.   -- for them to -- yeah, 15.  Toward the bottom of

23 the page, you say "Obviously the situation with Victor

24 there was ample time to call special resources, such as

25 SWAT"?

1    A.   Yeah, there was ample time.  In my opinion,

2  obviously ample time to find out if those resources were

3  available; nobody did.  I know that --

4    Q.   Right.

5    A.   -- you're saying they were too far away, but they

6  did have less-lethal on the scene, and they had big

7  vehicles that could be re-positioned safely to where

8  someone could be behind cover and still apply a

9  less-lethal, because they were not aware to a certainty

10  that an objectively-reasonably-trained officer would know

11  that a gun is available to him.

12    And we know that he was crazy; that he was out of it;

13  that he was acting like under the influence of drugs; that

14  he had been unconscious and that he was bleeding; all

15  those things.  And we don't have any allegation that he

16  committed a criminal act.

17    Q.   Okay.  When I read your report, it comes back to

18  something I remember listening to, I think, when both you

19  and I were both much younger men.

20              (Discussion off the record.)

21  BY MR. MCNEILL:

22    Q.   Anyway, when I read your report, I kind of go

23  back to -- you remember the radio -- famous radio

24  commentator Paul Harvey?

25    A.   I do.  "And now you know the rest of the story."

1    Q.   Your report fails to include the rest of the

2  story.

3    A.   My report says?

4    Q.   Fails to include the rest of the story.

5    A.   Well, it does, and I admit that, because I don't

6  have the training, I don't have the testimony, I have

7  police reports.  And I want you to know I did dearly

8  object, but I was told there's as deadline.  So I did to

9  the best of my ability, but I also acknowledged to you so

10  you would know that that was an issue.

11    Q.   And I just want to make a hundred percent sure

12  that the actual force that was used you do not have an

13  opinion as to that moment -- I'm not talking about all the

14  precursor stuff -- that moment when Corporal Hunady fired

15  his AR -- Ruger, I'm not sure it was an AR, but something

16  similar, Ruger-caliber, AR-like weapon -- at that moment

17  you're not saying that -- you're not making an opinion as

18  to the reasonableness of the use of force at the moment it

19  was fired?

20    A.   I'm saying -- I'm saying from what I know, there

21  are two things:  First of all, the courts have very

22  carefully said that you can take into consideration the

23  specific moments before, and they didn't define what that

24  was.

25       And that at the moment that the force was used, it was

1  at the behest of this officer not acting objectively

2  reasonable to command him out of the car before he knew

3  other information; and that he fired when indeed he had

4  not committed a criminal act prior; that he was not

5  actively resisting or attempting to flee; but that he was

6  a medical/mental/emotional person at the time, so that he

7  knew to a moral certainty something was wrong with the

8  man's thinking, therefore every effort should have been

9  made.

10     As your experts says, it should only -- I'll quote it

11 if you want me to out of his report -- "use of deadly

12 force should only be used as a last resort," and he did

13 not.

14     Now, taking your own expert's opinion and applying it,

15 he did not, because it wasn't, it was another resort; but

16 it wasn't last resort because they had less-lethal on the

17 scene, and they had vehicles that could have been

18 positioned to give cover, and they had it to up to 25

19 feet, which is a good distance to apply less-lethal.

20 Given the totality --

21     Q.  All right.

22     A.  -- of the circumstances, I believe that should

23 have been the objectively-reasonable decision.

