# EXHIBIT 6



# SHANE D. HEALEY

75 Lee Road 418, Opelika, Al 36804
(334)319-4577 * shane9702@gmail.com

July 20th, 2020

Mr. J. Randall McNeill
Webb & Eley Attorneys at Law
7475 Halcyon Pointe Drive, Montgomery, AL 36117
P.O. Box 240909, Montgomery, AL 36124

RE: *Donna Chisesi, as Independent Administratrix of the Estate of Jonathan Victor - Plaintiff*

*v.*

*Matthew Hunady, in his individual capacity, as a Baldwin County, Alabama, Sheriff's Deputy, and Huey Hoss Mack, in his individual capacity, as the Sheriff of Baldwin County, Alabama - Defendants*

*Case No: 1:19-cv-00221-C (Southern District of Alabama, Southern District)*

Mr. McNeill,

I respectfully submit the following report on the above-styled case pursuant to your request dated April 15th, 2020. I was asked to review case materials relevant to only the actions of Defendant Deputy Corporal Matthew Hunady of the Baldwin County, Alabama, Sheriff's Department. My report specifically addresses the following issue:

➢ Was the Defendant Deputy unreasonable in his use of force against the Plaintiff?

As part of my analysis, I reviewed the following:

1. Offense Report from the Baldwin County Sheriff's Office, Case #BCSO17OFF001860.
2. Alabama Uniform Traffic Crash Report, DPS Case #7656411.
3. Baldwin County Major Crimes Unit complete report and related documents titled, "OIS 05/12/2017, 17-003".
4. E911 Center of Baldwin County, 911 DecisionStation Incident Detail report for Incident ID: Baldwin-981523.
5. Baldwin County Sheriff's Office (Communications) Call History Record for Incident #BCSO17CAD039184.
6. Photographs of the scene and all evidence recovered during the investigation.

7. Baldwin County Major Crimes Unit prepared scene sketches and legend.
8. Alabama Department of Forensic Sciences Report of Autopsy, Toxicological Analysis Report, and Firearms Analysis Report for ADFS Case #17ME01343.
9. Autopsy and forensic testing photographs.
10. Statement of Baldwin County Deputy Daniel Middleton.
11. Statement of Baldwin County Deputy Sergeant Benjamin G. Burke, III.
12. Statement of Baldwin County Deputy Sergeant Nathan Lusk.
13. Statement of Baldwin County Deputy Andrew Harville.
14. Statement of Baldwin County Deputy Erik Von Bergen.
15. Statement of Baldwin County Deputy John Garner.
16. Statement of Baldwin County Deputy Stephanie Pilkington.
17. Statement of witness Donald Wayne Alumbaugh.
18. Statement of witness Jorge Gutierrez.
19. Statement of witness Joseph A. Devore, III.
20. Statement of witness Matthew Findley.
21. Statement of Rosinton Volunteer Firefighter Brandi Stockton.
22. Statement of Rosinton Volunteer Firefighter Michael Tobias.
23. Statement of Medstar EMT Stephen Crossland.
24. Statement of Medstar EMT Jason Felks.
25. Statement of Senior Trooper James Greg Eubanks (ALEA).
26. Disc Image file titled "110 shooting Matt Hunady body worn". (Body cam of Baldwin County Deputy Corporal Matthew Hunady)
27. Disc Image file titled "110 shooting Andrew Harville body worn". (Body cam of Baldwin County Deputy Andrew Harville)
28. Disc Image file titled "110 shooting Daniel Middleton Body worn". (Body cam of Baldwin County Deputy Daniel Middleton)
29. Disc Image file titled "110 shooting John Garner in Car video". (In-car video of Baldwin County Deputy John Garner)
30. MP4 file titled "Hunady dash cam". (Dash cam of Baldwin County Deputy Corporal Matthew Hunady)
31. MP4 file titled "video 3". (Dash cam of Baldwin County Deputy Corporal Matthew Hunady)
32. VLC media file titled "VTS_01_12020-04-16". (Body cam of Baldwin County Deputy Matthew Hunady)
33. VLC media file titled "VTS_01_22020-04-16". (Body cam of Baldwin County Deputy Corporal Matthew Hunady)
34. MP4 file titled "video 1". (Dash cam of Baldwin County Deputy Andrew Harville)
35. MP4 file titled "video 2". (Body cam of Baldwin County Deputy Daniel Middleton)
36. MOV File titled "IMG_0656, IMG_0657, IMG_0658, & IMG_3689". (Cellphone video from Jorge Gutierrez)
37. Video translation of Jorge Video (#IMG-0656).
38. Video translation of Jorge Video (#IMG-0657).

