# EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

DONNA CHISESI, AS INDEPENDENT
ADMINISTRATRIX OF THE ESTATE OF
JONATHAN VICTOR, DECEASED,

    Plaintiff,

vs.                                          Civil Action No. 19-221

MATTHEW HUNADY, in his
individual capacity as a Baldwin County,
Alabama, Sheriff's Deputy, and
HUEY HOSS MACK, in his individual
capacity as the Sheriff of Baldwin
County, Alabama,

    Defendant.

_____/

## AFFIDAVIT OF W. KEN KATSARIS

### SUBMITTED TO

### J. SAMUEL TENENBAUM

## MATERIALS REVIEWED PRIOR TO DEVELOPMENT OF OPINIONS

    The materials reviewed and listed in Attachment "A" are of the type typically relied upon by consultants and experts when conducting an analysis of law enforcement and private security issues and were sufficient to provide me enough relevant data to develop my opinions to a reasonable degree of professional certainty.

    The basis for the below listed opinions comes from an intensive review of all the materials submitted to me by J. Samuel Tenenbaum, which are listed as Attachment "A" of this

1

report, as well as the extensive education, training and experience I have gained from over thirty-five years of involvement in the law enforcement field and private security.

### **CREDENTIALS AND EXPERIENCE OF W. KEN KATSARIS**
(See Attachment "B", CV of W. Ken Katsaris)

I am currently a certified Florida Law Enforcement Officer/Instructor, and consultant in law enforcement and private security. I regularly instruct in a wide area of law enforcement subjects at the Regional Police/Corrections Academy, where I have been teaching for over 30 years. For over 25 years, I was also an instructor at the Florida Highway Patrol Academy. I also participate in law enforcement seminars throughout the USA where I have instructed well over 150,000 Police Officers, Private Security Officers, Commanders, Agency Administrators and the Attorneys representing these Agencies on a number of liability, investigation, tactics, and policy and procedure related subjects, including Police Pursuits and Use of Force/Deadly Force, the Internal Review/Investigation Procedures following a complaint or incident. In the past I have also specifically instructed over 25,000 Officers from all 50 states including Private Security agencies, the Federal agencies and the Canadian Royal Mounted Police in a variety of street survival police procedures including Police Pursuits, Use of Force and Deadly Force as well as other policy areas that are detailed in my C.V.

My law enforcement experience includes service as a Police Officer for the St. Petersburg Florida Police Department, off-duty armed private security, Police Officer with the Tallahassee Florida Police Department, Deputy Sheriff with the Leon County Sheriff's Office, Trooper with the Florida Highway Patrol, the elected Constitutional sheriff who performs as the Chief Law Enforcement Officer of the County of Leon, City of Tallahassee, Florida, a jurisdiction of 700

2

square miles, and I served as the Assistant to the Secretary of Corrections for the State of Florida, as an administrator of the third largest prison system in the nation, administering over 84 prisons and supervising 67 county detention systems.

My academic instructional background includes 10 years as the Department Chairman of the Criminal Justice Program at Tallahassee Community College (Tallahassee, Florida). In this capacity I directed and taught both the advanced in-service Police training programs and the degree granting programs, as well as directing the crime lab used to support local law enforcement. Extensive teaching and training including hands on skill development was taught in private security procedures, police patrol and criminal investigation and criminalistics courses. Academic subjects included courses in security management, police procedures, criminology, and private security patrol and administration. I have earned an Associate in Arts Degree in Police Administration and Bachelor and Masters Degrees in Criminology. I am ABD for the Doctorate in Public Administration.

