## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

DONNA CHISESI, AS INDEPENDENT ) 
ADMINISTRATRIX OF THE ESTATE )
OF JONATHAN VICTOR, DECEASED, )
                                           )
       Plaintiff ) **CASE NO.: 1:19-cv-00221-C**
                                             )
v. )
                                             )
MATTHEW HUNADY, in his )
individual capacity, as a Baldwin County, )
Alabama, Sheriff's Deputy, and HUEY )
HOSS MACK, in his individual capacity, as )
the Sheriff of Baldwin County, Alabama )
                                             )
       Defendants. )

## PLAINTIFF'S MEMORANDUM BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# INTRODUCTION

Jonathan Victor was an innocent victim who was senselessly and unnecessarily shot and killed by Sheriff's Deputy Matthew Hunady. Jonathan's life was ended by a deputy who chose to shoot an obviously injured individual who had just been involved in a single car accident in the ditch off the highway rather than attempting to assist someone clearly in distress. There were at least three other deputies at the scene and ***none*** of them felt threatened by Jonathan and none of them actually shot at Jonathan. Defendants' Motion for Summary Judgment reads like a movie script—this individual barricaded himself in his vehicle with a weapon then, when he finally exited, he took a shooter stance, he threatened EMTs and responding deputies (and other members of the public), and he advanced on deputies. Nothing could be further from the truth. This was not a movie. Indeed, the video evidence, photographic evidence, and testimony in this case clearly and overwhelmingly contradict the Defendants' cherry-picked facts.

On May 12, 2017, Baldwin County Sheriff's Office (BCSO) Deputy Matthew Hunady responded to a call of a single car accident on Interstate 10. It is undisputed that Jonathan, the car's driver and victim in this case:

- had no weapon;
- had no drugs in his system or in his possession;
- had no alcohol in his system or in his possession;
- was not the subject of an outstanding warrant;
- had not committed a crime and was not committing a crime;
- had no criminal history; and
- was injured and covered in blood.

While driving to the scene, Deputy Hunady understood the call to be a welfare concern for an individual clearly injured following a car accident. However, Deputy Hunady's behavior at the scene was totally inconsistent with a welfare concern. Indeed, Deputy Hunady's behavior was

inconsistent with typical police training in welfare check, car accident, or barricaded subject situations, and completely unreasonable in light of the facts.

Prior to Deputy Hunady's arrival, Jonathan was found unconscious in his car. At one point, it was believed Jonathan grabbed something from the backseat of his car. Medical responders told dispatchers that they were unsure if Jonathan had a weapon, and reported they never actually saw one. Indeed, no responder or civilian ever mentioned seeing a weapon of any kind. Because, Jonathan never had a weapon or anything that resembled a weapon, of any kind. Deputy Hunady even testified he never saw a weapon or anything that looked like a weapon. BCSO also checked Jonathan's background and criminal history, and found no irregularities. Still, Deputy Hunday never attempted to determine whether Jonathan had a weapon, never attempted to de-escalate the situation, and never attempted to check on Jonathan's welfare, even though that was the original purpose of the call. Instead, Deputy Hunady demanded Jonathan get out of the car and offered Jonathan "help"; Jonathan exited the passenger side door with his hands separated and elbows bent. Deputy Hunady demanded Jonathan "drop it" without telling him what to drop. Deputy Hunady said "don't do it" without telling Jonathan what not to do. Deputy Hunady never called in the negotiating team, even though Baldwin County had one. Deputy Hunady supposedly feared for the safety of others at the scene; yet, he took no steps to secure the area or move civilians. Deputy Hunady observed Jonathan outside of his vehicle for more than one minute without seeing a weapon or anything that looked like a weapon before he shot him. Finally, Deputy Hunady never even warned Jonathan that he was going to shoot him. He just fired. He fired four times at an unarmed man who was in shock, bleeding from his injuries. No other officer felt the need to shoot

Deputy Hunady was supposed to provide help to a car accident victim in need of medical attention. Instead of providing any semblance of help, he approached the situation as if he were

dealing with an armed, hostile criminal. Even if this were a "barricaded subject" or "suicide by cop" scenario, Deputy Hunady never took any actions consistent with typical police training for those types of situations. Deputy Hunady never considered using a taser or any other non-lethal force. In fact, the first thing Deputy Hunady did when he arrived on scene, before evaluating the situation, was retrieve his weapon and take a shooting position aimed at Jonathan. Defendants' Brief focuses on their skewed interpretation of the few seconds before Deputy Hunday pulled the trigger (which was not captured on video), but wholly ignores the full story, as well as the failures of training, communication, and policing that led to the shooting. Deputy Hunady used excessive, unreasonable and deadly force against an admitted victim who was unarmed and committed no crime. Therefore, Deputy Hunady deprived Jonathan of his Fourth Amendment rights and summary judgment must be denied.

## STATEMENT OF FACTS

1.      On May 12, 2017, Mother's Day weekend, Jonathan Victor's ("Jonathan") car hydroplaned into the Interstate 10 median, across the grass, and into the tree line. It had been raining and the ground was wet. (Def. Ex. A, Mack Dep. Pg. 38, Doc. 29-1, PageID.196; Def. Ex. H, Alumbaugh Interview Pgs. 4, 9, Doc. 29-8, PageID.328, 333.)

2.      A passerby on I-10 pulled over and approached Jonathan's car to offer help. The passerby could see a cigarette burning in Jonathan's lap. (Def. Ex. I, Alumbaugh Decl. Pg. 1, Doc. 29-9, PageID.358.) Thinking Jonathan was unconscious, the passerby shouted out to Jonathan. (*Id*.) Jonathan looked up and told him to "go away." (Def. Ex. H, Alumbaugh Interview Pg. 12, Doc. 29-8, PageID.336.) Recalling the event, the passerby said "[Jonathan] did not threaten me. He was real nice to me." (*Id.* at 9.)

3.      Fire department and medical emergency team personnel responded to the scene. (Ex. 1, Fire Report Summary Pg. 1, Doc. 35-1, PageID.457.) Jonathan was in his car when they

arrived. (*Id.*) First responders approached the vehicle to check Jonathan for injuries and noticed his arm was bleeding. (*Id.*)

4.　　Jonathan told responders he was okay. (*Id.* at 2.) Jonathan then barricaded himself in his car and refused further contact. At one point, Jonathan moved to the backseat, but responders were unable to determine why. (*Id.* at 1.) Responders said Jonathan seemed "spaced out" and was talking to himself. (Ex. 2, MCU Report 2 Pg. 1, Doc. 35-2, PageID.461.) They reported Jonathan was exhibiting an "altered mental status." (Def. Ex. J, 911 Calls Transcript Pg. 15, Doc. 29-10, PageID.365.) One responder saw Jonathan retrieve a "bag or something" from the backseat. (Ex. 2, MCU Report 2 Pg. 1, Doc. 35-2, PageID.461.)

5.　　No witness at the scene reported seeing a gun. (Def. Ex. B, Hunady Dep. Pg. 11, Doc. 29-2, PageID.239; Def. Ex. H, Alumbaugh Interview Pgs. 5, 15, Doc. 29-8, PageID.329, 339; Ex. 3, Beedy Dep. Pgs. 23, 32, Doc. 35-3, PageID.491, 500.)

