# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| DONNA CHISESI, as Independent Administratrix of the Estate of Jonathan Victor, Deceased, ) ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | CIVIL ACTION 19-0221-C |
| MATTHEW HUNADY, *et al.*, ) ) | |
| Defendants. ) | |

## ORDER

This matter comes before the Court on defendants' Motion for Summary Judgment (doc. 30).  The Motion has been briefed and is now ripe.

## I.    Background Facts.[1]

### A.  Nature of the Case.

This action arises from the fatal shooting of a motorist by a law enforcement officer following a single-vehicle accident in broad daylight on a busy interstate highway.  The administratrix of the decedent's estate brings claims against the officer, solely in his individual

---

[1]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Smith v. LePage*, 834 F.3d 1285, 1296 (11th Cir. 2016) ("It is not this Court's function to weigh the facts and decide the truth of the matter at summary judgment …. Instead, where there are varying accounts of what happened, the proper standard requires us to adopt the account most favorable to the non-movants.") (citations and internal quotation marks omitted).  Accordingly, the record will be viewed in the light most favorable to plaintiff, with all justifiable inferences drawn in her favor.  Also, federal courts cannot weigh credibility at the summary judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.").  Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead accept[s] Plaintiff's version of the facts drawing all justifiable inferences in [her] favor."  *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008).

capacity, and against the Sheriff of Baldwin County, also solely in his individual capacity, for wrongful death and personal injury.  Those causes of action include claims under 42 U.S.C. § 1983 against the officer for wrongful death (Count I), against the officer for excessive force (Count II), against the Sheriff for *Monell* liability (Count III), and against the Sheriff for supervisory liability (Count IV).  Defendants now move for summary judgment on all of these claims.

### B. *The Dispatch Call and the Scene.*

On the afternoon of May 12, 2017, volunteer firefighters and paramedics were called to the scene of a single-car wreck on Interstate 10 in Baldwin County, Alabama, near mile marker 60.  (Tobias Decl., ¶ 2, Doc. 29-4, PageID.313; Stockton Decl., ¶ 3, doc. 29-5, PageID.316.) Upon arrival, the firefighters were notified by bystanders that the driver of the wrecked vehicle (which was parked some distance off the roadway, in a grassy ditch in the median) was acting in a strange and erratic manner, and that he had remained in the vehicle with the windows rolled up and the doors locked.  (Tobias Decl., ¶ 3.)  One of the firefighters, Michael Tobias, asked the driver (who was later identified as Jonathan Victor) to roll down his windows and allow Tobias to look at his hands, which were wrapped in a cloth and appeared to be bleeding.  (*Id.*, ¶ 4.) When the driver refused and "continued to act strangely and aggressively," Tobias backed away and called the Baldwin County Sheriff's Office ("BCSO").  (*Id.*, ¶ 5.)  Ambulance personnel approached the vehicle; however, Victor yelled at them to leave.  (Crossland Decl., ¶ 4., Doc. 29-6, PageID.319.)  One of the ambulance personnel saw what he believed to be a weapon in Victor's lap.  (*Id.*)  At that point, EMS, firefighters and bystanders alike all retreated, took cover behind a parked vehicle, and waited for law enforcement to arrive.  (*Id.*, ¶ 5.)

Upon being informed of these events via 911 operator, the BCSO dispatched officers to the scene.  Through a series of calls, the 911 operator notified the BCSO dispatcher of the following facts and circumstances: (i) the suspect has "barricaded himself in the vehicle;" (ii) first responders "think he has a weapon on his lap," but they are "just kind of backing away from him;" (iii) the suspect was "[o]ne male approximately 30-years-old" who was "covered in blood and not for sure if he has a weapon on [sic] not, but he's got something in his lap;" (iv) the suspect had "jumped in the back of the vehicle and … grabbed something" but "[t]hey can't tell what it is," such that the 911 operator did not "know what he's grabbing in the back;" (v) the suspect was "refusing to comply," was "covered in blood," and "got his arm wrapped;" and (vi)

"now the subject is talking to himself, still locked in his vehicle, having conversations." (Doc. 29-10, PageID.362-65.) Most of this information was accurately relayed by the BCSO dispatcher over the radio to responding deputies, with the exception that the dispatcher indicated, "911 advised that they did see a weapon on his lap" (*Id.*, PageID.365), which is not correct.

One of the responding officers was BCSO Deputy Matt Hunady, who heard the initial call over the radio as a "welfare concern" and self-dispatched to that location. (Doc. 29-2, PageID.240.)[2] In his deposition, Deputy Hunady testified that "the initial call came in that he was possibly armed and intoxicated and, you know, not cooperating with the requests of the paramedics and the firefighters." (Doc. 29-2, PageID.236.) Upon arriving at the scene, Deputy Hunady encountered the first responders, one of whom indicated that Victor "was wide-eyed, acting irrationally, talking to himself, and had basically cut off contact with them as they were trying to help. … They said he was possibly armed." (*Id.*) From his position, Deputy Hunady was unable to see into Victor's vehicle because it had some kind of "dark mirrored window tint." (*Id.*, PageID.239.) He did not approach the vehicle "[d]ue to the information that we had that he was possibly armed." (*Id.*) The summary judgment record viewed most favorably to plaintiff supports a reasonable inference that Deputy Hunady did not attempt to debrief the first responders or bystanders in order to glean specific information as to exactly what they had or had not seen with regard to the possibility that the subject in the vehicle might be armed. (Doc. 29, Exh. L.) During the standoff, however, Deputy Hunady made several statements reflecting his understanding that Victor "possibly" or "supposedly" had a weapon. (*Id.*)