24     Q.  All right.  Time out.  So you are, then -- even

25 though it's not reflected in your report, you are now

1  giving an opinion that the use of force by Corporal Hunady
2  at the moment he fired was unreasonable and a violation of
3  *Graham v. Connor*?
4      A.   I believe that I have said that throughout my
5  report by quoting --
6      Q.   No, sir.
7      A.   -- by quoting --
8      Q.   You never even talked about -- you never even
9  talked about the shooting in your report.
10     A.   No --
11     Q.   You talk about everything that leads up to it,
12 but you don't even talk about the shooting.
13     A.   I didn't talk about --
14              MR. TENENBAUM:  I'm going to object --
15              THE WITNESS:   -- the shooting, I talked about
16         how police officers arrive at making decisions in
17         circumstances like this; and obviously, as I gave you
18         notice, reserving for depositions to flesh out more of
19         what they were trained to do or not.  Because I
20         believe that what I'm going to find -- I believe, that
21         what I'm going to find is that this is basically more
22         of a deliberate indifference to training, or the
23         application of that training, which would then make
24         this objectively unreasonable.
25 / / / / /

1  BY MR. MCNEILL:

2     Q.   Okay.  I still gotta get back, because I need to

3  make sure that if you do testify, what you testify to,

4  because this is the last day that we have any discovery;

5  it ends today, okay?  So that's why I'm having an issue

6  and trying to get you pinned down.  So --

7     A.   You said --

8     Q.   -- if I've heard you now, you have an opinion as

9  to that Corporal Hunady's use of force was unreasonable;

10 that's opinion 1; opinion 2, that Corporal Hunady's

11 training in regards to a mental subject would have been

12 deliberate indifference.  Is that your --

13    A.   I'm trying not to -- I want you to understand

14 that experts should not draw legal conclusions.  I'm

15 using those terms to cut to the chase --

16    Q.   I want you to.  I want you to.

17    A.   I would define it differently, as a police

18 officer is trained, as to what deliberate indifference is;

19 and that is, acting with knowledge and having alternatives

20 and knowing that this could resolve in an injury that

21 would be a constitutional violation.  That's what police

22 officers are trained about deliberate indifference.

23    Q.   Okay.  Let's see if I can share this screen, see

24 if you took into account.  Okay, do you see that --

25    A.   I don't --

1    Q.   -- document?

2    A.   I don't see it.

3    Q.   Dadgummit.  Did the video just pop back up?

4    A.   No.

5              MR. TENENBAUM:  No.

6              MR. MCNEILL:  I thought it was up?  Nothing?

7              MR. TENENBAUM:  Nope.  I don't have anything

8    on my screen.

9              MR. MCNEILL:  I don't understand this, it's

10   showing that it is.

11             THE WITNESS:  I don't see it.

12             MR. MCNEILL:  See anything now?

13             MR. TENENBAUM:  Nope.

14             THE WITNESS:  Are you trying to show me the

15   actual shooting, is that what you're showing?

16             MR. MCNEILL:  No, sir.

17             MR. TENENBAUM:  Now it's starting.  There.

18             MR. MCNEILL:  What do you see?

19             THE WITNESS:  I don't see it.

20             MR. MCNEILL:  It should be a part of a

21   transcript.

22             THE WITNESS:  Oh, I see a transcript, but I

23   can't read it.

24 BY MR. MCNEILL:

25   Q.   Okay.  I'm going to read it to you.  I just want

1  to make sure you read it.  Do you remember there was a

2  video of Jorge Rodriguez (as spoken;) correct?

3      A.   I didn't hear you.

4      Q.   Jorge Rodriguez?

5      A.   What about it?

6      Q.   There was a cell phone video that he took;

7  correct?

8      A.   Oh, yes.  I'm sorry.

9      Q.   Okay.  And this video has been transcribed, and

10 it was provided to Plaintiff.  And he was on the phone and

11 it was translated and transcribed, and this is what it

12 says:  "A man had an accident here in Alabama, Florida.

13 He had an accident, the man didn't want to get out of the

14 car, and the man got out of the car with a pistol.  He

15 gets out with a pistol, and the police killed him in front

16 of us."  That's what the transcript says.  And if you look

17 at Mr. Jorge's video -- did you look at that video?

18     A.   Yes.  You don't see a pistol.  That was a

19 civilian making an impression of what he believed from

20 movies.

21     Q.   Okay.  I think it was an impression that he made

22 from watching the scene.  He was the first car stuck in

23 the traffic.