39. Video translation of Jorge Video (#IMG-0658).
40. Various IFO Files & VOB Files titled "VIDEO_TS, VTS_01_0" (Nothing played)
41. VOB File titled "VTS_01_3". (Dash cam of Baldwin County Deputy Andrew Harville)
42. VOB File titled "VTS_01_4". (Dash cam of Baldwin County Deputy Andrew Harville)
43. MP4 files titled "20170512_173550_001, 20170512_173550_002, & 20170512_180520_001". (Cellphone video from Matthew Findley)
44. Complaint, Case #1:19-cv-00221-C, filed May 7th, 2019.
45. Baldwin County, Alabama, Sheriff's Office SOP#1 "Use of Force and Control Measures".
46. Deputy Corporal Matthew Hunady's personnel file from the Baldwin County, Alabama, Sheriff's Office.
47. Deputy Corporal Matthew Hunady's training file from the Baldwin County, Alabama, Sheriff's Office.
48. WMA File titled, "Medstar Radio Traffic" (Audio of the radio traffic between dispatchers and the Medstar unit)
49. WMA File titled "Rosinton VFD Radio Traffic" (Audio of the radio traffic between dispatchers and the Rosinton Volunteer Fire Units)
50. Multiple WAV and WMA Files titled "911 Call 1, 911 Call 2, Adm Call 1, Adm Call 2, Adm Call 3, Adm Call 4, Adm Call 5 and 6, Shooting I10 [5 11 39, 5 12 18, 5 13 03, 5 13, 40, 5 14 06, 5 15 20, 5 15 21, 5 15 50, 5 17 17, 5 19 32, 5 19 53, 5 20 00, 5 20 01, 5 21 09, 5 22 39, 5 23 43, 5 23 47, 5 24 56, 5 25 52, 5 26 19, 5 30 18, 5 31 06, 5 33 47, 5 34 56, 5 36 05, 5 37 47, 5 43 08, 5 43 24, 5 46 46, 5 47 11, 6 04 49, & Dispatch Research 01]" (Audio of the radio traffic and phone calls between the Baldwin County Sheriff's Office Dispatchers and the deputies, and the medical dispatchers)

I began my analysis of this case with an in-depth review of the above case materials. While preparing this report I used the following reference materials to support my opinion:

A. Code of the State of Alabama (Title 13 & Title 15).
B. Constitution of the United States of America, to include various Supreme Court rulings and quotations.
C. Michie's Alabama Criminal Code Annotated with Commentaries 2017 Edition (Mathew Bender & Company, 2017)
D. *National Consensus Policy and Discussion Paper on Use of Force*. International Association of Chiefs of Police (Revised July 2020, originally published October 2017)
E. Policy 300 – Use of Force. Model Policy from Lexipol, LLC. Copied from Opelika Police Department Policy Manual. (July 2020)
F. General Procedure #48 – Use of Force. Opelika Police Department policy used at the time of this incident. (02/15/2015)

Summary of incident: (The information in this summary was obtained from the above listed case reference materials.) Shortly before 5:00 PM on May 12th, 2017, the E911 Center of Baldwin County, Alabama, received a call of a single vehicle traffic crash along Interstate 10 eastbound