My experience includes extensive instruction to officers throughout the United States on all of the concepts, issues, and procedures for threat assessment, approaching, controlling, and restraining resisting subjects. For over twenty-five (25) years I instructed at the Florida Highway Patrol Academy on Police Pursuit Policy and Procedures, as well as Use of Force Policy and Procedure. I also served as the Force and Deadly Force and Police Pursuit Policy and Procedures Advisor for thirteen (13) years to the Director of the Highway Patrol. For over thirty (30) years I have instructed at the Pat Thomas Regional Law Enforcement Academy and the Florida Public Safety Institute. Some of my assigned subjects are Police Vehicle and Foot Pursuits, Traffic Stops and Procedures for Handling Traffic Violators, Use of Force, Deadly Force, Crisis

3

Intervention, and Dealing With the Mentally Ill and Emotionally Disturbed Individual, as well as Individuals Under the Influence of Drugs and/or Alcohol. For over twenty (20) years I have been senior instructor for AELE, the nationally recognized organization providing instruction to agency representatives of private security companies, commanders of law enforcement agencies and the attorneys representing city, county, and state agencies on civil liability claims, use of force, deadly force, and officer involved shootings. I also held the position of instructor for the nationally acclaimed Calibre Press Street Survival seminar where I presented specific instruction to police officers and private security officers in all fifty states on the skills and tactics of use of force and deadly force and the tactics of control, including handcuffing, neck restraint systems, total appendage restraint, active counter-measures, and tactics for pressure point control, police vehicle pursuits, and use of force and deadly force. I also have been the Officer Involved Shooting Instructor for the State of Texas Law Enforcement Command College through the Law Enforcement Management Institute at Texas (LEMIT). I hold certifications as a Driving/Pursuit Instructor, Firearms Instructor, Use of Force Instructor, Hostage and Barricaded Subject Instructor, Electronic Control Device (ECD) Instructor, Handcuffing Instructor, Total Appendage Restraint Instructor, and Lateral Vascular Neck Restraint Instructor.

As a trainer I have instructed agency administrators from throughout the USA on disciplinary procedures and consequences of officer conduct. Thousands of police officers also received instruction from me on their rights while under investigation, as well as the application of the complete internal review process and the application of progressive discipline. As a college professor these principles and the entire administrative process of officer evaluation and consequences of conduct below performance standards were reviewed. As a law enforcement

administrator, I supervised the internal review process, implemented the discipline procedures, and coordinated the processes of officer evaluation. As a police consultant I have been retained by agencies, large and small, throughout the U.S. to evaluate their review of issues relating to officer conduct and discipline.

As indicated above, my CV reflects certifications as an instructor on the Use of Electronic Control Weapons (ECW), continuing attendance at dozens of seminars over the last two decades, which focused on the use and procedures of ECW's (TASER®) that were presented by renowned experts from TASER International and the now renamed company, Axon, the medical research field, attorneys with TASER® who trained specific legal experience and expertise, and Master TASER® Instructors. I also was selected as only one of fifty, from countries throughout the world, to evaluate the standards for ECW's by the National Institute of Standards (NIS). This world-wide collection of TASER® experts met several times in Washington, D.C., and heard from the TASER® developers, Master Instructors, Medical Researchers, and Electronic Engineers to resolve and set a standard for TASERS®.

My initial and continuing education and training on ECW's provided the basis for qualifying me to provide regional, statewide, and national training on the Policy and Procedure issues of TASER® deployments. However, my retention as an expert in defense of officers, primarily in civil litigation claims, as well as my critique of the deployment of TASERS® by officers in Plaintiff claims, where the TASER® was deployed contrary to recognized, trained, and accepted practices, has exposed me to a plethora of agency policies throughout the USA as well.

My experience includes hundreds of evaluations of video surveillance and was certified in December 2019 upon completion of the Certification for "Video Examinations for Police Investigators" by Forensic Video Solutions, and have studied and researched all types of security systems in most every type of application. These evaluations included the installation, coverage, recording and monitoring from police dash-cams and body cams to bank and ATM systems. Dozens of my evaluations involve bar or club installations and procedures, but also includes unique situations like theme parks, hospitals and jails, and of course, there are installations in restaurants, shopping malls, apartment complexes, condominiums, office buildings, convenience stores and gas stations, and even some installations from private residences. During my twenty five plus years of consulting and litigation support I have viewed, on sight, these systems, studied the installation and coverage, and evaluated specifically how the systems were utilized for evidentiary value.