6.　　Defendants' Brief states that first responders "believed they saw" Jonathan "holding or retrieving" a weapon while inside his vehicle. (Defense Brief, 3 at ¶ 3.) That incorrectly states the evidence. None of the first responders ever saw a weapon.[1]

7.　　The responders kept their distance and called for law enforcement. (Ex. 1, Fire Report Summary Pg. 1, Doc. 35-1, PageID.457.) The 911 operator relayed the responders'

---

[1] EMT Crossland did not mention seeing a weapon at all—not in his Declaration nor in his interview with law enforcement hours after the shooting. (Def. Ex. F, Crossland Decl. Pgs. 1-2, Doc. 29-6, PageID.319-20; Ex. 13, Crossland Felks Interview 00:00-17:35, Doc. 35-13, PageID.733.) EMT Felks stated in his Declaration that he was "thinking" Jonathan had a weapon after seeing Jonathan with his hands under his shirt. (Def. Ex. G, Felks Decl. Pg. 1, Doc. 29-7, PageID.322.) In his interview with law enforcement right after the shooting, Felks did not mention seeing a weapon and stated "I didn't know if [Jonathan] had a weapon." (Ex. 13, Crossland Felks Interview 10:38, Doc. 35-13, PageID.733.) First Responder Stockton stated in her Declaration that she saw Jonathan retrieve a bag, but she retreated "fearing" he had a weapon. (Def. Ex. E, Stockton Decl. Pgs. 1-2, Doc. 29-5, PageID.316-17.) She did not mention seeing a weapon. (*Id.*) First responder Tobias, whom Defendants do not cite in this paragraph, made no mention of a weapon at all in his Declaration. (Def. Ex. D, Tobias Decl. Pgs. 1-2, Doc. 29-4, PageID.313-14.) Tobias noticed that Jonathan's hands were bleeding and wrapped in a towel or rag. (*Id.* at 2.) Finally, witness Alumbaugh gave a written statement at the scene in which he reported seeing "something" in Jonathan's hands. That statement was transcribed by a deputy who replaced "something" with the word "gun." (Ex. 2, MCU Report 2 Pgs. 4-7, Doc. 35-2, PageID.463-66.)

messages to the Baldwin County Sheriff's Office ("BCSO"), which dispatched officers to the scene. (*Id.*)

8.     According to the 911 call record, the 911 operator *never* definitively told BCSO that Jonathan had a weapon. Rather, 911 repeatedly told BCSO that Jonathan had something in his lap and that it might be a weapon. The following is a transcription of the calls, in relevant portion:

| | |
|---|---|
| 911: | The fire department and the ambulance are hollering for your deputy to step it up. I believe – I think he already told him that he's barricade himself in the vehicle. |
| BCSO: | Okay. |
| 911: | And they think he has a weapon on his lap. |
| BCSO: | He has a weapon in his lap? |
| 911: | That's what they're telling us. |
| BCSO: | All right. |
| | [Next call] |
| BCSO: | Paging 589. |
| Officer: | 89. |
| | 10-4. 911 is advising that it's going to be 1017. The subject had barricaded his self inside the vehicle and he has a weapon on his lap. |
| Officer: | 10-4. Affirm. |

(Def. Ex. J, 911 Calls Transcript Pgs. 2-4, Doc. 29-10, PageID.362.)

| | |
|---|---|
| 911: | The subject has a – has something in his lap. Possibly a weapon of some sort. So, well – so, I just want to pass that on to you. But it was just a possibly. He didn't say what it was. He said he has something in his lap and he's very excited. |

(Def. Ex. J, 911 Calls Transcript Pg. 6, Doc. 29-10, PageID.363.)

| | |
|---|---|
| 911: | And they're saying he's covered in blood and not for sure if he has a weapon on (sic) not, but he's got something in his lap. |

(Def. Ex. J, 911 Calls Transcript Pg. 7, Doc. 29-10, PageID.363.)

| | |
|---|---|
| 911: | Okay. I'm not sure if he's got a weapon now. I'm not saying – I don't know what he's grabbing in the back. |
| BCSO: | 10-4. 1033 traffic. |

(Def. Ex. J, 911 Calls Transcript Pg. 9, Doc. 29-10, PageID.363.)

| | |
|---|---|
| BCSO: | That subject is just steadily talking to his self (sic) inside the vehicle. |
| Officer: | 10-4 |
| Officer: | 5. Have they actually seen any weapons? |
| BCSO: | 911 advised that they did see a weapon in his lap. 911 could not advise what type of weapon it was. |

(Def. Ex. J, 911 Calls Transcript Pg. 17, Doc. 29-10, PageID.365.)

9.      911 was careful to inform BCSO that Jonathan may or may not have a weapon in his lap. In fact, 911 dispatchers urged EMS to deescalate the situation as much as possible: "we don't want the police arriving and drawing guns [with] him being secured with a head injury and grabbing his baby blanket." (Ex. 15, EMTs 911 Call 00:48, Doc. 35-15, PageID.735.) BCSO also used the 1033 call status, which indicates that the subject is armed. (Def. Ex. A, Mack Dep. Pgs. 81-82, Doc. 29-1, PageID.207-08.)

10.      Deputy Hunady never testified that he was responding to a 1033 call or a criminal call. Rather, Hunady testified that he heard the call "labeled" as a "welfare concern." (Def. Ex. B, Hunady Dep. Pg. 52, Doc. 29-2, PageID.239.) Deputy Hunady referred to the call as a "welfare concern" several times in his deposition. (*Id.* at 23, 43, 52.) Thinking this was a welfare call, Hunady self-dispatched to the scene. (*Id.* at 43.)

11.      Deputy Hunady had several weapons, lethal and non-lethal, at his disposal that day. He had a Ruger AR-15 patrol rifle, a Glock 17 pistol, a Glock 43 pistol, a Remington shotgun, and a Taser. (*Id.* at 49-50.)

12.      Arriving for a welfare concern, Deputy Hunady exited his vehicle, went to the trunk, and grabbed his Ruger AR-15 patrol rifle. (Def. Ex. L, Hunady Body-cam 00:10, Doc. 29-12, PageID.379.) As Hunady loaded the rifle, one of the first responders told him that Jonathan was "wide-eyed" and "staring at us." Deputy Hunady replied, "All right." (*Id.* at 00:13.)

13.      "I was just waiting for [Jonathan] to pass out," the first responder told Deputy Hunady. (*Id.* at 00:15.)

14.      On his body cam video, Deputy Hunady asks no questions of the first responder. At his deposition, Deputy Hunady stated that the only step he took to determine whether Jonathan had a weapon was to listen to the information relayed to him from first responders. (Def. Ex. B,

Hunady Dep. Pg. 62, Doc. 29-2, PageID.239.) "We never know 100 percent what we're walking into. All we can do is base the information we have and make a reasonable decision at that point." (*Id*.)

15.     Deputy Hunady made no effort to confirm whether Jonathan had a weapon. Three times, Hunady mentioned that Jonathan might have a weapon. (Def. Ex. L, Hunady Body-cam 00:50, 05:34, 07:58, Doc. 29-12, PageID.379.) Each time, Deputy Hunady said that Jonathan "possibly" or "supposedly" was armed. (*Id.*)

16.     "[Jonathan] supposedly had a weapon by his side that the paramedics seen (sic)," Deputy Hunady said during the event. (Def. Ex. L, Hunady Body-cam 05:34, Doc. 29-12, PageID.379.)