Deputy Hunady took up position behind a fire truck parked roughly 15 to 20 yards away from Victor's vehicle. (Doc. 29-2, PageID.234-35.) For the next few minutes, Deputy Hunady attempted to communicate with Victor in the form of verbal directives and hand motions for him

---

[2] In summary judgment briefing, defendants emphasize that at some point the BCSO dispatcher changed the call status from a "welfare concern" to a "1033," meaning an emergency call in which the subject is armed and for which radio traffic should be cleared until the situation is resolved. (Doc. 32, PageID.424, ¶ 10.) But defendants have cited no record evidence that Deputy Hunady was actually aware at any time prior to the shooting that the call had been reclassified as a 1033 rather than a welfare concern.

to exit the vehicle, all for the purpose of helping Victor.  (*Id.*, PageID.235.)[3]  Initially, the vehicle's passenger side window was slightly open, so Deputy Hunady called out to Victor that he was with the Sheriff's Office, that he needed Victor to come out of the vehicle with his hands up, and that the officers were there to help him.  (Hunady Decl., ¶ 4, doc. 29-15, PageID.384.) After a few minutes, Victor closed the passenger side window completely.  (*Id.*)  Deputy Hunady could see Victor moving around inside the vehicle, but was unable to discern what he was doing or what was in his hands.  (*Id.*)[4]  For his part, Deputy Hunady kept his Ruger AR-15 BCSO-issued patrol rifle pointed at Victor's vehicle the entire time.  (Doc. 29, Exh. M.)  He also had on his person throughout this incident a nonlethal weapon in the form of a Taser, with cartridges that were effective to a maximum distance of 25 feet.  (Doc. 29-2, PageID.242.)

### C.  *The Shooting.*

The standoff lasted for approximately ten minutes, during which time Deputy Hunady periodically called for Victor to step out of the car, even as he maintained his position under cover behind a fire truck with his Ruger AR-15 pointed at the vehicle.  (Doc. 29, Exh. M.)[5] Victor did not acknowledge or respond to these directives.  Then, without warning, Victor abruptly opened the front passenger door of the vehicle (the door closest to the officers), and stepped out onto the wet grass.  (*Id.*)  What happened next is a source of profound disagreement in the record.  For his part, Deputy Hunady asserts that Victor "immediately took an aggressive 'v-type' stance and punched his arms out in front of his chest as if he had a weapon; he stood in a weaver type shooting stance. … Due to the subject's stance and the way he punched out his arms, I believed the subject was armed with a weapon."  (Hunady Decl., ¶ 5, doc. 29-15, PageID.384.)

---

[3]      When asked why he was wanting to help Victor, Deputy Hunady testified, "Due to the initial call, I came out as a welfare concern.  The paramedics and fire were already on scene due to him being – driving off the road."  (*Id.*)

[4]      The video recording from Deputy Hunady's body cam reflects that he repeatedly shouted commands such as "Let me see your hands," "Come on out," "Step out of the vehicle," and the like throughout this time period.  (Doc. 29, Exh. L.)

[5]      The BCSO has a negotiations team that is trained to deal with barricaded subjects. (Doc. 29-2, PageID.242.)  At no time was that negotiations team called to the scene or otherwise contacted to ascertain its availability to assist in defusing the situation.  (*Id.*)

Video recordings of the event can be reasonably construed as portraying Victor's actions after exiting the vehicle quite differently than the aggressive shooting stance that Deputy Hunady ascribes to him.[6]  Deputy Hunady's dash camera video shows Victor stepping unsteadily out of the passenger side of the vehicle with his elbows bent and his hands near his face.  (Doc. 29, Exh. M, at 25:24.)  A reasonable finder of fact viewing that footage could conclude that Victor did <u>not</u> punch out his arms and did <u>not</u> assume an aggressive shooter stance.  To be sure, Victor's hand or hands appeared to be wrapped in cloth, but that fact was consistent with what Deputy Hunady and other officers and first responders already knew, inasmuch as Victor had reportedly been covered in blood and had his arm wrapped.  Approximately 30 to 40 seconds after exiting the vehicle, Victor began advancing slowly toward Deputy Hunady's position, appearing to have difficulty maintaining his footing in the wet uneven grassy median, and with his elbows still bent and his hands near his face.  (*Id.* at 26:06.)  In halting steps, Victor moved toward Deputy Hunady's position for approximately 15 seconds, at which time he disappeared from view on the dash camera video because of the position of the fire truck.  A reasonable finder of fact could conclude from this video that Victor did not take aggressive action toward Deputy Hunady or anyone else, and that he did not punch out his arms in a shooter stance.[7]

---

[6]     There are three sets of video footage of the incident, including Deputy Hunady's body camera (doc. 29, Exh. L), Deputy Hunady's dash camera (doc. 29, Exh. M) and non-party witness Jorge Gutierrez's cell phone video (doc. 29, Exh. N).  Collectively and individually, the video evidence is not as clear or unambiguous as one might wish because of the distance and angles of the cameras; therefore, this case is not controlled by the Supreme Court's guidance that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).  Rather, the relevant inquiry for summary judgment purposes here is how a reasonable finder of fact could view these video recordings, along with the other record evidence, in the light most favorable to plaintiff.