24     A.   He did not see a pistol.

25     Q.   It's not what he said on the phone.

1     A.   It doesn't make any difference, he didn't see a

2  pistol.

3     Q.  Okay.

4     A.   There wasn't one.

5     Q.  He thought he saw a pistol; right?

6     A.   Pardon?

7     Q.  He thought he saw a pistol; correct?

8     A.   There wasn't a pistol, that's why you got to --

9     Q.  You're playing words.  You're playing words.  He,

10  Mr. Jorge Rodriguez, as shown on the video, believed that

11  Mr. Victor had a pistol; correct?

12     A.   He's not a police officer, and he was not

13  interviewed quickly at the scene to determine what it was

14  he actually saw before the shooting took place.  This is

15  all after-the-fact, and thoughts by an untrained

16  individual making assessments that are not to substitute

17  for a trained police officer.

18     Q.  Okay.  Did you hear Corporal Hunady say 14 times

19  words of either "drop it" or "show me your hands"?

20     A.   I heard him.

21     Q.  Okay.

22     A.   He was --

23     Q.  Did you hear him say "Do not advance.  Stop

24  advancing"?

25     A.   Yes.

1    Q.   Okay.  Did you also look at -- I always

2  mispronounce his name -- Alumbaugh's statement, who was

3  positioned further down, and he's a civilian; did you read

4  his statement?

5    A.   Yes.

6    Q.   And you agree with me that Mr. Alumbaugh thought

7  that Mr. Victor had a pistol, or was armed?

8    A.   These are civilian witnesses, who are

9  speculating, that did not see a pistol.  I mean, they can

10  say it all day long, but there was not a pistol.

11    The officer could not see a pistol, the officer did

12  not testify he saw a pistol; in fact, he didn't say "drop

13  the gun," he just said "drop it."  He thought that maybe

14  something was under the towel, but he should have been

15  taking into consideration that the towel was there and on

16  his arm prior to the fact that he was still inside the

17  car, but they did not have a plan.

18    Plus, when he got him out of the car, they had the

19  option as not a last resort, certainly; and he had not

20  committed a crime; that they knew to a moral certainty

21  something was wrong with him; and that this was the

22  perfect situation to set up a plan to reposition a vehicle

23  and apply the Taser first, with lethal cover.

24    We train that when you're equipped with a Taser, you

25  use it under circumstances where you have no certainty and

1  you're not dealing with a person that is in sound mind at

2  the time -- and who may be suicidal, Suicide by Cop -- to

3  use less-lethal first under all circumstances where it's

4  possible.

5      I'm saying in this case it was possible they never had

6  a plan -- they never even thought about it -- and that

7  they took the first option which is simply shoot, even

8  though there was no confirmation that he committed a

9  crime; was attempting to resist; or that he even knew what

10 he was doing; and that they did not see a pistol but shot

11 him anyway.

12     Q.  Wait a second.  You're also not taking in

13 Mr. Devore's -- which I thought was Devoid's -- statement.

14 Mr. Joseph Devore?

15     A.  I don't recall, what did he say?

16     Q.  He is the former law enforcement officer that

17 talks about how there was -- that Mr. Victor took a

18 shooter's stance?

19     A.  I did not see a shooter's stance, but I saw an

20 extended arm.

21     Q.  Having your arms up like this, and you are -- got

22 your hands wrapped, it is right there at eye level, and

23 you're sitting there and you never show your hands, are

24 you telling -- are you going to tell the trier of fact in

25 this case that it would be unreasonable for Corporal

1  Hunady to have assumed that this was not a firearm that

2  Mr. Victor had?

3      A.   I didn't say that.  I said that --

4      Q.   That's what it seems like you're saying --

5      A.   No.

6      Q.   -- because that was exactly what happened, isn't

7  it?  That's how Mr. Victor presented himself:  In a

8  shooter's stance with his arms out holding in this

9  manner --

10     A.   He --

11     Q.   -- correct?

12     A.   No, he did not take a shooter's stance.  I viewed

13  the video, that's not a shooter's stance.  Was he

14  presenting his arm extended as he stumbled out of the

15  vehicle and towards the officer?  Yes, he had his arm

16  extended.  I would not call that a shooter's stance.