near the 60-mile marker. Medical units from Medstar Ambulance Service and Rosinton Volunteer Fire Department were dispatched along with the Baldwin County Sheriff's Department and the Alabama State Troopers. Medical personnel arrived on scene prior to any law enforcement officers. The sole occupant of the car involved in the crash refused to cooperate with medical personnel and jumped into the backseat area. Medical personnel requested that law enforcement speed up their response because of the occupant's strange behavior. While the medical personnel were awaiting law enforcement, they had reason to believe the occupant, who was later identified as Jonathan David Victor, had armed himself. This information was relayed to responding Baldwin County Sheriff's Department deputies. Corporal Matthew Hunady was one of the first law enforcement officers to arrive on the scene. Cpl. Hunady learned from the medical and fire personnel on the scene that Mr. Victor was not cooperating with their efforts to treat him and had apparently armed himself and climbed into the backseat of the car. Cpl. Hunady was armed with his duty AR-15 rifle and took a position to the front of a Rosinton VFD fire truck where he could use the truck as cover but gain a visual observation point on the car and Mr. Victor's actions. Cpl. Hunady began to give verbal commands to Mr. Victor and tried to engage him in conversation. Mr. Victor did not respond. As other deputies from the Baldwin County Sheriff's Department arrived, they took up alternate observation and covering positions. Mr. Victor emerged from the passenger side door of his car holding an unknown object in both of his hands that was covered by some type of cloth. Mr. Victor was holding the object in a shooting type position with both hands outstretched in front of him, raised about shoulder level. Mr. Victor was pointing the object at Cpl. Hunady and swung it between Cpl. Hunady and several other people on scene. Cpl. Hunady gave several loud, clear, concise verbal commands to Mr. Victor. Mr. Victor complied with none of the commands and ultimately began to advance toward Cpl. Hunady. Again, Cpl. Hunady gave numerous commands for Mr. Victor to stop while he began to retreat backwards away from Mr. Victor. Mr. Victor, who was again pointing the object at several other people intermittently, did not comply or stop his advancement. Cpl. Hunady fired several shots from his AR-15 rifle which struck Mr. Victor and he fell to the ground. No other law enforcement on scene fired their weapons. Cpl. Hunady and other deputies advanced on Mr. Victor and made sure the scene was safe. They immediately began providing medical assistance and turned that treatment over to the medical and fire personnel on scene. Mr. Victor succumbed to his injuries. It was subsequently determined that Mr. Victor had not been armed.

General observations: After studying this case in-depth, I have made several general observations related to the behavior and actions of Deputy Corporal Hunady. In making these observations I relied upon my twenty-nine years of policing experience and training in a municipal police department in the State of Alabama, as well as my familiarity with the Code of Alabama, the United States Constitution, current police tactics and police best practices. I have policed in every division and at every level of supervision within my department. I am currently in command of the Community Relations/Special Services Division of my department. My experience provides me with unique insight into how a patrol officer should act and react within the context of this incident. I have firm convictions as to what I would expect of officers under my command who

were placed in situations like this incident. It is my professional opinion that Cpl. Hunady acted properly in this incident. He performed as any reasonable police officer would facing the same set of facts and circumstances unique to this case. Furthermore, his actions were objectively reasonable based upon policing best practices that are common among agencies across the United States, as well as within all applicable State of Alabama and Federal law standards. Cpl. Hunady also acted within the framework of the Baldwin County Sheriff's Office's Use of Force policy.

<u>Specific observations:</u> The following specific observations were made considering the main issue posed above about the specific aspects of Deputy Corporal Hunady's actions during this incident. (I will reference where I obtained specific information by notating the reviewed or referenced material listed above by number or letter contained within parenthesis.)

➢ <u>Was the Defendant Deputy unreasonable in his use of force against the Plaintiff?</u>

First, an examination of Cpl. Hunady's training file shows he initially joined the Baldwin County Sheriff's Office on April 19th, 2004 as a Corrections Officer. He became a Deputy Sheriff on March 7th, 2005 and then attended the Southwest Alabama Police Academy. He has been a certified police officer in the State of Alabama since June of 2005 and has been certified as a K-9 Handler and SWAT Officer during his tenure. (47) Prior to this incident he had been policing for approximately twelve (12) years. His experience has been continuous with the Baldwin County Sheriff's Department. A review of Cpl. Hunady's training file reveals that during his time as a corrections officer and a police officer, he had received training in use of force issues approximately ninety-four (94) times prior to the incident on May 12th, 2017. (47) Some notable accomplishments Cpl. Hunady achieved relevant specifically to firearms in his career are that he was a certified tactical (SWAT) officer, he was a certified Sniper and won the top gun award in November of 2015 during his certification, he was an FBI certified firearms instructor and had been slated to attend the advanced course at the time of this incident. (47) Cpl. Hunady had also been a certified K-9 Handler, was a certified Field Training Officer, and a Street Medicine instructor. (47) His training and personnel records show Cpl. Hunady to be an experienced, seasoned officer. According to Cpl. Hunady's personnel file he had been involved in six (6) prior use of force situations, none of which involved the use of a firearm. In all these situations, Cpl. Hunady acted according to policy. He had no prior complaints of excessive use of force and had never been disciplined for such. (46) It is my opinion that Cpl. Hunady was properly trained in, and understood, use of force concepts, and applied that training properly in this incident.