## **CONSULTING AND LITIGATION EXPERIENCE**

In addition to all of the above experience, training, and education, it is important to also assess one specific consulting practice that I engage in – assessing police and private security officers involved use of force, including physical force, deadly force, and force utilizing various police tools such as the police baton, handcuffs, chemical restraint sprays, firearms and electronic control weapons. I am either a certified user or instructor of each tool, and physical control tactic, and have been a state certified firearms, and decision shooting instructor, for over thirty (30) years.

Of equal importance to over 30 years of actual police experience in the field and the forty-five (45) plus years of teaching tens of thousands of officers from all fifty (50) states, in

both practical, hands-on use of force, and deadly force issues, I have extensive experience doing case evaluations for the purpose of presenting reports and opinions to the Court. I have also participated in testifying, under oath, in both depositions and trials in both state and federal courts, where my testimony reflected I found officer misconduct, that conduct was considered criminal and/or civilly responsible for negligence, gross negligence, deliberate indifference, as well as objectively unreasonable. In the alternate, where the facts and circumstances were present to render favorable opinions as to officer conduct, such as in the use of force or deadly force, my report, deposition testimony or trial testimony reflected those opinions as well. Over a thirty (30) year history of litigation and court expert consulting, my work would reflect a near split between my findings and opinions of officer conduct and conformance/non-conformance to recognized policy and officer accepted, recognized and trained practices. The checks and balances of this consulting evaluation of officer conduct comes from cross examination, under oath, as to the officer conduct being critiqued. Therefore, my record of opinions, both supportive of officer conduct or below a recognized standard of care findings of officer performance have been archived, public, and very transparent.

Because all of the material listed in attachment "A" was carefully and fully reviewed, and is detailed and readily available, I will not attempt to summarize all the facts and circumstances of this case file. To do so in a complete, and thorough fashion, would simply be reiterating the salient information already archived, and in some fashion summarized by the investigative process.

# **METHODOLOGY UTILIZED IN DEVELOPING OPINIONS**

I reviewed and am familiar with the U.S. Supreme Court decisions *Daubert v. Merrill Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumbo Tire Company v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167 (1999) which established the standards for scientific, non-scientific, technical and specialized knowledge expert witnesses. I understand that a non-scientific expert must be qualified to offer expert testimony by knowledge, skill, experience, training, or education. I have provided in this report both my general and specific qualifications that I believe prove my qualifications to provide expert testimony in this case. I understand that an expert's testimony must be relevant and of assistance to the jury in understanding the evidence. I also understand that the methodology used and conclusions reached by the expert must also be reliable. To ensure my methodology was reliable and conclusions were based upon reliable methodology, I did not assign credibility to any witness, reviewed sufficient data to reach conclusions to a reasonable degree of professional certainty, developed a set of material and relevant facts only after a review of all materials provided and assumed those facts to be true solely for purposes of analysis. I then analyzed those facts against a backdrop of my knowledge, education, training and experience in law enforcement and reached conclusions and opinions which I believe are reliable to a reasonable degree of professional certainty.

The methodology I have used in this case is the same that I have utilized for many years. The methodology has been accepted over 100 times by presiding judges in previous cases in which I have testified at trial. The methodology is consistent with the methodology utilized by other experts in the non-science fields.

**FEE STRUCTURE OF W. KEN KATSARIS FOR
REVIEW AND ANALYSIS TO PROVIDE EXPERT OPINIONS**

See Attachment "C". Also see Attachment "D", a complete list of testimony offered by Deposition and Trial for the last 4 years.