17.     Deputy Hunady took command of the scene, but he gave few orders to the other officers and first-responder personnel. (Def. Ex. A, Mack Dep. Pg. 29, Doc. 29-1, PageID.193.) Rather than developing an organized plan, waiting for a more experienced commanding officer to take over, or simply waiting Jonathan out, Hunady escalated the situation by surrounding the car with armed officers and shouting unclear and ambiguous commands to the police and first responders. (Def. Ex. M, Hunady Dash-cam 00:50-10:58, Doc. 29-13, PageID.380.)

18.     "Folks, if he's possibly got a gun, y'all need to stay behind the freaking truck," Deputy Hunady told a few first responders, referring to the fire truck parked opposite Jonathan's car. (Def. Ex. L, Hunady Body-cam 00:50, Doc. 29-12, PageID.379.) "We'll stop the traffic," one responder said. (*Id.* at 00:54.) "Let's do that," Deputy Hunady replied. (*Id.*)

19.     Deputy Hunady took up a position at the front of the fire truck and immediately trained his Ruger AR-15 on Jonathan's car. (Def. Ex. M, Hunady Dash-cam 15:21, Doc. 29-13,

PageID.380.) Another officer, also armed with a rifle, came behind Hunady. "Zach, stay behind cover, man," Hunady told him. (Def. Ex. L, Hunady Body-cam 01:27, Doc. 29-12, PageID.379.)

20. Three officers in total came to Deputy Hunady's side and took up positions behind the fire truck. (Def. Ex. M, Hunady Dash-cam 22:30, Doc. 29-13, PageID.380.) One clambered onto the truck to get a vantage point and then crawled underneath. Another crouched by the rear of the truck, scoped rifle drawn. (*Id.* at 22:53.)

21. One officer walked back to his vehicle and engaged another in conversation. "You gonna grab you a gun? A different gun? You gonna grab a shotgun or something?" he says. (Ex. 11, Middleton Body-cam 00:12, Doc. 35-11, PageID.731.) "Yeah, grab a shotgun."

22. Without directives from Deputy Hunady, the officers made no effort to establish a perimeter or debrief the civilians or first responders standing behind their vehicles. According to various videos of the scene, first responders and civilians wander around their vehicles, peering over to look at Jonathan. (Def. Ex. L, Hunady Body-cam 01:05, Doc. 29-12, PageID.379.) One civilian leaves his vehicle on his own and walks past a police car. (Ex. 12, Citizen Video 00:14, Doc. 35-12, PageID.732.)[2]

23. While Deputy Hunady stood with his rifle aimed at Jonathan's car, a radio call came in informing him that Jonathan had no criminal history. (Def. Ex. L, Hunady Body-cam 6:30, Doc. 29-12, PageID.379.)

24. From the moment he took up position at the fire truck, Deputy Hunady shouted a string of orders and statements to Jonathan. He told Jonathan to "come on out" and "we're here to help you." (*Id.* at 01:06.)

---

[2] This video is labeled "Citizen Video" because it shows citizens walking by. This is in the dash-cam video of BCSO Deputy John Garner.

25.     Deputy Hunady stated on video that, at one point, Jonathan rolled down the window possibly to better hear Hunady's commands. (*Id.* at 05:45; Ex. 4, MCU Report 1 Pg. 14, Doc. 35-4, PageID.571.) Hunady could not tell if Jonathan tried to communicate. Hunady failed to turn off the fire truck, and only did so later. "I can't hear shit over this engine," he said. (Def. Ex. L, Hunady Body-cam 05:57, Doc. 29-12, PageID.379.)

26.     Deputy Hunady stood at the fire truck for roughly 10 minutes calling for Jonathan to exit the vehicle. (*Id.* at 01:08-11:06.) He had his Ruger AR-15 pointed at Victor's car for the entire time. (Def. Ex. M, Hunady Dash-cam 15:22-25:20, Doc. 29-13, PageID.380.)

27.     After 10 minutes, Jonathan complied with Deputy Hunady's order to exit his vehicle. (*Id.* at 25:20.)

28.     Following Deputy Hunady's dash-cam video, Jonathan opens his vehicle's passenger-side door—the door facing Deputy Hunady and the other officers. (*Id*.) Jonathan does not rush out of the car, which was twenty feet away from Deputy Hunady. (Def. Ex. B, Hunady Dep. Pg. 25, Doc. 29-2, PageID.239.) It takes him three seconds to put one foot out onto the wet, soggy ground. (Def. Ex. M, Hunady Dash-cam 25:20-25:23, Doc. 29-13, PageID.380.)

29.     Jonathan stands up and looks around. His hands are up by his face and appear apart. (Def. Ex. N, J. Gutierrez Video 00:48, Doc. 29-14, PageID.381.)

30.      For the most part, his elbows stay low and close to his body. He is positioned more like someone holding an injured hand than a shooter. (*Id.*)

31.     It takes Jonathan another four seconds to get his other foot out of the car and another two seconds to plant his feet. (Def. Ex. M, Hunady Dash-cam 25:59, Doc. 29-13, PageID.380.)

32.     Jonathan's hands are clearly wrapped since pieces of fabric visibly hang down from his arms. As 911 told BSCO, "They say he's covered in blood. He's got his arm wrapped." (Def.

Ex. J, 911 Calls Transcript Pg. 10, Doc. 29-10, PageID.364.) When Jonathan turns his body to look around, the fabric swings back and forth. (Def. Ex. M, Hunady Dash-cam 26:07, Doc. 29-13, PageID.380.)

33.     Officers at the scene reported that Jonathan emerged from the car with cloth wrapped around his hands. (Ex. 4, MCU Report 1 Pgs. 5-14, Doc. 35-4, PageID.574-83.)

34.     Jonathan then takes careful, plodding steps toward Deputy Hunady. Sometimes he waits three seconds to take a step, sometimes five seconds. The walking is slow going—it takes Victor 20 seconds to cover a few feet. After each step he looks around before taking the next step. (Def. Ex. M, Hunady Dash-cam 26:02-26:17, Doc. 29-13, PageID.380.) Various other officers were shouting at the same time. (Def. Ex. L, Hunady Body-cam 11:14, Doc. 29-12, PageID.379.)

35.     [Image]



(Def. Ex. N, J. Gutierrez Video 01:05, Doc. 29-14, PageID.381.)

36.     It appears from the image above that Jonathan's wrapped hands are visible and lower. (*Id.*) They are wrapped like they were when first responder Tobias saw Jonathan inside his car. (Def. Ex. D, Tobias Decl. Pg. 1, Doc. 29-4, PageID.313.) Plaintiff Expert Katsaris noted this

is why it is critical for officers to debrief "everyone there [at the scene], establish perimeters, get information." (Ex. 5, Katsaris Dep. Pg. 47, Doc. 35-5, PageID.631.) Deputy Hunady neglected to take this critical step.

37.     Jonathan's hands appear visible and his elbows are close his body; they are wounded and bleeding. At no point does he punch his hands out in an aggressive manner. At no point does he punch out in Deputy Hunady's direction or anyone else's. (Def. Ex. M, Hunady Dash-cam 26:00-26:17, Doc. 29-13, PageID.380.)

38.     [Image]



(Def. Ex. N, J. Gutierrez Video 01:08, Doc. 29-14, PageID.381.)



(Def. Ex. M, Hunady Dash-cam 26.16, Doc. 29-13, PageID.380.)

39.     As clearly shown on the video, Jonathan was off the road in a ditch and needed to make his way up uneven ground to get to the road and the officers. (*Id.* at 25:20-26:08.)