[7]     The Gutierrez video could reasonably be viewed in much the same way; in fact, it appears to show Victor lowering his hands as he moved in the direction of Deputy Hunady, in a manner that could reasonably be construed as non-aggressive.  (Doc. 29, Exh. N.)  And at no time from Victor's exit from the vehicle until the shooting itself was Victor visible on Deputy Hunady's body camera video.  (Doc. 29, Exh. L.)  Simply put, the totality of the video evidence could reasonably be viewed in a manner that conflicts with, and undermines, defendants' position that Victor took an aggressive, shooter-type stance.  On this record, a reasonable finder of fact could reject defendants' insistence that "Victor flung the passenger side door open, stepped out, and immediately took an aggressive 'v-type' stance and punched his arms out in (Continued)

What is clear and unambiguous from the video evidence is Deputy Hunaday's communication with Victor.  Beginning from the moment Victor stepped out of the vehicle until the time of the shooting roughly 60 seconds later, Deputy Hunady shouted the following commands, often in a rapid and repetitive manner:

> "Man, just step on out.  Step on out.  Drop what's in your hands.  Drop what's in your hands.  Drop it.  Drop it.  Drop it right now and put your hands up.  We're just here to help you, man.  We're just here to help you.  Drop whatever you got in your hand, dude.  Drop it.  Drop it.  Put your hands up, man.  We're just here to help you.  Put it down, dude.  Put it down.  Don't advance.  Do not advance.  Do not advance.  Stand right there.  Man, don't fucking do it.  Put it down, put it down.  Put it down right now.  Put it down.  Put it down.  Put it down.  Put it down."

(Doc. 29, Exh. L, at 11:06 – 12:06.)  After the last "put it down," Deputy Hunady fired four shots at Victor from his Ruger AR-15 in quick succession.

Throughout this confrontation, Victor's only words to Deputy Hunady were to mutter, "No, you drop it," at one point.  (Hunady Decl., ¶ 6, doc. 29-15, PageID.385.)  According to Deputy Hunady, as Victor advanced, he "believed that my life and the lives of the other Deputies, Medical and Fire personal [*sic*] and innocent drivers were in danger because I believed that he was armed."  (*Id.*)  At no time did Deputy Hunady actually see a gun, barrel, muzzle, or handle in Victor's possession, and at no time did Victor discharge or display a weapon.  (Doc. 29-2, PageID.232.)  Victor was approximately 20 feet away when Deputy Hunady opened fire.  (*Id.*, PageID.235.)[8]  At least one witness on the scene testified that at the time of the shooting, Victor "wasn't coming no further. … He was just standing there."  (Doc. 29-8, PageID.343.)  All four shots struck Victor, one in the hand or arm, two in the abdomen, and one in the femoral, pelvic region.  (Doc. 29-2, PageID.248.)  First responders, including Deputy Hunady himself,

---

front of his chest as if he had a pistol."  (Doc. 32, PageID.428.)  A reasonable viewer of the video evidence could conclude that this version of events described by defendants simply did not happen.

[8]     The record reflects that Deputy Hunady had a Taser on his person throughout this event, and that the cartridges used by his Taser had an effective range of 25 feet.  (Doc. 29-2, PageID.242.)  As such, Victor was close enough to Deputy Hunady to be within range of the Taser when the shooting occurred.  When asked why he elected not to deploy his Taser at the time, Deputy Hunady responded, "I could have, but I don't believe it … would have solved this situation at the time, because I believed he was armed with a weapon."  (Doc. 29-2, PageID.244.)  On that basis, Deputy Hunady testified that he did not consider utilizing a Taser at any time during this incident.  (*Id.*)

immediately rendered first aid, providing medical care to Victor on the scene to attempt to stop the bleeding and save his life; however, Victor died as a result of those gunshot wounds. (*Id.*, PageID.232.)  After the fact, Deputy Hunady discovered that Victor did not actually have a weapon in his hands, but instead carried only a "rain-type jacket wrapped around … the fanny pack, and his hand." (*Id.*, PageID.238.)  And Deputy Hunady had no knowledge and no reason to believe that Victor had committed a crime at any time up until the moment of the shooting. (*Id.*, PageID.233.)

> ### D.  Deputy Hunady's Training.

The summary judgment record reflects that Deputy Hunady was a seasoned law enforcement officer, having joined the BCSO in April 2004 and having served as a deputy sheriff since March 2005.  (Doc. 35-6, PageID.697.)  Thus, he had approximately 12 years of experience prior to the incident.  Hunady had also been certified as a SWAT officer.  (*Id.*)  Deputy Hunady's personnel file reflects that he had no prior complaints of excessive use of force and had never been disciplined for same.  (*Id.*)  Defendants' expert opines that Deputy Hunady had been properly trained in use of force concepts prior to this incident.  (*Id.*)  Plaintiff's expert disagrees.  (Doc. 35-9, PageID.722-23.)

As a longtime deputy in the Baldwin County Sheriff's Office, Deputy Hunady underwent a 13-week basic academy hosted by the State of Alabama, followed by a 12-week field training officer program conducted by the BCSO.  (Doc. 29-1, PageID.189.)  As part of that field training officer program, Deputy Hunaday successfully completed training in the BCSO's standard operating procedures for use of deadly force.  (*Id.*)  Those procedures entail training that officers are to use the least amount of force necessary to render the situation safe, with the use of force continuum ranging from verbal commands all the way to the use of deadly force.  (*Id.*, PageID.190.)  The BCSO also conducts at least four training sessions per year, including both classroom opportunities and practical situations.  (*Id.*, PageID.189.)  During all times relevant to these proceedings, BCSO did not have officer training programs for crisis intervention, de-escalation, or for dealing with persons who are suicidal or otherwise under acute mental distress. (*Id.*, PageID.188-90.)

## II.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule

56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.   Analysis.