17     You have two different shooter's stances at a minimum

18  that you could consider, and neither were presented by

19  him; but I'm not going to dispute that his arm was

20  extended, and it was covered and wrapped.

21     But you're missing the fact that I said you have to

22  consider the totality of the circumstances:  That they did

23  not know that he had committed a crime; that they knew

24  that he was emotionally disturbed; that they had

25  descriptions of his conduct and behavior, did not find out

1   that he had a towel wrapped around his arm prior to

2   getting out; and did not take into consideration that they

3   had less-lethal available; by re-positioning a vehicle

4   could have been easily in the 25-foot zone to attempt it,

5   even though he was covered by lethal; that if the Taser

6   didn't work and they tried it, potentially then

7   objectively, reasonably, they applied deadly force, but --

8       Q.   So a man advancing in that manner that is shown

9   on the video, a man advancing in that manner, your

10  testimony would be that Corporal Hunady lower his weapon,

11  pull out his Taser while a man is still advancing with his

12  arm extended out, not knowing what it is, take that time

13  and is hoping in the hope of all hopes that Mr. Victor was

14  not indeed armed?

15      A.   I did not say that, sir, respectfully --

16      Q.   That's what it sounds like you're saying.

17      A.   Respectfully, sir, you're summarizing what I said

18  and you didn't hear me.  I said someone could reposition a

19  vehicle to give them good cover, another -- there were

20  four officers there, they had enough for one officer to be

21  a Taser officer, and three to be lethal cover.

22      That is the way we train when you're given a person

23  who is emotionally unstable; who was bleeding profusely;

24  who was described as initially unconscious; who was talked

25  about being crazy, out of his mind, on drugs; to give them

1 every benefit of not having committed a crime.

2     And attempting, even by your own expert's opinion, a

3 last-resort effort which is described under both

4 Barricaded Subjects and Suicide by Cop; to attempt to

5 deescalate by a less-than-lethal method, which is talked

6 about in both of those training procedures, it was not

7 discussed as a plan.

8     I object to the fact that you said that I said Hunady

9 should put down his rifle, get out his Taser and hope for

10 the best.  I never said that.  I said they had four

11 officers there, one could position him or herself with a

12 Taser, given the totality of the circumstances.  It was

13 never an option given to this man at this time.

14     Q.  I want to share this screen, okay?

15             MR. TENENBAUM:  We don't have the video.

16             MR. MCNEILL:  How do I not have the video?  I

17     don't understand this.  I see share screen --

18             MR. TENENBAUM:  Oh, there, I got it.  I got

19     it.  I got it.  All right.

20             (Video played.)

21 BY MR. MCNEILL:

22     Q.  You can't tell me in all reasonableness that is

23 not a shooting stance.  Is that your --

24     A.  He has his arm up, I don't believe that he's

25 taking what police officers are trained as a shooting

1  stance.  I said I admit he had his arm extended that would
2  look reasonably like that, yes, but your --
3       Q.   With his eye right directly over his hands as if
4  he's aiming.
5       A.   I admit his arm was extended.  You're missing --
6       Q.   Look at it.
7       A.   You're missing everything else that I'm saying.
8  I admit he had his arm extended.  I admit that that could
9  look that way, but you're missing that I talked about all
10 of the information that they had about him.  And the fact
11 that they had not made a plan, had not discussed options.
12      And because he was not considered at the time to have
13 comitted a crime, that they could have utilized, as is
14 discussed in both of the attachments I presented to you,
15 that time's on your side; forcing him out of the car at
16 that moment was wrong.  And that they could have had a
17 plan, and they could have applied less-lethal, and they
18 did not.
19      And I don't know that they were trained about all of
20 these procedures, anyway.  I do believe that we have a
21 problem of lack of training in the proper procedures for
22 how to handle this kind of situation.
23      Q.   Well, let's agree with this:  Mr. Victor
24 certainly didn't come out with his hands over his head,
25 did he?