Secondly, after reviewing the Baldwin County Sheriff's Office Use of Force and Control Measures policy (45), it is my opinion that the Baldwin County Sheriff's Office's policy is consistent with current best police practices and is accountable to all state and federal guidelines and laws on use of force in place at the time of this incident. The policy is consistent with model policies from the International Associations of Chiefs of Police

(IACP), Lexipol, one of the leading producers of police policies in the United States, and my department's own Use of Force policy. (D, E, & F)

The Baldwin County Sheriff's Office makes two strong statements in their policy. First, "Deputies shall use only the force reasonably necessary to affect lawful objectives." (45) In this incident, Cpl. Hunady was initially tasked with maintaining the peace. He arrived on scene knowing there was a barricaded, uncooperative subject in the car, that was exhibiting strange behavior. Furthermore, he had been told by medical personnel that the subject was armed. Cpl. Hunady immediately began to apply his department's policy by using the Progressive Use of Force ladder. (45) Level 1 of that ladder specifically defines what an uncooperative subject is: "Subject refuses to comply with a Deputy's request or attempts to control the situation, or threatens with further resistance and does not respond to the Deputy's request." (45) This is the exact scenario Cpl. Hunady faced when attempting to communicate with Mr. Victor. The policy goes on to define what a reasonable deputy's response should be: "Respond by using controlled, non-emotional communication aimed at the problem solving, or verbal direction where the Deputy orders the subject to comply." (45) The best evidence of Cpl. Hunady complying with this policy is captured on his own body cam footage. Cpl. Hunady can be clearly heard saying, "Come on out, come on out. Let me see your hands. Let me see your hands. Put your hands in the air and come out of the vehicle. Put your hands in the air, come out of the vehicle. Come on out. Come on out. Come on out. Sir, everything is fine, just step out of the vehicle. I need to see your hands. Put your hands up and come on out of the vehicle." (26, 32, 33) Cpl. Hunady continues this dialogue for several minutes making similar statements. He tells Mr. Victor that he can not hear him, and he identifies himself as "Sheriff's Office". During this time Cpl. Hunady tells another deputy on the scene that Mr. Victor had rolled the window down a couple inches so he identified himself and was telling Mr. Victor to come out, but then Mr. Victor rolled the window up ignoring his instructions. Cpl. Hunady makes clear to Mr. Victor his intention when he says, "Man, Sheriff's Office. Come out with your hands up. We just want to help you." (26, 32, 33)

Cpl. Hunady maintains this level of response from initial contact until Mr. Victor exits the car approximately ten minutes later. At this point, the lawful objectives change. Mr. Victor is now committing law violations in front of Cpl. Hunady. These law violations range from violations of Alabama's firearm possession laws, to Menacing {13A-6-23}, Reckless Endangerment {13A-6-24}, to potentially committing felony assaults up to Murder {13-6-2}. (C) Even though the law objectives change, and Cpl. Hunady is faced with stopping or preventing those law violations and taking Mr. Victor into custody, he continues to maintain the same level of response. Cpl. Hunady's dash cam gives the best view of Mr. Victor exiting his car. (30, 31) As Mr. Victor steps out he has something in his hands. You cannot see what exactly the item is. (30, 31) However, Mr. Victor positions himself in a way that he makes the item appear to be a gun. Mr. Victor is seen holding the item in what is referred to as the high and also the low "ready" positions. His hands are together

holding the item in front of his chest approximately shoulder height. He lowers the item to his lower chest occasionally and then raises it back up. Furthermore, he swings the item as if he is aiming it from Cpl. Hunady to other bystanders and deputies. (30, 31) As Mr. Victor is doing this, Cpl. Hunady gives loud, clear, direct verbal commands to Mr. Victor.  Again, the best evidence of this is Cpl. Hunady's body cam footage. Immediately upon Mr. Victor's exit from the car Cpl. Hunady can be heard saying, "Man, step on out, step on out. Drop what's in your hand. Drop what's in your hand. Drop it. Drop it. Drop it right now and get your hands up. We're just here to help you man. We're just here to help you." (26, 32, 33) These commands clearly transmit Cpl. Hunady's intention to simply control the situation safely and bring it to a successful resolution by providing help to Mr. Victor. These are the commands I would expect to hear from any reasonable officer faced with a similar set of facts and circumstances. Cpl. Hunady maintains giving these commands continuously. As Mr. Victor's behavior changes, the commands change. At the point that Mr. Victor begins to advance, Cpl. Hunady gives loud, clear, direct commands to address Mr. Victor's actions. Cpl. Hunady tells Mr. Victor, "Put it down. Don't advance. Do not advance. Do not advance. Stand right there." (26, 32, 33) Cpl. Hunady remains calm, clear, and concise with his words. He gives short clear commands and repeats them more than once. This is a technique that is taught, and continually reinforced, throughout police training. The concept of giving commands such as these when feasible has become imbedded in almost all police use of force training nationwide. During such training, when officers are critiqued by instructors, verbal commands are of primary focus. In this specific incident, Cpl. Hunady had the time and it was feasible for him to give those commands, so he did.