**INTRODUCTION TO OPINIONS**

The file materials listed in Attachment "A" were provided by the heretofore disclosed law firm and attorney for my review and analysis. These file materials revealed sufficient information to form opinions about the use of deadly force utilized against Jonathan Victor (Victor) by Corporal Matthew Hunady (Hunady) of the Baldwin County Sheriff's Office (BCSO), and some information about the detailed events that led up to the shooting of Victor. I believe that the detailed information about the circumstances, the specific facts known to Hunady, and his training by his supervisors and Sheriff Huey Hoss Mack (Sheriff Mack) are critical to be determined for a complete analysis of police practices that should have been utilized to **prevent** the use of deadly force against Victor. This information must now be developed by sworn deposition testimony of the civilian witnesses, volunteer fire responders, medical responders, and law enforcement officers at the scene prior to Victor's shooting. The details of the information known and concluded by Hunady **prior** to the shooting is **critical**. The sketchy and incomplete documentation of what was known about Victor's reasons for being in the instant situation leads me to believe that Victor was emotionally disturbed and suicidal. There was no reason for Hunady to believe Victor had committed a crime, nor was there reason to believe Victor was fleeing from or resisting arrest. Victor did not present **any** threat to **anyone** while he was in his bogged down and clearly disabled vehicle. I bring up these facts, which must be probed more

9

thoroughly, because it is recognized and trained to law enforcement agencies and officers throughout the country that the circumstances, that appear to have been known to Hunady, would **clearly** call for the implementation of procedures for dealing with an emotionally destabilized individual, Victor, who was suicidal and barricaded. I have attached the relevant recognized, trained and accepted procedures which set forth the tactics for dealing with <u>Barricaded Subjects</u>, produced for National distribution to law enforcement agencies, academies, and officers by the International Association of Chiefs of Police (IACP), and the equally recognized, trained, and accepted national procedures and tactics for police dealing with the suicidal, which would include <u>Suicide by Cop</u>: "Protocol and Training Guide," distributed by the Police Executive Research Forum (PERF). The combined procedures from these training documents, if implemented by the BCSO, and specifically Hunady, prior to shooting Victor, would have dramatically changed the course of events.

## OPINIONS

1. **None** of the statements of the individuals who witnessed Victor's vehicle leave the roadway, and proceed to crash and bog down in an area of mud and standing water, related seeing a gun in Victor's lap. In fact, it is clearly stated by Donald Wayne Alumbaugh (Alumbaugh), a citizen that quickly responded to provide assistance after Victor's vehicle crashed and became bogged down off the roadway, that when he approached the vehicle, the driver (now known as Victor), appeared unconscious, was still pressing the gas pedal which created a "rooster tail" of mud and water, and further describes the driver of the vehicle as having a hand wrapped in a towel-like cloth, and a **cigarette** still burning in his lap.

Other characterizations of Victor by responding fire and medical personnel indicate Victor was "acting crazy," "strange-like," "not acting correctly," "bleeding badly," "spaced out," "on drugs," and "wide-eyed." These characterizations would put the reasonably trained police officer on notice of Victor's destabilized mental condition, as well as the likelihood of a serious injury, which would be supported by the amount of blood and bleeding, and the towel around his hand, as reported.

It is also clearly stated, as I noted earlier, that the best reported and described item in Victor's lap was a burning cigarette described by Alumbaugh. Only medical responder Stephen Crossland noted in his statement that "He (Victor) had **something** in his lap." It was reported that Victor did subsequently move from the front of the vehicle to the back, and he did retrieve "a bag or something," but, it is pure speculation that a weapon was present and accessible to Victor.

2. It is my opinion that the only implementation of a strategy or tactic for dealing with someone presenting as Victor did, was Hunady yelling to Victor that he wanted to help him. But, clearly it was a prolonged standoff of a situation that can only be defined in law enforcement training as a "Barricaded Subject." And, that it was clear and obvious that Victor was in some manner mentally compromised, hence I include the recognized, and accepted and trained procedures attached as evidence of the police procedures that were clearly called for. The lack of implementing these recognized tactics, and that I have no evidence that this training is provided by Sheriff Mack or the BCSO in this record, requires training files to be produced, policies produced relevant to these areas, and training curriculum for Hunady's training to confirm that the training that would have prevented Victor's shooting was provided or not.