40.     The videos contradict the officers' post hoc characterizations of what happened. In the picture below, an officer shows Deputy Hunady what he supposedly saw Jonathan do, but the video evidence shows different. (Def. Ex. L, Hunady Body-cam 1:58, Doc. 29-12, PageID.379.)

41.     [Image]



(Def. Ex. L, Hunady Body-cam 1:58, Doc. 29-12, PageID.379.)

42.     Plaintiff Expert Katsaris testified that Jonathan "did not take a shooter's stance." (Ex. 5, Katsaris Dep. Pg. 89, Doc. 35-5, PageID.673.)

43.     Once Jonathan exited his vehicle, Deputy Hunady told him to "drop it" several times. But Deputy Hunady never said what to drop. Deputy Hunady later acknowledged that he never said drop the *weapon*, drop the *gun*, or drop the *pistol*. (Def. Ex. B, Hunady Dep. Pg. 19,

Doc. 29-2, PageID.239.) Hunady admitted that he never actually saw Victor holding a weapon and never saw physical evidence that Victor had a weapon—a gun barrel, muzzle, or handle. (*Id.* at 11-12.)

44. Deputy Hunady did not give any warning to Jonathan that he would shoot him if he did not comply. (Def. Ex. L, Hunady Body-cam 12:06, Doc. 29-12, PageID.379.)

45. Jonathan did not advance quickly at Deputy Hunady or any other officers. (Def. Ex. M, Hunady Dash-cam 25:20-26:22, Doc. 29-13, PageID.380.)

46. With eight to ten feet between them, Deputy Hunady shot Jonathan four times with his Ruger AR-15. Jonathan was not visible on any available video when he was shot.

47. Witness Donald Alumbaugh stated that, when Jonathan was shot, he was not advancing toward Deputy Hunady. (Def. Ex. H, Alumbaugh Interview Pgs. 17-19, Doc. 29-8, PageID.341-43.)

48. Deputy Hunady did not give a warning before shooting. (Def. Ex. L, Hunady Body-cam 12:06, Doc. 29-12, PageID.379.) The last thing Deputy Hunady said before shooting Jonathan was "Put it down." (*Id.*)

49. Deputy Hunady was protected by the fire truck at the time of the shooting. (Def. Ex. B, Hunady Dep. Pg. 23, Doc. 29-2, PageID.239.)

50. No other officer fired at Jonathan. Within a few feet of Deputy Hunady, four other armed officers watched Jonathan attempt to walk from his car. (Def. Ex. M, Hunady Dash-cam 26:17, Doc. 29-13, PageID.380.)

51. Deputy Hunady had a Taser on his person when he shot Jonathan. (Def. Ex. B, Hunady Dep. Pg. 50, Doc. 29-2, PageID.239). Deputy Hunady stated that he never considered using it to render the situation safe. (*Id.* at 60.)

52.     Tasers like the one in Deputy Hunady's possession have a functional range of 12 to 25 feet. (Def. Ex. A, Mack Dep. Pg. 34, Doc. 29-1, PageID.195; Def. Ex. B, Hunady Dep. Pg. 50, Doc. 29-2, PageID.239.) Deputy Hunady was within his Taser's functional range when he shot and killed Jonathan. Deputy Hunady has been trained on the use of a Taser. (Def. Ex. B, Hunady Dep. Pg. 59, Doc. 29-2, PageID.239.)

53.     BCSO policy dictates that deputies use the least amount of force necessary to render a situation safe. (Def. Ex. A, Mack Dep. Pg. 15, Doc. 29-1, PageID.190.)

54.     BCSO has a negotiation team, but that team was never called to the scene by Deputy Hunady or any other officer. (Def. Ex. B, Hunady Dep. Pg. 51, Doc. 29-2, PageID.239; Ex. 3, Beedy Dep. Pg. 48, Doc. 35-3, PageID.516.)

55.     At the time of the shooting, BSCO lacked officer training in several fundamental areas. BCSO had no crisis intervention training. (Def. Ex. A, Mack Dep. Pg. 8, Doc. 29-1, PageID.188.) BCSO still has no specific training for de-escalation scenarios. (*Id*.) BCSO also has no specific training for situations involving mental distress or suicide. (*Id*. at 17.)

56.     However, Deputy Hunady has more training than the Defendants' Brief lets on. He was a trained SWAT officer and K-9 handler. (Ex. 6, Healey Report Pg. 5, Doc. 35-6, PageID.697.) According to Plaintiff's expert Katsaris, it would be "inconceivable" for SWAT or K-9 officers to not know about de-escalation and handling the mentally ill, emotionally disturbed, or the suicidal. (Ex. 5, Katsaris Dep. Pg. 76, Doc. 35-5, PageID.660.) "[T]he first thing they train SWAT officers to do is handle barricaded subjects." (*Id*.)

57. Deputy Hunady would have received de-escalation training from his SWAT background, but did not receive such training from BCSO.[3] (Def. Ex. A, Mack Dep. Pg. 8, Doc. 29-1, PageID.188.)

58. When subduing a subject, Deputy Hunady had been trained to shoot center mass, specifically the chest. (Def. Ex. B, Hunady Dep. Pg. 77, Doc. 29-2, PageID.239.) Deputy Hunady is a certified sniper and won the top gun award in 2015. (Ex. 6, Healey Report Pg. 5, Doc. 35-6, PageID.697.) Deputy Hunady's four shots hit Jonathan in the pelvis, foot, thumb, and leg. (Ex. 7, Medical Report Pg. 3, Doc. 35-7, PageID.705.)

59. First responders at the scene and officers immediately provided medical care to Jonathan. (Def. Ex. L, Hunady Body-cam 22:44, Doc. 29-12, PageID.379.) Jonathan was flown by helicopter to a nearby hospital where he was pronounced dead.

60. Toxicology reports showed that Jonathan did not have drugs or alcohol in his system during the event.[4] (Ex. 8, Toxicology Report Pg. 1, Doc. 35-8, PageID.708.)

61. BCSO and the Baldwin County Major Crimes Unit ("MCU") each investigated the shooting and produced reports. Despite numerous requests, the BCSO's internal investigation findings have not been shared with Plaintiff. Deputy Hunady gave a statement to the internal BCSO investigation but it has not been produced. (Def. Ex. A, Mack Dep. Pg. 62, Doc. 29-1, PageID.202.) MCU completed its investigation by turning in a report to the District Attorney. (Ex. 3, Beedy Dep. Pg. 44, Doc. 35-3, PageID.512)[5]

---

[3] BCSO says it has produced all of its training materials. There is no mention of de-escalation training.
[4] After the shooting, paramedics injected Jonathan with 100 milligrams of ketamine. At a press conference with representatives from MCU a few months later, a reporter asked whether Jonathan had been intoxicated. Captain Beedy replied that "narcotics" were in Jonathan's system. (Ex. 14, MCU Press Conference 07:54, Doc. 35-14, PageID.734.) The Baldwin County District Attorney later said it was Ketamine, "not one of the normal drugs that we see on a regular basis." "It's abused. It's a drug that's abused," another added. (*Id.* at 21:01.) Jonathan's estate was charged $31.91 for the ketamine injection. (Ex. 10, Medical Bills Pg. 3, Doc. 35-10, PageID.730.)
[5] Deputy Hunady, on video, declined to give a statement to MCU. (MCU interview at 02:23; *see contra* Ex. 4, MCU Report 1 Pg. 6, Doc. 35-4, PageID.575.) However, in his deposition, when asked if had asserted his Fifth Amendment

62.     Each side retained one expert in this case. Plaintiff retained William Katsaris who has over 30 years of police experience, nearly 50 years of experience teaching police officers, and has given opinions in hundreds of federal and state courts. (Ex. 9, Katsaris Report Pg. 1, Doc. 35-9, PageID.716; Ex. 5, Katsaris Dep. Pg. 16, Doc. 35-5, PageID.600.) Defendants retained Shane Healey who has policed with the City of Opelika for around 30 years and, in this case, sat for his third deposition as an expert. (Def. Ex. C, Healey Dep. Pgs. 6-7, Doc. 29-3, PageID.277.)