### A.  *Qualified Immunity and Deputy Hunady.*

Not surprisingly, defendants' Motion for Summary Judgment revolves principally around the issue of qualified immunity.  "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quotation marks omitted).  "To receive qualified immunity, the officer must first show that he acted within his discretionary authority." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009).  There appears to be no dispute – and no reasonable basis to dispute – that Deputy Hunady was acting within his discretionary authority at all relevant times; accordingly, the burden shifts to plaintiff to "show that qualified immunity should not apply." *Id.*  To do so, she must show both (1) that Deputy Hunady violated a constitutional right of Victor's; and (2) that the relevant right was clearly established at the time of the alleged violation. *See, e.g., Jacoby v. Baldwin County*, 835 F.3d 1338, 1344 (11th Cir. 2016).  On summary judgment, courts "normally take as true the testimony

of the non-moving party and adopt [her] version of the facts in a qualified-immunity case." *Hinson v. Bias*, 927 F.3d 1103, 1118 (11th Cir. 2019).

The appropriate starting point for the qualified immunity analysis in this case is to examine whether there was a constitutional violation. Of course, the Fourth Amendment right to be free from unreasonable searches and seizures "encompasses the right to be free from excessive force during the course of a" seizure. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). The inquiry is governed by the Fourth Amendment's "objective reasonableness" standard, which requires courts to consider "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Hinson*, 927 F.3d at 1117 (citations omitted). This analysis is performed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citations omitted). Courts must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." *Id.* (citations omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Thorkelson v. Marceno*, --- Fed.Appx. ----, 2021 WL 1100537, *3 (11th Cir. Mar. 23, 2021) (citation omitted). "The amount of force used to affect the seizure must be reasonably proportionate to the need for that force." *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018). "[A]nalysis of this balancing test is governed by (1) the severity of the crime at issue; (2) whether [Victor] posed an immediate threat to the officers or others; and (3) whether he actively resisted arrest." *Penley v. Eslinger*, 605 F.3d 843, 850-51 (11th Cir. 2010) (citation omitted). Of course, Victor neither had committed nor was suspected of having committed a crime, and did not resist arrest or flee; therefore, the first and third factors weigh unambiguously in plaintiff's favor. The critical factor here, as it is in so many excessive force cases, is the presence of absence of an imminent threat. *See, e.g., Shaw*, 884 F.3d at 1099 ("The decisive [factor] here is the threat of physical harm that Shaw posed at the time he was shot."); *Penley*, 605 F.3d at 851 ("In this case, the reasonableness analysis turns on the second of these factors: presence of an imminent threat.").

"The reasonableness of the shooting depends on the totality of the circumstances." *Shaw*, 884 F.3d at 1099; *see also Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015) ("[B]efore deciding whether a police officer has actually used excessive force, we must slosh our way

through the factbound morass of reasonableness because, in the end, all that matters is whether [the officer's] actions were reasonable.") (citation and internal quotation marks omitted). Viewing the summary judgment record in the light most favorable to plaintiff, the relevant facts and circumstances known to Deputy Hunady on the scene were as follows: Victor had apparently been injured in a one-vehicle accident. No witness had reported to Deputy Hunady, either directly or indirectly, that Victor was armed, only that he was "possibly" armed.[9] Deputy Hunady never attempted to follow up with any of the bystanders, first responders or Victor himself to ascertain whether Victor had a weapon. Victor remained barricaded in his vehicle for approximately ten minutes after Deputy Hunady arrived, even as Deputy Hunady repeatedly commanded him to exit the vehicle. When Victor finally stepped out of the car, a reasonable fact finder could conclude that he was neither aggressive nor threatening to Deputy Hunady or anyone else. Video footage shows Victor taking slow, hesitant, halting steps in the muddy grass of the median, all of which is consistent with someone who has been injured in an automobile accident. Victor made no threatening statements. To be sure, he appeared to hold an unidentified object wrapped in a cloth in his hand, which he did not relinquish despite Deputy Hunady's commands to "drop it." But there was no particular reason to believe the cloth-

---

[9] Defendants argue in their reply that this characterization "ignores statements made to Plaintiff's own investigator by a civilian witness." (Doc. 39, PageID.775.) It is true that witness Donald Alumbaugh told plaintiff's investigator that when Alumbaugh and a firefighter had approached Victor's car before Deputy Hunady arrived on the scene, "the boy had a shirt wrapped around … it looked like … we thought it was a gun. He stuck it up at us like a weapon." (Doc. 29-8, PageID.329.) The trouble with defendants' reliance on Alumbaugh's statement for summary judgment purposes is that it was made on December 11, 2020, some three and a half years after the shooting. What matters is not what a witness saw or did not see, much less that witness's recounting of his recollection years after the fact. Instead, what matters for purposes of the Fourth Amendment excessive force inquiry is what Deputy Hunady knew at the time of the shooting. After all, "[w]e must see the situation through the eyes of the officer on the scene …." *Crosby v. Monroe County*, 394 F.3d 1328, 1334 (11th Cir. 2004). Simply put, there is no evidence that Deputy Hunady was aware of Alumbaugh's belief that he had seen a gun in Victor's hand. There is no record evidence that Alumbaugh ever relayed this information to Deputy Hunady, or that Deputy Hunady ever asked anyone on the scene whether they had seen a weapon on Victor's person or in his vehicle at any time. As such, Alumbaugh's statement to plaintiff's investigator is of no consequence for summary judgment purposes.

wrapped object was a firearm.[10]  A reasonable finder of fact could conclude from the evidence that it did not look like a weapon and that Victor was not brandishing anything in an aggressive or threatening manner.

Moreover, Deputy Hunady's assertion that he shot Victor because he feared for his own life as well as the lives and safety of other officers, first responders and members of the public is one that a reasonable jury could reject.  After all, Deputy Hunady and his colleagues were not standing out in the open, but instead had taken cover behind a fire truck.  In the light most favorable to plaintiff, the record shows that Victor was not aggressive, was not advancing at the time of the shooting, was standing still approximately 20 feet from Deputy Hunady, and appeared disoriented or in shock from the accident.  It is also significant that Victor was within range of Deputy Hunady's Taser, which he had on his person and available to deploy at any time had he elected to do so.  Another relevant consideration is that during the entire time that they shouted commands at Victor from behind the safety of the fire truck, neither Deputy Hunady nor any other officer on the scene ever warned to Victor that he would be shot if he failed to comply with commands to "drop it," "stop advancing," and the like.