1      A.   He did not come out with his hands over his head,

2 because obviously we now know that he had -- both hands

3 were injured, and he had towels -- apparently he made some

4 effort to stop his own bleeding.  But in any event,

5 considering the totality of the circumstances and what --

6      Q.   And holding his hands out helps from the

7 bleeding?  Is that your -- seriously, now, come on.  Come

8 on.  Come on.  Come on, Mr. Katsaris --

9      A.   Don't do that to me, sir.

10      Q.   Sounds like Joe Biden in the debates.  I mean --

11      A.   Sir, this is not -- this is not a "come on"

12 situation.  The man --

13      Q.   Yes, it is.

14      A.   The man was bleeding.

15      Q.   Look at it.  Look at it.  He's not showing any

16 way form or fashion that he is even in any type of

17 physical distress.  His hands are placed out with his eyes

18 over his hand, with something parked in his hands as if he

19 is holding a pistol.

20      A.   I am offering to you, sir, police expert

21 testimony.  If you want to provide expert police

22 testimony, do it in another case when you qualify.  I am

23 telling you --

24      Q.   I'm not giving it --

25      A.   I --

Q.   -- that's what it looks like, isn't it?

A.   I am telling you that he has his arm extended.  I said to the best of my ability that, yes, it could be considered.  I said that they didn't have a plan and they did not apply the totality of the circumstances, and I gave you the reasons for it.  If you continue --

Q.   I want to make sure I understand what your testimony --

A.   Sir, I know you don't mean to, but you are being very argumentative.  You've got --

Q.   I'm not.

A.   -- my opinion and you don't like it.

Q.   No, no, I'm trying to understand your opinion, and that's why I'm clarifying this --

A.   You don't like my opinion.

Q.   -- is it your opinion that at this moment, the way that Mr. Victor presented himself, it was reasonable for Corporal Hunady and everybody else there at that scene to believe that he, Mr. Victor, had a pistol?

          MR. TENENBAUM:  I'm going to object to the
     form of the question.  Go ahead.

          THE WITNESS:  It's not reasonable --
BY MR. MCNEILL:

Q.   Is it reasonable?

A.   We're not talking about the conduct of the

 1  officer being reasonable, we're talking about whether it
 2  was objectively reasonable.  And --
 3       Q.  All right.  Is it objectively reasonable that
 4  Corporal Hunady and every other officer at the scene --
 5  because trust me, we're bringing in about 20
 6  declarations --
 7       A.  You are not giving me an attempt to answer your
 8  question.
 9       Q.  Every witness at the scene that all says that
10  they believed he was -- "he" being Mr. Victor -- was armed
11  with a pistol.
12       A.  I don't care what the others said at the scene --
13       Q.  Objectively reason --
14       A.  I don't care what the other said at the scene,
15  they are not trained.  My concern is that the officers
16  weren't trained, either.  Please, sir, you've got to
17  understand what I'm saying, and you don't like it.  I --
18       Q.  No, those are playing words --
19       A.  I'm trying to be --
20       Q.  You're playing words.  My question is very simple
21  -- you're playing words.  My question is very simple:  is
22  it unreasonable, when you see that situation, what you saw
23  on that video, is it unreasonable for Corporal Hunady to
24  have believed -- to believe that Mr. Victor was armed with
25  a pistol?

1    A.  Are you going to give me a chance to answer, or

2  are you going to cut in again?

3    Q.  I just want to know is it reasonable.  It's a yes

4  or no question.  Is it reasonable?

5    A.  I'm going to give you my answer, and when you

6  hear what I'm saying and you don't like, will you not cut

7  me off?