Cpl. Hunady also incorporated an additional action in his response that is not required by law or policy. He retreated from Mr. Victor as Mr. Victor continued his advance. Cpl. Hunady's body cam and dash cam footage both record the best view of Cpl. Hunady's actions. (26, 30, 31, 32, 33) By retreating, Cpl. Hunady keeps approximately the same distance between himself and Mr. Victor. This maneuver gives Cpl. Hunady more time (approximately 13 seconds) to give further verbal commands in an attempt to get Mr. Victor to stop his advance and comply peacefully. While Cpl. Hunady backs up, he can be heard continuing to give commands to Mr. Victor, saying, "Man don't (expletive) do it. Put it down. Put it down. Put it down right now. Put it down. Put it down. Put it down. Put it down." (26, 32, 33) All the while, Mr. Victor continues his advance. (30, 31) Mr. Victor advances to a point where he has nearly reached the fire truck which was being used as cover for deputies and bystanders. If Mr. Victor advanced any further, he would have a clear line of sight on these other deputies and bystanders. Again, referring to the Baldwin County Sheriff's Office's Progressive Use of Force Ladder, this is the point in time where this incident changes Cpl. Hunady's perception from a Level 1 to a Level 5. Level 5 is "Assaultive (Serious bodily harm or death) – There is a potential for death or serious physical injury to the deputy, (e.g. the subject makes overt, hostile attaching movements with or without a weapon, with the intent and apparent ability to cause death or great

bodily harm to the deputy or others." (45) A reasonable Deputy's response should be, "Deadly Force – As a last resort, utilize techniques that may result in imminent death, serious injury, unconsciousness, paralysis or permanent disfigurement, such as impact weapon strikes or the use of firearms." (45) At this point, if Mr. Victor is allowed to advance any further, he has the potential to cause death or great bodily harm to bystanders or other deputies. From the moment Mr. Victor exits his car he presents himself as a person in possession of a firearm. His actions show he has the ability and the intent to harm someone. The non-law enforcement or non-medical personnel that were witness to these events stated that Mr. Victor had a gun and they felt as if he was pointing it at them. A witness, Mr. Matthew Findley, who was sitting in a vehicle near the scene, can be heard on his cellphone video during the incident, "It looking like he got a gun. Better take him down." (43) Witnesses, Jorge Gutierrez and Graciela Zaragoza, who were in the car together and filmed the incident as it occurred on Mr. Gutierrez's cellphone, can be heard in their conversation saying:

"No, no, no, a pistol look." – Mr. Gutierrez

"A what?" – Ms. Zaragoza

"A pistol, look…they are going to point at someone" – Mr. Gutierrez (36, 37, 38, 39)

Further in their conversation they made the following comments:

"Look he's getting out now. He's getting out. Look at him. Look at him, look at him." – Ms. Zaragoza

"Does he have a pistol in his hand?" – Mr. Gutierrez

"He's pointing over here oh Poppy!" – Ms. Zaragoza

"He's standing there and he's pointing over here." – Mr. Gutierrez

"I'm getting out. I'm getting out. Dianna bend down." – Ms. Zaragoza

"Bend down, bend down to the floor. Oh shit!" – Ms. Zaragoza

"…Pointing at us." - Ms. Zaragoza (36, 37, 38, 39)

Based upon these witnesses' statements, it is clear to see that they believed Mr. Victor was armed and was pointing a gun in their direction. At this point, Cpl. Hunady made the decision to stop Mr. Victor. He fired four rounds, striking Mr. Victor. Cpl. Hunady continued to give commands up until the moment he fired, as well as after firing. (26, 30, 31, 32, 33) Cpl. Hunady advanced on Mr. Victor, helped secure him, and immediately began providing medical care within a few seconds.