11

3. The circumstances facing Hunady as Victor did not respond to simple and repeated loud commands while Hunady held his rifle in view of Victor, were not by any stretch of the imagination "split second" decisions being made by Hunady. In fact I cannot see where, if proper police procedures, tactics, and policy were implemented that there would be the necessity for a "split second" decision by Hunady. It is obvious that Victor was not suspected of committing a crime, and the actions of Hunady, over many minutes, with many civilians and officers roaming the area, even without cover or sight lines of Victor, provides ample evidence that Hunady could not have believed he or the others in the area were in immediate threat of harm by Victor. In fact, Victor was approached while in his vehicle, after his crash, by citizens who observed his crash, by medical and fire personnel, and Victor provided no weapon or threatened any of them. Victor appeared decompensated mentally, injured, as obvious by the bleeding and blood observed, and simply told these people to basically leave him alone. The issue of a firearm being in Victor's possession is simply not backed up by **any** evidence.

But what **any** reasonable officer would have known is that Victor should be addressed as a "barricaded subject" and "suicidal."

Referencing the attached material on <u>Barricaded Subjects</u>, the definition of "barricaded," for law enforcement officer reference and from proper training is:

> "A person who is not suspected of committing a crime but is the focus of a legitimate intervention effort – most often involving threats of suicide or mental illness – who has taken a position in a physical location most often a structure or vehicle, that does not allow immediate police access – whether fortified or not – and who is refusing police orders to exit. A barricaded subject may be known to be armed, thought to be armed, have access to weapons in the location, or be in unknown weapon status."

12

Obviously Victor fits this definition. Extracting the recognized tactics, then, from this recognized procedure which is attached for full review, the below is a summarized list of actions called for by the reasonable and trained police officer to deal with this situation, and specifically, Victor.

- Use minimally intrusive techniques – negotiation, time, and surveillance, chemical agents, less lethal munitions

- Establish an inner and outer perimeter of a small area without any uninvolved police personnel, for officer safety and barricaded subject safety.

- Determine whether the need to apprehend the subject at that moment outweighs the challenges associated with compelling the subject to submit to police authority.

- In the absence of a crime or under circumstances where the incident commander (IC) cannot articulate the legitimate risk of death of serious injury, the agency's best course of action may be to "stand down."

- Ensure appropriate and specialized resources have been requested (Swat Team) (with bullet resistant shields for protection and ability to use less lethal, i.e. TASER, and other less lethal munitions limiting risk of firearms being presented (added by writer)

- Provide psychological services

- locate, isolate, and debrief witnesses (Get **ALL** the details of their observations) and, determine the subjects mental state and condition, and if possible, location of treating clinicians.

- Determine circumstances leading up to the immediate problem.

And most importantly:

- Positive progress in a barricade resolution effort shall be defined as developments that increase the probability that the subject will be safely taken into custody, as opposed to mere passage of time.

Time and recognized and trained police procedures, for both dealing with a barricaded subject

13

like Victor, as well as applying the application of the trained and recognized procedures for the suicidal, as it is my opinion Victor was, would have prevented the prolonged aggressive police tactics by Hunady, not only presenting his police rifle, but also shouting commands for a prolonged time. Obviously that is why I opine that this situation was not a "split second" decision time for Hunady.

4. The second attachment I have provided is also important to my opinion that Victor's shooting was not necessary and was preventable. This document deals with suicidal individuals and "Suicide by Cop." The procedures were developed by the Police Executive Research Forum (PERF), working with police and sheriff's officials, including experienced use of force trainers, specialized SWAT/Emergency Service Unit personnel, and a psychologist with more than 40 years of experience working with police departments. These procedures have been nationally recognized and incorporated into police training nationwide.

My opinion of the preventable shooting of Victor incorporates the summarized tactics from this attached documents. The document recognizes that between 2015 and 2018 there were approximately 900 to 1,000 fatal officer involved shootings similar to the Victor shooting. Obviously there is wide recognition of the procedures I will note because of the extensive number and evaluation of similar circumstances nationwide, and that, indeed, as many as 29% or more of officer involved shootings involve these recognized, accepted and trained circumstances leading up to the shootings.