63.     According to Healey's report, Jonathan was an "uncooperative subject" when staying in his vehicle. (Ex. 6, Healey Report Pg. 6, Doc. 35-6, PageID.698.) Healey describes Deputy Hunady's request that Jonathan "come on out" as "communication aimed at … problem solving." (*Id*.)

64.     But Healey then states that when Jonathan complied with the commands and exited his car, Jonathan changed Deputy Hunady's "lawful objectives." (*Id*.) At that point, Deputy Hunady "is faced with stopping or preventing those law violations and taking Mr. Victor into custody." (*Id*.) Healey lists several potential crimes. (*Id*.) According to Healey, Victor defied law enforcement when in his car but also violated the law by stepping out. (*Id*.)

65.     In deposition testimony, Deputy Hunady stated that Jonathan had committed no crimes before or during the shooting. (Def. Ex. B, Hunady Dep. Pg. 14, Doc. 29-2, PageID.239.)

66.     According to Healey, shooting Victor was supposed to be a last resort. (Def. Ex. C, Healey Dep. Pg. 51, Doc. 29-3, PageID.288; Ex. 6, Healey Report Pg. 8, Doc. 35-6, PageID.700 (citing BCSO SOP).) Healey is uncertified in the use of a Taser and admits to having very limited knowledge about the device. (Def. Ex. C, Healey Dep. Pgs. 31-32, Doc. 29-3, PageID.283.)

---

right, he said "No," and that he had given a statement to MCU. (Def. Ex. B, Hunady Dep. Pg. 9, Doc. 29-2, PageID.239.) Moreover, Hunady did give a statement to BCSO internal affairs, but said statement and file were never produced.

67.     Katsaris, on the other hand, recognized that Deputy Hunady had time and police resources on his side but squandered them both. Taking the time to gather information is particularly critical when dealing with a "*potential* for a firearm." (Ex. 5, Katsaris Dep. Pg. 61, Doc. 35-5, PageID.645 (emphasis added).) In his report, Katsaris notes that Jonathan was not suspected of a crime and merely told people to leave him alone. (Ex. 9, Katsaris Report Pg. 12, Doc. 35-9, PageID.722.) Jonathan was likely emotionally destabilized which rendered this a barricaded subject or suicide-by-cop scene. (*Id.* at 12, 14.)

68.     In either case, the key question a trained officer should consider is whether the need to apprehend Victor outweighed the challenges in compelling him to submit to the police. (*Id.* at 12.) A trained officer should create an inner and outer perimeter. (*Id.*) Other officers should be directed to remove civilians from the perimeter and debrief for more information. (*Id.*) Make requests rather than yelling orders; nonverbal communication overtakes verbal communication, so do not point a weapon. (*Id.* at 14.) Call in crisis intervention teams. (*Id.*) At bottom, a trained officer should understand that he has time and can always stand down. (*Id.* at 12.)

69.     "If you should suspect there's a firearm and you've got a bleeding subject, you have to go with the fact that … [Deputy Hunady] is not responsible for [Jonathan's] injuries. [Deputy Hunady is] responsible for the potential of what [he] might do to injure [Jonathan] further, or what might happen to someone else if you start thinking 'I now have ordered him out of the car and I put everybody at risk, now I gotta shoot him.'" (Ex. 5, Katsaris Dep. Pg. 62-63, Doc. 35-5, PageID.646-47.)

70.     According to Katsaris, failure to train an officer on these points would constitute "reckless disregard to a known risk of harm." (*Id.* at 63.)

71.     The passerby who first saw Jonathan stayed at the scene until the shooting occurred. (Def. Ex. H, Alumbaugh Interview Pg. 13, Doc. 29-8, PageID.337.) He noted, "They were pushing [Jonathan] to hurry and get him out of the car and hurry, hurry … and I think if they would have given him a little more time, it would have never went where it went. If they would have just given him time to, you know, calm down." (*Id.*)

## STANDARD OF REVIEW

In analyzing this case for summary judgment, the court should find "all reasonable inferences in favor of the party opposing summary judgment." *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1313 (11th Cir. 1999). As such, the facts in the case should be viewed in the light most favorable to the nonmoving party, in this case Jonathan. *See Tolan v. Cotton,* 572 U.S. 650, 657 (2014) ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant. . . ."). The Defendants are incorrect to assert that this established principle does not apply in this case. There is no indisputable video evidence—in fact, what the videos show is, at best, a significant factual dispute. In reality, the full video shows the innocent killing of a victim in shock, following a car accident, by a deputy with no regard for the welfare of this man, let alone any single attempt to de-escalate the situation. Furthermore, there is no video evidence of the last seconds before Deputy Hunady inexplicably ended Jonathan's life. *See supra* Statement of Facts (hereinafter "SOF") number 48. Without any video evidence, let alone undisputed video evidence, the presumption to view the facts in the light most favorable to Jonathan simply cannot be set aside. In viewing the facts in the light most favorable to and drawing all inferences in favor of Jonathan, there are multiple, significant issues of genuine fact. Accordingly, summary judgment must be denied.

## ARGUMENT

## I. THE DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

The actions of the Defendants are not excusable by the doctrine of qualified immunity. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 736 (2002). Looking at the facts in a light most favorable to Jonathan, a reasonable jury could find that his rights were violated.

The Defendants wish to construe qualified immunity as broadly as possible; however, Deputy Hunady and Sheriff Mack are not entitled to qualified immunity simply because they are law enforcement officers. Defendants' reliance on the cases in their Brief is misplaced. For example, Defendants cite the principle that law enforcement officers are acting within their afforded discretion when effecting arrests. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 761 (2005). Here, Jonathan was **not** under arrest or suspected of any crime, nor were the officers effecting an arrest. *See supra* SOF number 23. Deputy Hunady was dispatched to Jonathan's location for a welfare check, not because the general population was in any danger that required officers in their capacity as maintainers of law and order. *See supra* SOF number 10. He correctly did not believe he was responding to a criminal situation and at no point was he threatened with a weapon (or anything that looked like a weapon). *See supra* p.2. Indeed, Deputy Hunady and the other deputies took no real steps to protect the general public, as detailed above, they did not properly evaluate the situation, create a perimeter, or even clear the area of first responders or other civilians. Moreover, Deputy Hunady admitted Jonathan did not and was not committing a crime, and, what's more, he never saw Jonathan with a weapon or anything that looked like a weapon. Rather, Deputy Hunady observed Jonathan's bandaged hands, which he had been made aware of. Thus, there was no suspected crime.