The Eleventh Circuit has explained that "[t]he use of deadly force is more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm …; and the officers either issued a warning or could not feasibly have done so before using deadly force."  *Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (citations and internal quotation marks omitted).  As discussed above, the summary judgment record may be reasonably viewed as showing that Victor did not pose an immediate threat of serious physical harm to anyone at the time of the shooting.  Not only is the video evidence subject to multiple interpretations as to Victor's actions, but in his 15 minutes on the scene Deputy Hunady had neglected to take any steps to ascertain whether anyone had actually seen Victor with a weapon and instead traded in speculation that he "possibly" or "supposedly" might be armed.

---

[10]     In arguing otherwise, defendants rely "upon the report of Victor having a weapon."  (Doc. 32, PageID.439.)  In Deputy Hunady's own words, though, his understanding at the time was nothing more than "the subject possibly being armed."  (Hunady Decl., ¶ 4, doc. 29-15, PageID.384.)  Deputy Hunady was operating under nothing more than an unconfirmed, uncorroborated "possibility" that Victor possessed a weapon.

Additionally, Victor had not committed – and was not suspected of having committed – any offense, much less a crime that involved infliction of serious physical harm to anyone. And Deputy Hunady failed to issue a warning to Victor, although it plainly would have been feasible for him to do so before resorting to the use of deadly force.[11]

In briefing the excessive force issue, both sides have relied on *Davidson v. City of Opelika*, 675 Fed.Appx. 955 (11th Cir. Jan. 17, 2017). Notwithstanding its unpublished status, *Davidson* is instructive for the analysis here. In *Davidson*, a police officer was dispatched to the scene when an erratic driver collided with an 18-wheeler on an interstate highway at night. As the driver exited the vehicle, he withdrew his wallet from his pocket. The officer, who had his gun drawn and his spotlight trained on the vehicle, yelled twice, "Let me see your hands." The driver brought his hands together, and extended them outward toward the officer, with his wallet visible over the top of his hands. When he did so, the officer fired two shots, one of which struck the driver. The Eleventh Circuit concluded that the officer was entitled to qualified immunity, reasoning as follows:

> "The positions of the object and Davidson's hands – established by the video – are key. To be clear, Davidson exiting his vehicle, reaching behind himself, and holding an unidentified object would not have been sufficient to make Hancock's use of deadly force reasonable under the circumstances. But the unusual position of the dark object in Davidson's outstretched and clasped hands would have led a reasonable officer to believe that Davidson was pointing a gun at him."

*Davidson*, 675 Fed.Appx. at 959. Likewise, Victor exiting his vehicle and holding an unidentified object in his wrapped hands could not suffice, without more, to make Deputy Hunady's use of deadly force reasonable. Unlike in *Davidson*, however, there is evidence supporting a reasonable inference that Victor's hands were not outstretched and were not

---

[11]     In that regard, the circumstances present here are markedly different from those in the Eleventh Circuit's very recent decision in *Thorkelson v. Marceno*, --- Fed.Appx. ----, 2021 WL 1100537 (11th Cir. Mar. 23, 2021). In *Thorkelson*, the suspect raised her gun (which was later determined to be a Pumpmaster BB gun, although the officers did not know it at the time) to her shoulder with her finger on the trigger, and aimed it at an officer, prompting another officer to shoot her in the chest. The Eleventh Circuit concluded that no warning was necessary in those circumstances because "Captain Casale shot Thorkelson only when she posed an imminent threat to a defenseless officer. Captain Casale was not required to warn Thorkelson before firing when that delay might have cost Deputy Linn his life." *Id.* at *3. By contrast, Deputy Hunady had ample time to warn Victor, and there was never a time when Victor posed an imminent threat to a defenseless officer or member of the public.

clasped.  There was no "dark object" in this case because the incident occurred in broad daylight and only the cloth wrapped around Victor's hands was visible.  Whereas the *Davidson* officer had just three seconds to evaluate and react to the situation, Deputy Hunady had ample time on the scene before the confrontation to marshal resources and devise contingencies to preserve life and maximize safety for everyone involved.  Indeed, Deputy Hunady observed Victor walking slowly and unsteadily up the muddy embankment for more than a minute before shooting him.  Unlike the *Davidson* officer, Deputy Hunady had cover in the form of the fire truck behind which he was positioned.  Plaintiff's evidence is that Victor was not advancing when he was shot, but that he was "just standing there."  In short, the circumstances in *Davidson* that rendered the use of deadly force reasonable, as a matter of law, are wholly lacking here when the record is viewed in the light most favorable to plaintiff.  Victor's acts of exiting his vehicle (which he did in compliance with Deputy Hunady's commands) and holding something wrapped in cloth in his hands as he walked haltingly toward the shielded officers were simply not enough to make Deputy Hunady's use of deadly force reasonable as a matter of law under the circumstances.  On this record, given the factual disputes and the multiple conflicting reasonable interpretations of the evidence, the question of the objective reasonableness *vel non* of Deputy Hunady's use of deadly force against Victor is one for the jury to resolve at trial, not for this Court to decide on summary judgment.