8    Q.  If it's less than maybe 50 words, yes.  Try.

9    A.  It is my opinion that the shooting of Mr. Victor

10  under the totality of the circumstances was objectively

11  unreasonable, given all of the circumstances I have

12  described about what they knew, and his demeanor; and the

13  fact that the officers probably were not trained to assess

14  what they had, and therefore shot him.  And I believe that

15  it was objectively unreasonable to do so under the

16  circumstances.  Now, I know --

17    Q.  That was not my question.

18    A.  -- want to argue about that, but that is my

19  answer.

20    Q.  That was not my question.

21        MR. TENENBAUM:  Well, I think we've --

22        MR. MCNEILL:  My question was at this moment.

23    I'm not talking everything in totality, I want to know

24    at this moment.

25        MR. TENENBAUM:  I'm going to object to the

1    form of the question.  Go ahead.

2              THE WITNESS:  At that moment --

3 BY MR. MCNEILL:

4    Q.   Not talking about everything in totality, this

5 moment.

6    A.   At that moment, the shot that was taken was based

7 on the lack of training because it should not have been

8 taken at that moment.  There were --

9    Q.   The shot wasn't taken at that moment.

10   A.   There were --

11   Q.   The shot was taken one minute later.

12   A.   You see, you don't like my answers, and you're

13 not letting me talk.

14   Q.   You're not answering my question.  My question is

15 is it unreasonable for these officers to believe that

16 Mr. Victor was armed?  That's my question.  You're

17 avoiding everything on it.  That's all my question is.

18   A.   They had no knowledge whether he was or wasn't.

19 Did he present himself in a manner that they could make

20 some observation about that?  Yes; but they did not know

21 he was armed.  He presented himself because they didn't

22 find out or take into consideration everything else they

23 knew.  They did not collect it, they didn't plan, they

24 didn't apply their training.  They could, looking at him,

25 have some reasonable belief that it's possible, but it

 1  wasn't to a probable cause standard.

 2       Q.   Possible?

 3       A.   Possible.

 4       Q.   Okay.  When writing your report, were you asked

 5  not to provide an opinion as to the events -- actually the

 6  minute leading up to the shooting?

 7       A.   I was never asked to do anything other than

 8  assess the materials and write a report.  I don't believe

 9  I even discussed my opinions with them.  I don't write

10  draft reports so --

11       Q.   That was my next question.

12       A.   Yeah.

13       Q.   All right.  So there -- we don't have any draft

14  reports?

15       A.   I never write draft reports ever.  I tell the

16  attorney --

17       Q.   Good practice.

18       A.   -- it's not their report, it's mine.  Every time

19  an expert writes a draft report, attorneys like to have

20  input, so I tell them "It's not your report, it's mine.

21  You don't like it" --

22       Q.   No, that's good practice.  I agree with it,

23  that's a good practice.

24            I'm just looking over my notes making sure I haven't

25  -- I've got everything covered.  Looking at your

1  testimony, it almost appears in your previous cases,

2  because there's a lot of it, maybe very slightly more for

3  the plaintiff than for the defendant, but it's like 45/51,

4  and some of them we couldn't tell.

5      A.   I couldn't hear your statement, sir.  What was

6  it?

7      Q.   I'm looking at -- I was looking at your previous

8  testimonies --

9      A.   It's more defense.  It's more defense than it is

10  plaintiff.  I'm sure it is.

11     Q.   I had almost like almost dead-even, that's why I

12  was trying to figure --

13     A.   Well, it might be, but I'm retained about 75

14  percent by the defense.  Sometimes MSJ and settlements

15  come as a result of my discussions; it might when it comes

16  to testimony, it could be even, but I think it's still

17  heavier on the defense side.

18     Q.   That's okay.

19     A.   The majority of my Alabama cases in the past have

20  all been defense, I know that, but --

21     Q.   Have you testified in the Southern District

22  via -- by deposition?

23     A.   Oh, I'm sure I have.  I don't --

24     Q.   Have you ever testified at trial in Mobile?

25     A.   I likely did.  I don't keep anything beyond four

1  years, but I likely did, I had so many Mobile cases, yeah.

2  I couldn't imagine none of them went to trial, I just

3  don't have that information.