The second strong statement made in the Baldwin County Sheriff's Office's Use of Force policy is, "When applying deadly force, the objective must be to stop the suspect." (45)

Cpl. Hunady fired at Mr. Victor to stop him from getting to a point where he could potentially use deadly force on anyone else. He used only the level of force needed to stop Mr. Victor. Once Mr. Victor fell to the ground, Cpl. Hunady ceased firing. Under Section 10 the policy states, "Deadly Force - Justification for the use of deadly force must be limited to what reasonably appears to be the facts known or perceived by a deputy at the time he/she decides to use such force." (45) Under Subsection A it says deadly force can be used, "In the defense of another person, or himself/herself from what he/she reasonably believes to be an immediate threat of death or serious physical injury." Furthermore, Subsection B says, "If the deputy has probable cause to believe any of the following: 1. The subject possess a weapon, or is attempting to gain access to a weapon, under circumstances indicating an intention to use it against the deputy or others." (45) The policy defines reasonable belief as, "When facts or circumstances surrounding a particular situation would cause ordinary and/or reasonable persons to interpret or understand the situation in a similar manner." (45) The reference materials are filled with statements where people other than Cpl. Hunady believed that Mr. Victor was armed, unreasonable, uncooperative, and pointing a firearm at either themselves and/or other people. These were uninvolved bystanders such as Mr. Findley, Mr. Gutierrez, and Ms. Zaragoza, as well as many of the medical responders and other deputies.

Progressive use of force is defined by the Baldwin County Sheriff's Office as, "…refers to the escalation of force used by the Deputy, in order to control a situation, from a minimal force to maximum force. Deputies shall use only the force which is reasonable and necessary under these circumstances: A. To lawfully and properly neutralize an unlawful assault against a Deputy. B. To protect another person." (45) It is my opinion that Cpl. Hunady had a reasonable belief that Mr. Victor was going to use deadly force against any of the witnesses, other deputies, or himself, and that he used the proper level of force to bring the situation under control and stop Mr. Victor's actions. It is my opinion that Cpl. Hunady abided by and acted within the policy of his agency with his progression of force decisions, specific to his actions in this case.

It is also my opinion from reviewing the case materials that Deputy Corporal Hunady did not use excessive force against Mr. Victor, but that he acted reasonably in a rapidly unfolding situation and used proper police tactics. He escalated his use of force consistent with commonly taught police tactics and his department policy. The level of force used by Cpl. Hunady was relative to the level of resistance displayed by Mr. Victor. He followed best police practices adopted by law enforcement officers throughout the country.

The Baldwin County Sheriff's Office has a clear and concise policy on use of force that mirrors other use of force policies throughout the country. They have a well-defined training program related to use of force and firearms training. This policy is also similar to training policies for police and sheriff departments throughout the country. It is my

opinion that Cpl. Hunady followed his department policies and procedures related to his use of force in this incident.

Final observations: It is my opinion that Deputy Corporal Matthew Hunady acted using well established and common police tactics, within the laws of the State of Alabama, within the confines of the United States Constitution, and within accepted police best practices. He acted as any objectively reasonable police officer would if facing the same set of facts and circumstances. The legal principles relevant to these issues have long been established. Those time-honored principles were cited in a recent case decided on May 17, 2017, by the Eleventh Circuit Court of Appeals. In *Santana v. Miami-Dade County et al.* the court said:

- Plaintiff's excessive force claim is analyzed under the "objective reasonableness" standard of the Fourth Amendment. *Plumhoff v. Richard*, 134 S. Ct. 2012, 2020 (2014) (citing *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985)). Reasonableness in this context depends on all the circumstances relevant to an officer's decision to use force and the amount of force used. *See id*. We view the circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. (internal quotation marks omitted). And we allow for the fact that officers are often required to make "split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. (internal quotation marks omitted).
- It is reasonable, and therefore constitutionally permissible, for an officer to use deadly force against a subject who poses an imminent threat of serious physical harm to the officer or others. *See Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) ("We have held that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril.") … The relevant inquiry in the qualified immunity context is whether an officer in the defendant's position reasonably could have perceived the subject to pose such a threat. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) (finding no constitutional violation where the defendant officer shot a suspect he "could reasonably [have] perceive[d]" to pose "an imminent threat of violence to the officer and other bystanders"). The officer is entitled to qualified immunity unless "every reasonable officer" in his position "inevitably" would conclude that deadly force was unnecessary and thus unlawful under the circumstances. *See Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993).[vi] [emphasis added]

Based on the totality of all of the reviewed information, and my research on the topic, it is my opinion that Deputy Corporal Matthew Hunady acted reasonably and appropriately in his actions pertaining to the incident with Jonathan David Victor on May 12th, 2017, and committed no constitutional violations.

As the discovery process may be ongoing in this litigation, I reserve the right to supplement or amend my report upon receipt and review of any additional relevant material.

Very Respectfully,

*Shane D. Healey*

Shane D. Healey (electronically signed)
Captain of Police