The subject, like Victor, is often:

- Appearing depressed or in a mental health crisis
- Not behaving like a criminal offender
- Behaving aggressively toward the police for no apparent reason

- Exhibiting strange behavior
- And, in most of these incidents the subject does not have a firearm

The recognized, accepted and trained procedures in this document direct dispatchers to:

- Convey the **exact** language that the 911 caller is using
- Listen carefully to key words or phrases
- Share the specific information with the officers responding

The protocol for responding police (Sheriff) officers:

- If the subject does not appear to have a weapon do not bark orders. Make small requests, one at a time. Do now yell "Show me your hands." Make a request such as "Can you do me a favor and show me your hands? I want to make sure you do not have a weapon, so we can take some time and talk, but first I need to know you are unarmed."

- The difference between making a request and yelling an order can determine whether the subject complies.

- Call in a crisis intervention team, if available, or other resources with special training on mental illness calls.

- Pointing a firearm elevates the subjects level of anxiety and can make it impossible to communicate with the person. "If an officer says 'I'm here to help you,' but is pointing a firearm at the suicidal person, it's conflicting messages. And, people will always believe the nonverbal message."

Obviously, in this situation with Victor, there was ample time to call for special resources such as specially equipped SWAT officers, or those trained to deal with an emotional crisis, which Victor was obviously experiencing.

Additionally, to carry out the communications with Victor and not appear aggressive and with a pointed rifle, the recognized, trained and accepted procedures require:

- A contact officer whose role it is to communicate, establish a relationship of trust, and attempt to diffuse the incident without the use of deadly force. The cover officer's role is to protect the safety of the officer and public.

Also the admonition:

- Slow it down, do not think you need to resolve the incident quickly. If a person's life is at stake, there is nothing wrong with taking many hours to resolve it.

5. The decision to shoot Victor by Hunady was not consistent with the accepted, trained, and recognized procedures, as I have carefully explained in the above opinions. The shooting was **not** a split-second decision for all the reasons cited above. Victor had not committed a crime, even when he exited his vehicle holding up his previously recognized and unchanged bleeding and cloth-wrapped hand and arm. There was plenty of time to have acquired less lethal weapons, such as bean bag shotgun rounds, which would have the effect of pain, distraction, and potentially stopping Victor. There was plenty of time for SWAT equipment, such as bullet resistant shields to be brought to the scene. Had Hunady stopped yelling commands, which I elaborated on the reasons against such actions earlier, even more time was potentially possible. The acquisition of less lethal munitions in the time Hunady had, and even the protection bullet resistant shields, would have provided time to allow less lethal weapons to be used, and would have provided for safety of Hunady and other officers, removing the third prong of the constitutional assessment for the need for the use of deadly force, which is the immediate threat of injury or death to the officer or others.

For all of the reasons I have cited, and with supporting documents that are credible, relied upon by agencies and officers nationwide, I find that the shooting of Victor was objectively unreasonable and unnecessary. While this appears to be a legal conclusion, it is not. I, and other trainers who provide use of force training nation wide, relate to officers the components of the

law used, as training guidance, to know **specifically** how they will be judged in a use of force encounter.

Therefore my conclusion is one that follows the training format for preparing officers to appropriately know assess and apply the constitutional standard for the use of force.

If further discovery materials are provided I reserve the right to amend, add to, or change my opinions, which will be promptly provided to retaining counsel to share with opposing counsel.

Respectfully submitted,

W. Ken Katsaris

STATE OF FLORIDA

COUNTY OF LEON

Sworn and subscribed to this 11th day of November, 2020, by W. Ken Katsaris, who is personally known to me.

Sara S. Alligood, Notary Public

My Commission Expires:

SARA S. ALLIGOOD
Commission # GG 074290
Expires June 16, 2021
Bonded Thru Troy Fain Insurance 800-385-7019

17