**A. Deputy Hunady's use of force was unreasonable under the Fourth Amendment.**

Excessive force is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor,* 490 U.S. 386, 397 (1989). This standard is a balancing test between the violation of an individual's Fourth Amendment protections versus the "countervailing governmental interests at stake" based on the circumstances. *Id.* at 395. The dispositive factors in determining objective reasonableness are: "(1) the severity of the crime at issue; (2) whether [Jonathan] posed an immediate threat to the officers or others; and (3) whether he actively resisted arrest." *Penley v. Eslinger*, 605 F.3d 843, 850–51 (11th Cir. 2010). Examining the record in the light most favorable to Jonathan it is evident his Fourth Amendment rights were violated.

The first factor supports Jonathan because there was no evidence or suspicion of criminal activity. *See supra* SOF numbers 23. Defendant was called for a welfare check of Jonathan, who had just been injured in a car accident. *See supra* SOF numbers 1–2, 10. No crime had been committed, nor was Jonathan in the process of committing a crime, and Jonathan had no weapons or anything that looked like a weapon, as admitted by Deputy Hunady. *See supra* p. 2.

The second factor also favors Jonathan. This factor can be otherwise stated as "whether, given the circumstances, [Jonathan] would have appeared to reasonable police officers to have been gravely dangerous." *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002). Jonathan was not armed or under the influence of any substance. *See supra* p. 2. To the contrary, Jonathan's actions were indicative of someone who had just been injured in a car accident and was in shock or suffering from some sort of head injury. Defendants claim the positioning of Jonathan's hands was reason enough to take his life. Defendant's Mem. at 21. However, the 11th Circuit has already held this to be an unreasonable use of force: "[t]o be clear, [Jonathan] exiting his vehicle. . . and holding an unidentified object would not have been sufficient to make [Deputy Hunady's] use of

deadly force reasonable under the circumstances." *See Davidson v. City of Opelika*, 675 F. App'x

955, 959 (2017). There is no evidence of an objective threat. Quite the opposite, Jonathan's long,

delayed steps on uneven ground, his blood covered arms, and hands near his face, again, support

the fact that he was in shock and injured—not a threat. Even the independent witness, a civilian

who stopped to check on Jonathan, stated (unequivocally) that Jonathan was not threatening or

advancing on the deputies when he was shot and killed. And, most indicative of the lack of threat,

*none* of the other officers on scene fired on Jonathan—because he was not a threat.

The Defendants cite to a number of cases in order to give the false impression that Deputy

Hunady had any reason to fear for his safety. All of these comparisons fail for the same reason—

in every case the Defendants cite, the suspect ***had a weapon***. Jonathan had no weapon and Deputy

Hunady ***admitted he saw no weapon or anything that looked like a weapon*** in Jonathan's

possession. *See supra* p. 2, SOF number 32. In *Jean-Baptiste v. Gutierrez*, the suspect had a gun;

Jonathan did not have a gun. *See* 627 F.3d 816, 819 (11th Cir. 2010); *see supra* p. 2. In *Murphy v.*

*Demings*, the suspect had a gun and was running from the officers, whereas here Jonathan did not

have a gun and was not fleeing Deputy Hunady. *See* 626 F. App'x 836, 840 (11th Cir. 2015); *see*

*supra* p. 2, SOF number 34. In *Long v. Slaton*, the suspect was commandeering a vehicle in a

reckless manner; Jonathan got out of his vehicle per Deputy Hunady's instructions and in search

of the help offered by Deputy Hunady, and, thus, was not inside his vehicle at the time he was

shot. *See* 508 F.3d 576, 579 (11th Cir. 2007); *see supra* SOF number 46. In *Williams v. Deal*, the

suspect physically assaulted the officer; Jonathan did not assault anyone nor was he close enough

to any other person at the scene to physically assault them. *See* 659 F. App'x 580, 581 (11th Cir.

2016); *see supra* SOF number 46. In *Davis v. Edwards,* the suspect had a gun; Jonathan admittedly

did not have a gun or anything that looked like a gun. *See* 779 F. App'x 691, 692 (11th Cir. 2019);

*see supra* p. 2. In *Penley v. Eslinger,* the suspect had a modified toy gun; Jonathan did not have a gun, toy or otherwise anything that looked like a gun or weapon of any kind. 605 F.3d at 845; *see supra* p. 2. In *Davidson*, the suspect motioned like he was grabbing a gun from his back pocket; Jonathan, as admitted by Deputy Hunady, had no such object that could be confused for a weapon in his hands. *See* 675 F. App'x at 959; *see supra* p. 2, SOF number 37. There, the entire situation was very quick, about three seconds, and the officer had nothing to shield himself with and a black object was clearly visible in Davidson's hands. *Id.* at 957. Here, Jonathan had no gun, black object, or anything that looked like a weapon in his hands and did not make such hand movements. As Hunady testified, he did not see a muzzle or a barrel or weapon of any kind, all he saw was Jonathan's wrapped hands—which he had been advised about. *See supra* p. 2, SOF number 37. Deputy Hunady, who had over a minute of daylight to observe Jonathan as he exited his car, admitted he saw nothing in Jonathan's hands, and Deputy Hunady was protected by a firetruck. *See supra* SOF numbers 5, 19, 20. Deputy Hunady did not have to make a split-second decision like the officer in *Davidson.* Unlike *Davidson*, Jonathan was still eight to ten feet away from Deputy Hunady when Deputy Hunady, who was shielded by a fire truck, shot him.[6] Finally, in *Hammett v. Paulding County,* the suspect homeowner was aggressive towards law enforcement and did not comply with their demands as officers were executing a search warrant; Jonathan was not in his home, was not aggressive, had no substances in his system, and exited his vehicle as requested by Deputy Hunady. *See* 875 F.3d 1036, 1040, 1049 (11th Cir. 2017); *see supra* p. 2, SOF number 27. Despite complying with his order to get out of his vehicle and receive the help Deputy Hunady promised, Jonathan was still shot and killed. The question at issue is not whether

---

[6] As a trained SWAT officer, Deputy Hunady undoubtedly received tactical training in which threats (like simulated shooters) pop up within inches of him and he had to make actual split second decisions. Here, Jonathan was nearly ten feet from him when shot, had no weapon or anything resembling a weapon, and Deputy Hunady observed him outside his vehicle for more than one minute.

it is reasonable to see a suspect with a gun as a danger, because Jonathan did not have a gun, weapon, or anything that looked like a weapon and did exit his vehicle. Thus, all of these cases provide absolutely no support for Defendants' position. The real question is whether Jonathan was a danger, and the Defendants have not presented any facts that show Jonathan was a danger. In viewing the facts in the light most favorable to Jonathan, he posed no danger. At best, Defendants have only demonstrated a factual dispute exists that cannot be decided on summary judgment.

The third factor also weighs in Jonathan's favor. Jonathan was in an accident and was injured. *See supra* SOF numbers 1–2. He exited his vehicle per Deputy Hunady's instructions and was seeking help, as promised by Deputy Hunady. *See supra* SOF number 27. Jonathan was approaching in Deputy Hunady's direction in an effort to get help. Jonathan was not resisting Deputy Hunady. *Id.* Jonathan, who was injured, bloody, and in shock, was maneuvering up a wet, uneven ditch to comply with Deputy Hunady. Deputy Hunady waited more than one minute to observe Jonathan trying to make his way towards him (at his request); yet, the only seconds obscured from video after that minute are when Deputy Hunady ended Jonathan's life. All three factors for the objective reasonableness test support Jonathan. Thus, the force used to end Jonathan's life was indisputably unreasonable. As such, the Defendants do not enjoy qualified immunity protection and summary judgment must be denied.