In so concluding, the undersigned has carefully heeded the appellate courts' stern admonition against armchair-quarterbacking the decisions of law enforcement officers in the field in tense, rapidly evolving circumstances.  Indeed, the Court recognizes that "[i]n making an excessive force inquiry, we are not to view the matter as judges from the comfort and safety of our chambers, fearful of nothing more threatening than the occasional paper cut as we read a cold record accounting of what turned out to be the facts."  *Crosby v. Monroe County*, 394 F.3d 1328, 1333-34 (11th Cir. 2004).  Likewise, the Supreme Court has instructed that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation."  *Ryburn v. Huff*, 565 U.S. 469, 477, 132 S.Ct. 987, 181 L.Ed.2d 966 (2012).  That does not mean, however, that law enforcement officers are necessarily, automatically insulated from liability for their decisions in the field.  Where, as here, the record supports a reasonable determination that the use of deadly force was not objectively reasonable, judges must say so.  Importantly, this was not a split-second decision by Deputy

Hunady.  He had more than ten minutes on the scene to formulate plans and make arrangements to safeguard the lives of everyone involved.  Although defendants protest that "Victor controlled the entire scene" (doc. 39, PageID.776), a jury could conclude that is simply not true.  Indeed, it would be reasonable on this record to find that Deputy Hunady controlled the scene by continually commanding Victor to step out of the vehicle, rather than allowing him to remain there until more help (and appropriate specialized resources) could be called.  Deputy Hunady had time to plan for what would happen if and when Victor did exit the vehicle and behaved erratically (which was entirely foreseeable given the reports of his erratic behavior inside the vehicle before Deputy Hunady arrived on the scene).  He had time to make arrangements for the safety of law enforcement, first responders and members of the public.  He had time to speak with witnesses to determine what, exactly, they had seen that might "possibly" have been a gun when they interacted with Victor.  He had time to consider non-lethal force options, such as the Taser he was carrying on his person.  He had time to consider calling in the BCSO's negotiation team.  All of these elements were within Deputy Hunady's control, not Victor's.  A reasonable jury could conclude, without running afoul of the judicial deference paid to police officers making split-second decisions in dangerous situations, that Deputy Hunady mismanaged those elements and violated Victor's Fourth Amendment rights by unreasonably using deadly force to subdue him in a situation that posed no imminent threat.[12]

Having found that genuine issues of material fact remain as to whether Deputy Hunady violated a constitutional right of Victor's, the Court now turns to the "clearly established" prong of the qualified immunity analysis.  "[A]lthough officials must have fair warning that their acts

---

[12]    Last month, the Eleventh Circuit adopted a test for analyzing excessive force claims in the context of an officer responding to a medical emergency, rather than making an arrest.  In such a case, the Eleventh Circuit determined, "courts should ask: (1) Was the person experiencing a medical emergency that rendered him incapable of making a rational decision under circumstances that posed an immediate threat of serious harm to himself or others? (2) Was some degree of force reasonably necessary to ameliorate the immediate threat? (3) Was the force used more than reasonably necessary under the circumstances (*i.e.*, was it excessive)?"  *Helm v. Rainbow City, Alabama*, 989 F.3d 1265, 1273 (11th Cir. 2021) (citation omitted).  "If the answers to the first two questions are 'yes,' and the answer to the third question is 'no,' then the officer is entitled to qualified immunity."  *Id.* at 1274 (citation omitted).  If the *Helm* test were applied here, a reasonable finder of fact could conclude that the answer to the third question is "yes" even if the answers to the first two questions were "yes" (which is debatable).  For that reason, as well, qualified immunity is inappropriate here.

are unconstitutional, there need not be a case on all fours[] with materially identical facts, … so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Salvato*, 790 F.3d at 1294 (citation and internal quotation marks omitted). "Moreover, a plaintiff can point to a broader, clearly established principle [that] should control the novel facts in [her] situation." *Id.* (citation and internal quotation marks omitted). Without question, "the standard for excessive force is clearly established." *Id.* Defendants articulate no persuasive argument, and the Court is aware of none, that might support a conclusion that it was not clearly established that using deadly force on Victor in the circumstances described above violated the Fourth Amendment. If the facts are taken in the light most favorable to plaintiff, then Deputy Hunady used deadly force on a subject who was not behaving aggressively, who did not pose an imminent threat to anyone, who appeared dazed and confused after being injured in a car accident, and who was following the officers' instructions by exiting his vehicle and walking slowly toward them, all because he was holding an unidentified object wrapped in cloth in his injured hands. There is no plausible argument that a reasonable officer would not have known the use of deadly force to be a constitutional violation in those circumstances. Therefore, the Court readily concludes that plaintiff has satisfied the "clearly established" prong of the qualified immunity test.[13]

For all of the reasons, Deputy Hunady is not entitled to qualified immunity from plaintiff's § 1983 claims arising from the fatal shooting of Victor. The Motion for Summary Judgment is **denied** as to this issue.

### B. *Qualified Immunity and Sheriff Mack.*

Next, defendants move for summary judgment in favor of defendant Sheriff Mack on the basis of qualified immunity. Defendants' position is that "this case involves an isolated incident involving a single deputy sheriff. Thus, Plaintiff cannot demonstrate that Sheriff Mack acted

---

[13]    Defendants correctly state that "[i]n the context of deadly force, the appropriate standard is that law enforcement officials are entitled to qualified immunity unless every reasonable officer in their position inevitably would conclude that deadly force was unnecessary and thus unlawful under the circumstances." (Doc. 32, PageID.443 (citing *Santana v. Miami-Dade County*, 688 Fed.Appx. 763, 770 (11th Cir. May 17, 2017)).) If the summary judgment record is viewed in the light most favorable to plaintiff, every reasonable officer in Deputy Hunady's position would conclude that deadly force was unnecessary and thus unlawful under the circumstances; therefore, the "clearly established" prong is satisfied.

unconstitutionally.  Nor can Plaintiff demonstrate that he acted in violation of clearly established law under a qualified immunity analysis."  (Doc. 32, PageID.447.)