4       Q.  I understand.  I understand.  I'm not holding you

5  to it.  I'm not --

6       A.  I had well over 30 cases in Alabama, most of them

7  shootings.

8       Q.  That was my last question:  On all those cases

9  that you dealt with, because you've got a wide range of

10  expertise in law enforcement, what would you say the

11  percentage that you dealt with actually involved police

12  shootings?

13       A.  Probably the majority of them are shooting cases.

14  I've been an officer-involved-shooting instructor all over

15  the United States.  In fact, the State of Texas made a

16  decision to hire the first non-Texan to be their

17  officer-involved-shooting instructor at the Law

18  Enforcement Management Institute, which is their command

19  college.  I did that between 2015 and 2017.  I was the

20  officer-involved-shooting for the entire State of Texas

21  command college.

22       I teach officer-involved-shootings all over the United

23  States, and when I say "officer-involved-shootings,"

24  that's the investigation of, the assessment of.  I am a

25  current certified firearms instructor, which has

1  reciprocity throughout the country based on the Florida

2  Criminal Justice Standards and Training Commission.

3      Q.  My last questions is just to make sure, because

4  this is the last day we have discovery, do you have any

5  other opinions which I have not -- this is a wide-open

6  question --

7      A.  No, sir.

8      Q.  -- any --

9      A.  Not that you haven't --

10     Q.  Any other opinions?

11     A.  I'm not going to sit here and try to think of

12  something else I might opine.  I wrote what I thought was

13  appropriate from the materials that I had; and I obviously

14  gave my protest about I didn't have sworn testimony or

15  training, and I need that.

16     Q.  Okay.  So other than what's in your report and

17  your testimony today, you can't think of -- and there's

18  not some other glaring opinion that you have in this case

19  that I've forgotten to ask you about?

20     A.  That's correct, sir.

21          MR. MCNEILL:  Okay.  All right.  That's all I

22     have.

23          (Discussion off the record.)

24          MR. TENENBAUM:  I want to ask you a few

25     questions, though.

1        THE WITNESS:  Oh, okay.  I'm sorry.

2        MR. TENENBAUM:  That's okay.

3        MR. MCNEILL:  Wow.  I wasn't expecting that.

4    Go ahead.

5        MR. TENENBAUM:  Just a couple.

6            E X A M I N A T I O N

7 BY MR. TENENBAUM:

8    Q.    Is the goal for police officers of Suicide by Cop

9 to assist in the suicide?

10    A.    No.  But they may have to under certain

11 circumstances; I've said that, so let me just say, you

12 know, that there are circumstances which you could say

13 they had no choice.  In this case, they had a choice.

14    Q.    Could -- are there methods available for officers

15 to safe -- where they could have safely approached the

16 vehicle?

17    A.    Yes, there are.

18    Q.    What are those?

19    A.    Well, proper resources -- there are a number of

20 options with the proper resources.  I don't know what or

21 where they were, but there are bullet-resistant shields

22 that are available to special resource officers, sometimes

23 supervisors carry them.  And there are vehicles that are

24 utilized for the same purpose.  Also, from a distance,

25 they can break out a window utilizing rounds that are

specifically for that purpose, inject gas into the car, OC pepper spray, chemical restraint spray, disable the person, and then approach. There are methods, obviously, both in the car and as they exit, with less-lethal rounds. There are rubber baton rounds that are available sometimes to supervisors, and certainly to a moral certainty to every SWAT member in the country. Rubber baton rounds, which could disable the individual, or certainly knock them down or knock them to the extent that they would reveal whether or not they did have a firearm. There are pepperball rounds that are available to many of the SWAT teams, or that they choose to have, and there are also bean bag rounds, which are simple fired from a 12-gauge shotgun.

I do not have information as to the resources, where they were, who had them; but we do know they had less-lethal at this scene, being a Taser, and I think I've spoken ad nauseam as to the application of it.

Q. Yeah, I'm not going to go into that any further. Now, before the call went out for the sheriff, do you recall about how much time elapsed from when the paramedics or the fire department personnel arrived on the scene, until they made that call?