**B. Deputy Hunady's use of force violated Jonathan's constitutional rights.**

It is ignorant to believe that a reasonable officer would not recognize it is a violation of one's constitutional rights to kill an unarmed man who is complying with his instructions to exit his vehicle and approach him for help. This is further supported by the fact that none of the other deputies on scene felt threatened by Jonathan, let alone fired on him. The fact that this exact situation has not previously been analyzed by a higher court is not fatal to Jonathan's case.

"While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular arrest beyond debate." *District of Columbia v. Wesby*, 138 S. Ct. 577, 580 (2018). Unlike *Wesby*, this was not an arrest; moreover, Jonathan had not threatened anyone. *See id.*

In trying to selectively apply precedent to incorrectly show that Deputy Hunady could not have known shooting an unarmed, injured man was a constitutional violation, Defendants rely on a number of the cases, which, as shown in the previous section, are inapplicable to this case due to their incompatible fact patterns. *See supra* Section I.A. The other cases cited by Defendants are also easily distinguishable. In *Shaw v. City of Selma,* the suspect was not complying with officers' instructions. 884 F.3d 1093, 1100 (11th Cir. 2018). However, Jonathan did comply with Deputy Hunady's request to exit his vehicle and was making his way toward help, as promised by Deputy Hunady. *See supra* SOF number 27. In *Kenning v. Carli*, the suspect had a gun. 648 F. App'x 763, 764 (11th Cir. 2016). Once again, Deputy Hunady admitted he saw no gun or anything that looked like a gun or weapon in Jonathan's possession. *See supra* p.1, SOF number 43.

The use of deadly force when it is not justified is unreasonable under the Fourth Amendment and is a violation of one's rights. *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005). Viewing the facts in the light most favorable to Jonathan, the use of deadly force against him was objectively unreasonable and thus "beyond debate." *Wesby*, 138 S. Ct. at 580. When this standard is met, the offending officers are not "entitled to summary judgment on the basis of qualified immunity." *Kisela v. Hughes*, 138 S. Ct. 1148, 1161 (2018). Therefore, the Defendant's summary judgment motion must be denied.

**C. Sheriff Mack violated Victor's constitutional rights.**

Sheriff Mack can also be held liable for Deputy Hunady's egregious conduct. Liability is expanded "when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). As the Defendants concede, this connection can be proved in three ways, the most relevant being when a supervisor's "custom or policy . . . result[s] in deliberate indifference to constitutional rights. . . ." *Id.* at 1360. Insufficient training is evidence of this causal connection. The officers present did not secure the scene—the videos show numerous people walking about, first responders, civilians, etc. *See supra* SOF number 22. Deputy Hunady did not verbally warn Jonathan he was going to shoot him and shot him anyway. *See supra* SOF numbers 43-44. Not just an unarmed man, but an injured man in shock who had just been involved in a car accident trying to make his way out of a ditch. This failure to train liability is "proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations." *Bd. Of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). At present, this case is not the only police shooting case Sheriff Mack is in court for. *See Yates v. Mack,* No. 20-00131-KD-B, 2020 U.S. Dist. LEXIS 162384, at *1 (S.D. Ala. Sep. 2, 2020). As further evidenced in Plaintiff expert Katsaris's Report, Deputy Hunady's actions were wholly inconsistent with basic police training and policies. Deputy Mack is responsible for training and setting policy. *See infra* pp. 28–31 for further analysis.

## II.     QUALIFIED IMMUNITY IS NOT A VIABLE DEFENSE.

In theory, it is logical that police officers should be protected from frivolous lawsuits when acting justifiably. But, in practice, qualified immunity has been used as an absolute shield by officers to protect them from suffering any consequences even in situations where officers act

unlawfully and unconstitutionally. Courts, however, have signaled a shift away from blind deference to officers. *See, e.g., Estate of Jones v. City of Martinsburg,* 961 F.3d 661 (4th Cir. 2020) (reversing summary judgment in favor of officers). As the Fourth Circuit noted, "[t]his has to stop. To award qualified immunity at the summary judgment state in this case would signal absolute immunity for fear-based use of deadly force, which we cannot accept." *Id.* at 673.[7] Indeed, federal and state legislatures have also introduced and passed bills limiting or disallowing qualified immunity as a defense in civil suits. *See, e.g.*, 2020 Bill Text CO S.B. 217 (abolishing qualified immunity as a defense to civil suits for police).[8] Qualified immunity should not be used to shield officers who have acted unjustifiably. To grant summary judgment here, especially with such significant factual disputes, would be giving Defendants absolute immunity—to which they are not entitled. Accordingly, summary judgment must be denied.

## III.     WRONGFUL DEATH UNDER 42 U.S. § 1983 IS A VIABLE CLAIM.

Defendants cite *Estate of Gilliam v. City of Prattville* for the proposition that the present case abates under Alabama law. Brief for Defendant at 12-13 (citing 639 F.3d 1041, 1045-50 (11th Cir. 2011)). Since 42 U.S.C. § 1983 does not specifically allow for survivorship of civil rights actions, the question of survivorship is governed by 42 U.S.C. 1988(a). *Gilliam* 639 F. 3d 1041 at 1045 (citing *Robertson v. Wegmann*, 436 U.S. 584, 588-89 (1978)). State law applies as long as it is consistent with federal law and the Constitution. *Id.* (quoting 42 U.S.C. 1988(a)).

But *Gilliam* only considers the question of abatement in cases where an officer's excessive force **did not cause death**. *Id*. at 1044. Further, *Gilliam* **expressly declines** to address the situation

---

[7] *See also Pena v. City of Rio Grande City*, 816 F. App'x 966 (5th Cir. 2020); *Stoddard-Nunez v. City of Hayward*, 817 F. App'x 375 (9th Cir. 2020). Moreover, Supreme Court Justices (on both sides of the political aisle) have questioned qualified immunity. *See* Ruth Marcus, *The Supreme Court invented qualified immunity. Now, a judge's blistering opinion shows why it must go.*, Wash. Post, Aug. 5, 2020.
[8] *See also Ending Qualified Immunity Act*, 116 S. 4142; 116 S.Res. 602; *Reforming Qualified Immunity Act*, 116 S. 4036

in the present case: "We **stress** at the outset that this case, in its present procedural posture, does **not involve a claim that the officers' unconstitutional conduct caused the decedent's death**." *Id.* (emphasis added). Thus, Defendants' reliance is misplaced and their argument fails.

In *Brazier v. Cherry*, a panel of the former Fifth Circuit found that Georgia state law's survivorship provisions were sufficient to "make the policy of the Civil Rights Statutes fully effectual" and applied state law to give effect to a § 1983 action. 293 F.2d 401, 409 (5th Cir. 1961); *Carringer v. Rodgers*, 331 F.3d 844, 850 (11th Cir. 2003) (applying the rule from *Brazier* to a case where a spouse/murderer was barred from recovery and parents of the deceased therefore had standing to sue under § 1983). *Gilliam* considers that question only in contexts where the officers did not cause death. *See Gilliam* at 1044. It is undisputed in this case that Deputy Hunady caused Jonathan's death. As Plaintiff expert Katsaris points out, Deputy Hunady's inadequate training also contributed to Jonathan's death by posing a "reckless disregard" to the risk of constitutional violations like the one here. SoF number 65. Therefore, Count 1 is not barred by *Gilliam*.