It is well-settled, of course, that supervisory liability exists under § 1983 for subordinates' constitutional violations only when the supervisor either "personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation."  *Matthews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007) (citation omitted).  Plaintiff argues that sufficient evidence of a causal connection exists to create a jury question, predicated on the notion that Sheriff Mack's failure adequately to train BCSO deputies evinces deliberate indifference to constitutional rights.  Such a theory of supervisory liability is cognizable under applicable law.  *See, e.g., Keith v. DeKalb County, Georgia*, 749 F.3d 1034, 1052 (11th Cir. 2014) ("[U]nder § 1983, a supervisor can be held liable for failing to train his or her employees only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact.") (citations and internal quotation marks omitted).

There is no dispute that Sheriff Mack was responsible for training BCSO deputies and setting BCSO policy at all relevant times; indeed, he testified that he is "the highest level" at BCSO and that he is "known as the governor."  (Doc. 29-1, PageID.188.)  In support of the failure-to-train theory, plaintiff identifies the following purported defects in BCSO training protocols for deputies such as Deputy Hunady during the relevant time period: (i) no specific training on armed, barricaded subjects; (ii) no specific training for subjects who are suicidal or otherwise under severe mental distress; and (iii) no de-escalation training of any kind until 2019, two years after this incident.  (*Id.*, PageID.189-90.)

Moreover, plaintiff's expert has opined that the actions of Deputy Hunady and the other BCSO deputies on the scene on the day of the Victor shooting reveal a host of glaring training deficiencies, to-wit: (i) "the only implementation of a strategy or tactic for dealing with someone presenting as Victor did, was Hunady yelling to Victor that he wanted to help him;" (ii) "it was clear and obvious that Victor was in some manner mentally compromised," yet the BCSO officers did not implement "police procedures that were clearly called for," and there is no evidence that Sheriff Mack had ever provided them such training; (iii) "I cannot see where, if proper police procedures, tactics, and policy were implemented that there would be the necessity for a 'split second' decision by Hunady;" (iv) a reasonable, trained police officer would handle a

barricaded subject like Victor by using minimally intrusive techniques, establishing a perimeter, weighing the need to apprehend the subject against the challenges of compelling the subject to submit to police authority, standing down when appropriate, requesting appropriate and specialized resources such as SWAT teams with bullet resistant shields and less lethal munitions, providing psychological services, debriefing witnesses, and so on, none of which Deputy Hunady or any of the BCSO officers on the scene followed. (Doc. 35-9, PageID.721-724.) Likewise, plaintiff's expert opined that the BCSO deputies failed to follow, and apparently had not been trained in, well-established procedures and protocols for handling suicidal or mentally unstable subjects, such as (i) not barking orders at a subject who does not appear armed; (ii) calling in crisis intervention teams or other specialized resources with mental illness training; (iii) not pointing a firearm at the subject; and (iv) slowing it down and taking time to resolve the issue without loss of life. (*Id.*, PageID.725-26.) Plaintiff's evidence is that in the absence of such training, "we have a case of a reckless disregard to a known risk of harm by the fact that [BCSO deputies] were not given instruction about how to handle this." (Doc. 35-5, PageID.647.)

Defendants' rejoinder to plaintiff's failure-to-train argument is neither to present evidence that such training was actually furnished nor to assert that such training was unnecessary or causally disconnected from the Victor shooting. They do not argue that Sheriff Mack adequately trained Deputy Hunady and other BCSO deputies in these areas. They do not argue that training on these topics was not important for the tasks that BCSO deputies must perform on a usual and recurring basis in the field. Instead, defendants place their entire focus on the legal argument that Sheriff Mack cannot be liable on a failure-to-train theory in the absence of a "pattern of similar unconstitutional conduct by Baldwin County deputy sheriffs." (Doc. 32, PageID.447.) Simply put, defendants say Sheriff Mack is entitled to qualified immunity because there is no evidence of any such pattern of misconduct, which is a necessary precondition for a finding of deliberate indifference.

The trouble with defendants' position is that, even under the authorities they cite, such a pattern of violations is not always required. *See, e.g., Connick v. Thompson*, 563 U.S. 51, 62, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) ("A pattern of similar constitutional violations by untrained employees is ***'ordinarily necessary'*** to demonstrate deliberate indifference for purposes of failure to train.") (emphasis added and citation omitted). "Ordinarily necessary"

does not equate to "always necessary."  To that end, the Supreme Court has explained the

relevant principles as follows:

> "[W]e did not foreclose the possibility that evidence of a single violation of
> federal rights, accompanied by a showing that a municipality has failed to train its
> employees to handle recurring situations presenting an obvious potential for such
> a violation, could trigger municipal liability.
>
>           \*                          \*                          \*
>
> "[I]n a narrow range of circumstances, a violation of federal rights may be a
> highly predictable consequence of a failure to equip law enforcement officers
> with specific tools to handle recurring situations.  The likelihood that the situation
> will recur and the predictability that an officer lacking specific tools to handle that
> situation will violate citizens' rights could justify a finding that policymakers'
> decision not to train the officer reflected 'deliberate indifference' to the obvious
> consequence of the policymakers' choice – namely, a violation of a specific
> constitutional or statutory right.  The high degree of predictability may also
> support an inference of causation – that the municipality's indifference led
> directly to the very consequence that was so predictable."

*Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409-10, 117 S.Ct. 1382,

137 L.Ed.2d 626 (1997).

Plaintiffs' evidence is that circumstances like Victor's are both common and recurring in

law enforcement officers' daily activities, and that there is an obvious potential for a subject's

federal rights to be violated in that situation.  Indeed, plaintiffs' expert opines that there were as

many as 1,000 officer-involved shootings during the 2015-2018 period involving circumstances

such as Victor's, where the subject appeared to be in a mental health crisis, was not behaving

like a criminal offender, exhibited aggressive or strange behavior, and was unarmed.  (Doc. 35-9,

PageID.724-25.)  Approximately 29% of officer-involved shootings involve these recognized

circumstances.  (*Id.*, PageID.724.)  As such, plaintiff has made an adequate showing that this is

the kind of recurring situation presenting an obvious, highly predictable potential for violation

that can trigger liability for failure to train, even in the absence of a pattern of violations.  In

other words, under the Supreme Court's reasoning in *Brown*, a finding of deliberate indifference

can attach to Sheriff Mack's failure to provide training to BCSO deputies in the specified areas

(*i.e.*, barricaded subjects, subjects with mental health crises, de-escalation tactics and strategies,

etc.) even in the presence of a single constitutional violation, given the recurring nature of the

situation and the predictability that an officer lacking specific tools to handle that recurring

situation will violate a subject's federal rights.

For all of the foregoing reasons, "[g]iven this state of the law, as well as the conflicting evidence in this case, whether [Sheriff Mack] was deliberately indifferent is a question that should have been left to a jury. … In viewing the evidence in the light most favorable to [Chisesi], the nonmovant, we conclude genuine disputes of material fact remain on this element." *Favors v. City of Atlanta*, --- Fed.Appx. ----, 2021 WL 915355, *6 (11th Cir. Mar. 10, 2021); *see also Brown*, 520 U.S. at 409 ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected deliberate indifference'….").)[14]

### C. Other Legal Issues Raised on Summary Judgment.

A pair of other legal issues raised in defendants' Motion for Summary Judgment must be addressed at this time.  First, defendants contend that Count I, the § 1983 wrongful death claim against Deputy Hunady, must be dismissed because it abated under Alabama law upon Victor's death.  In particular, defendants rely on *Estate of Gilliam ex rel. Waldroup v. City of Prattville*, 639 F.3d 1041 (11th Cir. 2011), for the proposition that, under Alabama Code § 6-5-462, a § 1983 excessive force claim not filed prior to the decedent's death abates under Alabama law. *See id.* at 1050.  The trouble with this line of reasoning is that *Gilliam* is distinguishable on its face.  In *Gilliam*, the Eleventh Circuit explained, "We stress at the outset that this case, in its present procedural posture, does not involve a claim that the officers' unconstitutional conduct caused the decedent's death. … Therefore, the only issue we address is *whether a § 1983 excessive force claim that did not result in the decedent's death* survives in Alabama or abates under Ala. Code § 6-5-462." *Id.* at 1044-45 (emphasis added).  In stark contrast to *Gilliam*, this case involves a § 1983 claim that did result in the decedent's death.  As such, the *Gilliam* analysis and reasoning are not instructive here.  Movants offer neither argument nor authority in support of any possible expansion of *Gilliam* to reach Count I, which is a § 1983 wrongful death

---

[14]     As for the "clearly established" prong of the qualified immunity analysis, defendants advance no argument and make no showing that these principles were not clearly established at the time of the allegedly violative failure to train by Sheriff Mack.

claim based on alleged excessive force by Deputy Hunady. The Court will not apply *Gilliam* to dismiss Count I.[15]

Second, defendants argue that Count III, a § 1983 *Monell* liability claim against Sheriff Mack, is inapplicable as a matter of law. As pleaded in the Complaint, Count III specifically is framed as a claim for "*Monell* liability" predicated on the notion that, "Where a municipality's failure to supervise causes a constitutional violation, and such a failure reflects deliberate indifference to constitutional rights, the municipality may be found liable under 42 U.S.C. § 1983." (Doc. 1, ¶ 66, PageID.8.) That is an accurate statement of a *Monell* theory of liability. *See, e.g., Pierce v. Clayton County, Georgia*, 717 Fed.Appx. 866, 874 (11th Cir. Nov. 21, 2017) ("*Monell* imposes liability on municipalities for deprivations of constitutional rights visited pursuant to municipal policy, whether that policy is officially promulgated or authorized by custom.") (citation omitted). But plaintiff has sued Sheriff Mack only in his individual capacity, not his official capacity. She has not sued Baldwin County or the Baldwin County Sheriff's Office, nor has she otherwise sought to impose liability on the County or any municipality for policies that Sheriff Mack may be alleged to have formulated on behalf of the County, the BCSO or any municipal entity. Plaintiff has offered no legal explanation how a *Monell* claim could be proper against Sheriff Mack in his individual capacity under the circumstances presented here. As such, the Court agrees with defendants that a *Monell* claim is not cognizable against this defendant as pleaded in the Complaint; therefore, the Motion for Summary Judgment is **granted** as to Count III. Nothing herein affects plaintiff's claim in Count IV against Sheriff Mack for supervisory liability in his individual capacity under § 1983.

---

[15] In passing, defendants also suggest, with neither elaboration nor citations to authority, that Count I's reference to a "duty to use reasonable care" is fatal to the claim and that Count I must be dismissed as duplicative of the Count II excessive force claim. (Doc. 32, PageID.433.) The Court declines to develop these fragmentary arguments for movants on summary judgment; however, the issue of whether Count I is properly dismissed as duplicative of Count II will be addressed at a later date after plaintiff is given fair notice and an opportunity to be heard.

**IV.     Conclusion.**

For all of the foregoing reasons, defendants' Motion for Summary Judgment (doc. 30) is **granted** as to Count III (*Monell* claim against Sheriff Mack) and that claim is **dismissed**.  In all other respects, the Motion for Summary Judgment is **denied**.

DONE and ORDERED this 19th day of April, 2021.

s/WILLIAM E. CASSADY
UNITED STATES MAGISTRATE JUDGE