MR. MCNEILL: Object to form.

THE WITNESS: I don't recall that exact time

1      limit.  Obviously there was a delay.  I mean, there
2      certainly was some time, but I didn't archive that.
3  BY MR. TENENBAUM:
4      Q.  All right.  Now, I think the record reflects that
5  it took Sheriff Hunady from the time he received the call
6  -- Deputy Hunady, from the time he received the call,
7  approximately 15 minutes to get to the scene?
8      A.  I knew it took some time, but I don't know
9  exactly the time, no.
10      Q.  And another ten minutes before Mr. Victor exited
11  the vehicle; correct?
12      A.  At least, yes.
13      Q.  So that's 25 minutes; correct?
14      A.  Yes.
15      Q.  All right.  In addition, Mr. Victor was able to
16  get out of the car under his own power; correct?
17      A.  Well, it was a feeble exit in my opinion, but he
18  got out, yes.
19      Q.  All right.  He got out.  All right.  Well,
20  clearly the bleeding that had occurred was not enough
21  where he would have bled to death within a minimum of,
22  what, 30 minutes?
23      A.  I don't know how long it would have taken for him
24  to bleed to death, but I don't think that figures into the
25  equation.

1    Q.   All right.  Was traffic flow and ending the

2  traffic jam more important than preserving life?

3    A.   No, because you can deal with the traffic.

4    Q.   I think it was on Exhibit 3 Mr. McNeill seemed to

5  indicate that there was a declining list of importance

6  with respect to the subjects, and I just want to make it

7  clear that that list is not in order of priority, and that

8  the priority depends on the facts and circumstances of

9  each individual case; is that correct?

10    A.   That is correct.

11    Q.   Now, you mentioned that he had a towel wrapped

12  around his arm, do you know if was a towel or if it was

13  his jacket?

14    A.   No, it was just called a towel, I -- I just

15  referred to it as what the officers perceived at that

16  time, that's all.

17          MR. TENENBAUM:  Nothing further.

18          THE WITNESS:  Thank you.

19          MR. MCNEILL:  Nothing further.  Thank you.

20          MR. TENENBAUM:  All right --

21          THE WITNESS:  I waive.

22          MR. TENENBAUM:  Okay.  That was going to be

23      my next question.  Thank you.

24          (The witness waived reading and signing and

25      the deposition was concluded at 1:38 p.m.)

```
 1                    CERTIFICATE OF OATH

 2

 3  STATE OF FLORIDA

 4  COUNTY OF LEON

 5

 6        I, JEFFREY BABCOCK, the undersigned authority,

 7  certify that W. KEN KATSARIS, personally appeared before

 8  me and was duly sworn.

 9

10        WITNESS my hand and official seal this 2nd day of

11  January, 2021.

12

13

14

15        _____Jeffrey R. Babcock_____

16              JEFFREY R. BABCOCK

17                Court Reporter

18        Notary Public, State of Florida

19        My Commission No. GG306943

20            Expires:  6/25/2023

21

22

23

24

25
```

1    CERTIFICATE OF REPORTER

2

3  STATE OF FLORIDA

4  COUNTY OF LEON

5

6        I, JEFFREY BABCOCK, do hereby certify that I was

7  authorized to and did stenographically report the

8  deposition of W. KEN KATSARIS; that a review of the

9  transcript WAS NOT requested; and that the foregoing

10 transcript, pages 1 through 105, is a true record of my

11 stenographic notes.

12       I FURTHER CERTIFY that I am not a relative,

13 employee, or attorney, or counsel of any of the parties,

14 nor am I a relative or employee of any of the parties'

15 attorney or counsel connected with the action, nor am I

16 financially interested in the action.

17

18       DATED this 2nd day of January, 2021 at

19 Tallahassee, Leon County, Florida.

20

21       _Jeffrey R. Babcock_

22       JEFFREY R. BABCOCK

23           Court Reporter

24

25