## IV. SHERIFF MACK'S FAILURE TO ADEQUATELY TRAIN HIS OFFICERS RENDERS HIM LIABLE UNDER § 1983 FOR DEPUTY HUNADY'S VIOLATION OF JONATHAN'S RIGHTS.

Section 1983 imposes liability on government officials when a government policy causes a constitutional violation. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997). In the law enforcement context, that liability arises when a failure to adequately train police officers evinces a "deliberate indifference to constitutional rights." *Rivas v. Freeman*, 940 F.2d 1491, 1495 (11th Cir. 1991).

A pattern of rights violations is not necessary to prove deliberate indifference. Rather, a "single violation of federal rights" by a police officer is sufficient to impose liability on his supervisor. *Bryan Cty.*, 520 U.S. at 409. This occurs when the supervisor failed to train the officer on how to handle recurring situations with an "obvious potential for such a violation." *Id.* Thus,

Defendants' discussion of supervisory liability under § 1983 tries to close a door to liability that the Supreme Court has repeatedly left open—as further detailed below. Defendants correctly point out that Sheriff Mack did not personally partake in the killing and did not order anyone to act unlawfully. But, when Defendants, in their penultimate paragraph, finally get to Plaintiff's actual claim of failure-to-train liability, they quote the Supreme Court to say that a "pattern of similar constitutional violations" is required. That is incorrect. The real quote is that such a pattern is "ordinarily necessary" but **not required**. *See Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citing *Bryan Cty.*, 520 U.S. at 410). Rather, the Supreme Court has "le[ft] open" § 1983 supervisory liability explicitly for a "failure-to-train claim" against the police using deadly force. *Bryan Cty.*, 520 U.S. at 409 (holding inadequate employee screening claim is not sufficiently similar to police failure-to-train claim); *see also Connick*, 563 U.S. at 51 (holding that failure to train prosecutors is not sufficiently similar to failure to train police in use of deadly force). Courts look to a "narrow range of circumstances" namely a high likelihood that the situation in a case will recur and a high predictability that an untrained officer would lack the tools to resolve such situation without a constitutional violation. *Bryan Cty.*, 520 U.S. at 409. When a law enforcement supervisor fails to train his officers for such predictable situations, he is deliberately indifferent to the constitutional rights at issue. *Id.* at 409-10.

Defendants do not dispute that Sheriff Mack is the BCSO supervisor and policymaker. In Sheriff Mack's own words, he is at the "highest level" in the county. (Def. Ex. A, Mack Dep. Pg. 8, Doc. 29-1, PageID.188.) "[P]er the county," he said in his deposition, "I'm known as the governor." (*Id.*) He has been Sheriff since 2007. (*Id.*) Thus, Sheriff Mack, admittedly is responsible for training his officers and setting policy. Likewise, he is responsible for gaps in that training, and lack of setting such policies. A reasonable jury would question whether Sheriff Mack had trained

Deputy Hunady or any other officers in welfare check, barricaded subject, and suicide by cop situations prior to Jonathan's killing. Sheriff Mack cannot point to specific training for barricaded subjects and suicide by cop. When asked at deposition about training provided "specifically on barricaded subjects" Sheriff Mack replied, "*Probably* through our tactical training." (*Id.* at 13-14 (emphasis added)) He also mentioned the "school safety program." (*Id.* at 14.) Sheriff Mack flatly denied any training for dealing with people under mental distress or suicide risk. (*Id.* at 17.) There was no de-escalation training in place when Jonathan was killed. (*Id.* at 8.) But it is not just these specific trainings, the deputies' actions here call into question whether they have adequate training in simply evaluating or securing scenes, let alone evaluating whether an individual is actually a threat.[9] In just the past year, BCSO has started de-escalation training. *Id.*

Barricaded subject and suicide by cop events are highly likely to occur. Suicide by cop elements are present in as many as 29% of officer-involved shootings. (Ex. 9, Katsaris Report Pg. 14, Doc. 35-9, PageID.724.) Between 2015 and 2018, approximately 900-1,000 fatal officer-involved shootings mirrored Jonathan's case. Analyzing this event, Katsaris stated that recognized and accepted police training procedures in barricaded subjects were "clearly called for" but not followed. (*Id.* at 11.) Katsaris has extensive experience in police procedure, both in practice and as an instructor. He previously served as the Chief Law Enforcement Officer of the County of Leon, City of Tallahassee, Florida. (*Id.* at 2). He has taught "well over 150,000" police and other law enforcement members on police procedure including appropriate use of deadly force. *Id.*

It is also highly predictable that, absent such training and faced with a similar situation, an officer like Deputy Hunady will impermissibly use deadly force in violation of a victim's Fourth

---

[9] Despite repeated requests and Sheriff Mack's claim that he has. (*See* Def. Ex. A, Mack Dep. Pg. 7, Doc. 29-1, PageID.188.) Defendants have failed and refused to produce any BCSO training related materials from before or after Jonathan's death.

Amendment rights, again. Hunady and all the other BCSO officers at the scene behaved similarly, except for actually shooting. They grabbed weapons, pointed them at Jonathan, and took cover. They behaved without a plan. Never even considered making a plan. They failed to clear the scene of civilians or safeguard first responders. They failed to set up a perimeter. They failed to call in a crisis intervention team. They never actually evaluated Jonathan before aiming their weapons at him. Rather, they did exactly what the training says *not to do*. (Ex. 5, Katsaris Dep. Pg. 14, Doc. 35-5, PageID.598.) They accelerated and exacerbated the situation. They brought out deadly weapons ignoring less lethal options like their BCSO-issued Tasers or crisis intervention. They made no effort to de-escalate, get critical information about Jonathan's state of mind, or determine whether he had a weapon (which he did not). From the moment they arrived on scene, without an iota of evidence supporting their belief, they assumed Jonathan had a weapon and treated him like a hostile criminal—which he was not. As Plaintiff's expert Katarsis succinctly stated, if Deputy Hunady and the other officers had no adequate training "then we have a case of reckless disregard to a known risk of harm by the fact that they were not given instruction on how to handle this." (*Id.* at 63.) This conclusion is overwhelmingly supported, as detailed above. Thus, Sheriff Mack's failure to train his officers evinced a "deliberate indifference" to the constitutional rights of Jonathan and anyone else who could predictably be in a situation like his. This failure gives rise to § 1983 supervisory liability.

## CONCLUSION

One of the 911 dispatchers gave a prescient warning in the statement "we don't want the police arriving and drawing guns [with] him being secured with a head injury. . . ." *See supra* SOF number 8. Unfortunately, this situation was realized, and Jonathan Victor lost his life. For this and the aforementioned reasons, summary judgment must be denied.

Dated: February 8, 2021

Respectfully submitted,
Plaintiff

By: /s/ Jack Samuel Tenenbaum
    Jack Samuel Tenenbaum
    Attorney for Plaintiff Donna Chisesi
    Bluhm Legal Clinic
    Northwestern Pritzker School of Law
    375 E. Chicago, 8th Floor
    Chicago, IL 60611-3069
    Phone: (312) 503-4808
    Email:s-
    tenenbaum@law.northwestern.edu

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 8th day of February, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

J. Randall McNeill
WEBB MCNEILL WALKER PC
7475 Halcyon Pointe Drive (36117)
Post Office Box 240909
Montgomery, Alabama 36124
(334) 262-1850
rmcneill@wmwfirm.com

/s/ Jack Samuel Tenenbaum
J. Samuel Tenenbaum
s-tenenbaum@law.northwestern.edu